**07 CV 11123**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
VOYAGER SHIPHOLDING CORP.

                      Plaintiff,

- against -

HANJIN SHIPPING CO., LTD.,

                      Defendant.
-------------------------------------------------------X



## VERIFIED COMPLAINT

Plaintiff VOYAGER SHIPHOLDING CORP. (hereinafter "Voyager") by and through its attorneys, Lennon, Murphy & Lennon, LLC, as and for its Verified Complaint against the Defendant, HANJIN SHIPPING CO., LTD. (hereinafter "Hanjin" or "Defendant"), alleges, upon information and belief, as follows:

1. This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and 28 United States Code § 1333. Jurisdiction over this matter is also present pursuant to the Federal Arbitration Act, 9 United States Code § 1 *et seq.*, and this Court's federal question jurisdiction, 28 United States Code § 1331.

2. At all times material to this action, Voyager was, and still is, a foreign company duly organized and operating under foreign law with offices at Majuro, Marshall Islands.

3. Upon information and belief, Defendant Hanjin was, and still is, a foreign corporation, or other business entity organized and existing under South Korean law, with an office at Seoul.

4. At all material times Voyager was the Owner of the M/V KEN.

5. Pursuant to a charter party dated May 7, 2004, Voyager time chartered the M/V KEN to Defendant Hanjin for the carriage of cargo.

6. During the course of the charter party, certain disputes arose between Voyager, as Owner, and Hanjin, as Charterer, relating to the payments due and owing to Voyager.

7. Pursuant to the Clause 17 of the May 7, 2004 charter party all disputes between the parties are to be submitted to arbitration in the city of London, England with English Law to apply.

8. Defendant Hanjin commenced arbitration proceedings against Voyager, which are currently pending.

9. Voyager has asserted counterclaims against Defendant Hanjin in said arbitration proceedings in the amount of **$85,750.00.**

10. Despite due demand, Defendant Hanjin has failed and/or refused to pay the sums due and owing to Plaintiff.

11. Interest, costs and attorneys' fees are routinely awarded to the prevailing party in arbitration pursuant to English Law. As best as can now be estimated, Plaintiff expects to recover the following amounts in the arbitration:

| | | |
|---|---|---:|
| A. | Principal Claim: | $85,750.00 |
| B. | Estimated Interest on claims:<br>2 years at 7%, compounded quarterly | $19,825.85 |
| C. | Attorneys' fees: | $75,500.00 |
| D. | Arbitration costs/expenses: | $61,000.00 |
| **Total** | | **$242,075.85** |

A copy of the Declaration of Douglas Bateson, which addresses the quantum of arbitration legal fees and costs, is attached hereto as Exhibit 1.

other funds held by any garnishee within the District which are due and owing to the Defendant, in the amount of $242,075.85 calculated to date to secure the Plaintiff's claim, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

D. That this Court recognize and confirm any arbitration award(s) or judgment(s) rendered on the claims set forth herein as a Judgment of this Court;

E. That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

F. That this Court award Plaintiff its attorneys' fees and costs incurred in this action; and

G. That the Plaintiff have such other, further and different relief as the Court may deem just and proper.

Dated: December 10, 2007
New York, NY

The Plaintiff,
VOYAGER SHIPHOLDING CORP.

By: _____
Patrick F. Lennon
Nancy R. Peterson
LENNON, MURPHY & LENNON, LLC
420 Lexington Ave., Suite 300
New York, NY 10170
(212) 490-6050 – phone
(212) 490-6070 – fax

## ATTORNEY'S VERIFICATION

State of New York    )
                     )   ss.:   Manhattan
County of New York   )

1. My name is Nancy R. Peterson.

2. I am over 18 years of age, of sound mind, capable of making this Verification, and fully competent to testify to all matters stated herein.

3. I am an attorney in the firm of Lennon, Murphy & Lennon, LLC, attorneys for the Plaintiff.

4. I have read the foregoing Verified Complaint and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

5. The reason why this Verification is being made by the deponent and not by the Plaintiff is that the Plaintiff is a business organizations with no officers or directors now within this District.

6. The source of my knowledge and the grounds for my belief are the statements made, and the documents and information received from, the Plaintiff and agents and/or representatives of the Plaintiff.

7. I am authorized to make this Verification on behalf of the Plaintiff.

Dated:    December 10, 2007
          New York, NY

                                            _____
                                            Nancy R. Peterson

EXHIBIT "I"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
VOYAGER SHIPHOLDING CORP.

                         Plaintiff,

   - against -

HANJIN SHIPPING CO., LTD.,

                         Defendant.
----------------------------------------------------------------X

## DECLARATION OF DOUGLAS WILLIAM BATESON

I, Douglas William Bateson, declare under penalty of perjury of the laws of the United States of America as follows:

1. I am a solicitor of the Supreme Court of Judicature of England and Wales and a partner in the English law firm Thomas Cooper. I am the managing partner of their Athens office. I have practiced in the area of maritime law for the past 25 years.

2. I act for the Plaintiff herein, Voyager Shipholding Corp. ("Voyager") in relation to the London arbitration proceeding between Voyager and the Defendant, Hanjin Shipping Co., Ltd. ("Hanjin") regarding the claims which are the subject of Voyager's Verified Complaint in this action.

3. I submit this Declaration in support of Voyager's request for an ex parte order for the issuance of process of maritime attachment and garnishment.

4. In particular, I wish to address the quantum of legal fees and costs that Voyager will recover in the London arbitration proceeding and to explain the basis for thereof.

5. Costs are recoverable under English law before the courts and in arbitration and typically the costs recoverable by the winning party will be awarded on a standard basis which

means that the burden of proof for showing that the costs were reasonably incurred and therefore recoverable rests with the winning party. Usually this will result in a 65% to 70% recovery of attorney fees and the disbursements etc. incurred.

6. In this case, the Defendant, Hanjin, arrested Voyager's vessel in South Africa in order to obtain security for its own claims. Hanjin have filed an affidavit (which I attach hereto as Exhibit "1") which asserts their recoverable costs in the London arbitration as GBP 200,000, which I understand was admitted to be an error and adjusted to USD $200,000, which had to be posted by Voyager. The $200,000 of security in respect of legal fees and arbitration costs is more than the amount of Hanjin's claim.

7. It is the reality of London arbitration that the costs may exceed the amount of the claim and the smaller the claim the more likely this is to happen.

8. Voyager has a claim against Hanjin for USD $75,000 plus interest and costs.

9. In this case we will need an expert to explain in the arbitration the damages sustained by Voyager, and his costs including attendance at the hearing may well be in the range of GBP 20,000.

10. Voyager's expenses claim in respect of costs disbursements in relation to the London arbitration will be approximately GBP 3,000.

11. Legal fees in respect of Voyager's need to retainer counsel (a barrister) in respect of establishing its claim in the arbitration may well cost GBP 15,000.

12. The arbitrators' fees for Voyager's claim are likely to be GBP 7,500.

13. All of the foregoing costs should be recoverable in full.

14. The legal fees for my firm's representation of Voyager in the arbitration, including attendance at the hearing in relation to the claim will be approximately GBP 35,000 of which as stated above, about 65% will be recoverable or GBP 22,750.

15. The sum total of all of Voyager's anticipated costs and legal fees, as described above, are therefore reasonably calculated a GBP 68,250, or approximately USD $136,500.

16. To emphasize, the above described legal fees and costs will be costs that Voyager will be entitled to recover in the arbitration as the prevailing party.

17. Finally, I wish to further explain that the foregoing costs and legal fees are in relation solely to Voyager's claim in the arbitration, and bear no relationship to the anticipated costs and legal fees that Voyager will incur in defending Hanjin's claim in the arbitration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 3rd, 2007 at Athens, Greece.

_____
Douglas William Bateson

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
VOYAGER SHIPHOLDING CORP.

              Plaintiff,

  - against -

HANJIN SHIPPING CO., LTD.,

             Defendant.
----------------------------------------------------------------X

**EXHIBIT "1" TO DECLARATION
OF DOUGLAS WILLIAM BATESON
DATED 3ʳᴰ DECEMBER 2007**

IN THE HIGH COURT OF SOUTH AFRICA
DURBAN AND COAST LOCAL DIVISION
EXERCISING ITS ADMIRALTY JURISDICTION         CASE NO: A    /2007
NAME OF SHIP: mvs "KEN" and "MARK"

In the matter between:

HANJIN SHIPPING CO. LTD                                    Applicant

and

mv "KEN"                                                  Respondent

AND IN THE MATTER of an *ex parte* application for the arrest of mv "KEN" in terms of Section 5(3) of the Admiralty Jurisdiction Regulation Act, No. 105 of 1983.

---

## AFFIDAVIT

---

I, CATHERINE VIVIEN PITMAN, make oath that:

**1**

I am an attorney of the High Court of South Africa and practise as such as a director of GARLICKE & BOUSFIELD INC., at 24th Floor, Durban Bay House, 333 Smith Street, Durban, Kwa-Zulu Natal.

**2**

I am duly authorised on behalf of the applicant to depose to this affidavit and to bring this application on its behalf.

**3**

The matters deposed to in this affidavit are to the best of my knowledge and belief, true and correct and, to the extent that any allegations of fact are hearsay, the information upon which they are based has been made available to me by telephone and telefax copier messages from Ian Hawkes and Eduardo Prim, a partner and assistant respectively of the applicant's London solicitors, MFB of 45 Moorfields, London, which is a firm of maritime and insurance lawyers that operates in specialised fields: the carriage of goods by sea; the commercial operation of ships; the sale and purchase of goods; insurance and reinsurance. Both Messrs Hawkes and Prim are solicitors of England and Wales.



Page 2

**4**

The applicant is Hanjin Shipping Co Ltd, a company duly incorporated and registered in accordance with the company laws of South Korea. The applicant is an owner and operator of ships and provides liner, bulk and logistics services. It operates about one hundred and forty five vessels that cover eighty major ports in thirty five countries. Additionally, it operates eleven dedicated terminal facilities. It has two hundred offices and third-party agents are spread across fifty three countries. It carries on business from its place of business at 25 – 11, Yoido-Dong, Youngdeungpo-Ku, Seoul, Korea.

**5**

The respondent is the motor vessel "Ken", owned by Voyager Shipholding Corporation, a company duly incorporated and registered in accordance with the company laws of the Marshall Islands ("owners"). The respondent is, as will become apparent, managed by Union Commercial Inc of 5-7 Kanari Street, Piraeus, Greece.

CLAIM 1

**6**

On 7 May 2004 and at New York the applicant and owners concluded a charterparty on an amended New York Produce Exchange Form of the respondent by owners to the applicant for eighteen months with the applicant having an option of a further two months, a copy of which is annexed hereto marked "CPV.1".

**7**

The respondent was duly delivered by owners to the applicant on 29 August 2004 at 20h30 Greenwich Mean Time ("GMT") and was subsequently redelivered by the applicant to owners on 18 February 2006 at 19h24 GMT.

**8**

The applicant has prepared a complete reconciliation of the financial relationship of the parties flowing from the charterparty, a copy of which is annexed hereto marked "CPV.2", and which shows the various payments and debts that have arisen during the period of the charterparty.

9

Page 3

9

The appears from the reconciliation the applicant claims that it is owed an amount of US$140,732.47.

10

I am advised that the items making up that balance under dispute by owners are items 6, 7, 8 and 9 on the reconciliation, all dealing with issues of the speed of the respondent in relation to fuel (both intermediate fuel oil and marine diesel oil) consumption.

11

In that respect in lines 9 and 10 of the charterparty owners promised that the respondent would be "... capable of steaming, full laden, under good weather conditions *throughout the currency of Charter Party* about *13.5/14* knots on a consumption of about *28 / 29 metric* tons of *IFO (380 CST) no MDO* at sea ...."

12

Furthermore, clause 45 of the charterparty provides-

"Speed / Consumption Ballast / Laden respectively:

Ballast: Abt 14KT/14.5KT on 28/29 MT

Laden: Abt 13.5KT /14KT on 28/29 MT

Always +0.1MT MDO"

13

Finally, additional clause 12 provides-

"Vessel's speed and consumption as per description. For the purpose of this Charter Party good weather condition is considered not to exceed Beaufort Scale 4 and Douglas Sea State 3."

14

I am advised by Messrs Hawkes and Prim that under English law the effect of those clauses taken together with the respondent's configuration, size, draft, trim, etc in respect of the particular voyages concerned is that the she would be required to achieve an average speed of 13.5 knots in a loaded condition on a consumption of 29 metric tonnes of

Page 4

10

intermediate fuel oil and 0.1 metric tonnes of Marine Diesel Oil in the weather conditions provided for in additional clause 12.

15

I annex hereto marked "CPV.3", "CPV.4", "CPV.5" and "CPV.6" calculations based on four different loaded voyages by the respondent from Suez to Penang in respect of a voyage from Liverpool to Penang in April 2005, Punto Cardon to Sepetiba in January 2005, Tubarao to Saldanha in February 2005 and Penang to Paradip in May 2005 respectively. All of the calculations, except that in respect of item 9, have been prepared by weather companies that have full details of weather and sea conditions on the route of the respondent at the time. These companies specialise in calculating speed relative to fuel consumption. The required speed of the respondent has been adjusted by them to compensate for any deleterious effect of wind and current on her during those voyages. The calculation in respect of item 9 was prepared by North China Shipping, the sub-charterers in respect of the respondent during that voyage. Messrs Hawkes and Prim have checked that calculation and found it to be in all respects correct.

16

The results of those calculations were reflected on the applicant's hire statement by converting the time lost due to slow speeds in number of hours to days or portions thereof and multiplying by the daily hire rate of US$25,500.00 and then deducting 2½ percent for the commission that had been paid on that hire by virtue of clause 28 of the charterparty. Any over consumption of Intermediate Fuel Oil and Marine Diesel Oil was reflected after multiplying the quantity over consumed by the price of the fuel paid for the fuel concerned.

17

In this respect I note that the applicant incorrectly reflected an under consumption of Marine Diesel Oil as an over consumption on its hire statement. Consequently, an amount of US$135.00 should be deducted from the total amount owed.

18

In the circumstances the applicant claims US$140,732.47 less US$135.00 from owners, being an amount of US$140,597.47.

19

The claims are subject to London arbitration and English law in terms of clauses 17 and 90

Page 5

of the charterparty and I am advised that Mr Patrick O'Donovan has been appointed sole arbitrator by the applicant and owners in respect of all disputes between the parties. Sub-charterers commenced arbitration proceedings in respect of their claim against the applicant in respect of item 9 and, consequently, the applicant has commenced arbitration proceedings against owners in respect of that item and submissions have been exchanged, both parties reserving rights to serve further submissions dealing with other issues. The submissions that have been exchanged run to over one hundred pages and, consequently, in order not to overburden these papers I do not annex them. I do, however, reserve the right to supplement these papers with them should the need arise. I am told that the factual allegations of the applicant in the submissions are all true and correct.

20

I am further advised by Messrs Hawkes and Prim that the claim is *prima facie* enforceable in terms of English law, that the arbitration is only likely to be concluded in respect of the claims five years from the time they arose, being May 2010, and that the arbitrator is likely to award interest at 6% compounded quarterly on the claims. On that basis the applicant requires security for interest in an amount of US$48,813.76.

21

Messrs Hawkes and Prim further instruct that the applicant's recoverable costs will conservatively be in an amount of £200,000.00 sterling including the costs of this application.

22

In the circumstances the applicant seeks security for its claim in the sum of US$140,732.47 in respect of the capital claim, US$48,813.76 in respect of interest thereon and £200,000.00 sterling in respect of legal costs.

CLAIM 2

23

On 13 December 2001 and at Seoul the applicant chartered the mv "Mark" ("the vessel") from Sea Fighters Marine Corporation ("Sea Fighters") on an amended New York Produce Exchange form ("the head charterparty"). During the course of that charter the applicant sub-chartered her to Daeyang Shipping Co Ltd ("Daeyang") of Seoul, South Korea at Seoul



Page 6

on 30 June 2003 on essentially back to back terms ("the Daeyang charterparty") and during the course of that charter Daeyang again sub-chartered her to STX Pan Ocean (then named Panocean Shipping Co Ltd ("Pan Ocean") of Seoul, South Korea on 28 April 2004, also on essentially back to back terms ("the Pan Ocean charterparty").

24

During the course of the Pan Ocean charterparty Pan Ocean supplied the vessel with 680.22 mt of Fuel Oil 380 and 60.20 mt of Marine Gas Oil at Balboa, Panama on or about 17 June 2004. Sea Fighters alleged that the fuel was not in accordance with the specification agreed in the head charterparty and refused to abide the instructions of Panocean in terms of lines 77 and 78 of clause 8 to proceed with the voyage until either the fuel was removed from the vessel or the applicant provided an undertaking on terms acceptable to it.

25

It was and remains the position of Pan Ocean as against Daeyang, Daeyang as against the applicant and the applicant as against Sea Fighters that the fuel was within contractual specification and that the refusal to abide the instructions to proceed with the voyage concerned constituted a breach of lines 77 and 78 of clause 8 of the relevant charterparties.

26

In order to break the deadlock and to avert further delays Daeyang arranged for the fuel to be replaced between 9 to 12 July 2004, always reserving its legal position and a right to recover all damages, costs and expenses from the applicant.

27

In terms of clauses 17 and 90 of the respective charterparties any disputes are subject to English law and London arbitration.

28

On 3 September 2004 an agreement was concluded between Sea Fighters, the applicant and Tide Marine Ltd, purchasers of the vessel, in terms of which Tide Marine Ltd became jointly and severally responsible with Sea Fighters for any and all claims of the applicant under the terms of the head charterparty on the day on which the agreement was signed and the Protocol of Delivery and Acceptance of the vessel between Sea Fighters and Tide Marine Ltd was executed. I annexed hereto marked "CPV.7" a copy of that agreement.



The applicant does not have knowledge of precisely when ownership in the vessel was transferred to Tide Marine Ltd but submits that the earliest it would have been transferred would have been when the Protocol of Delivery and Acceptance of the vessel between Sea Fighters and Tide Marine Ltd was executed, which is the time at which the applicant's claim against Tide Marine Ltd arose in terms of the tripartite agreement.

29

Daeyang subsequently commenced proceedings against the applicant to recover the losses and damages it allegedly incurred as a result having to replace the fuel.

30

The applicant has, in turn, commenced arbitration proceedings against Sea Fighters to recover whatever it has had to pay out to Daeyang on various grounds, including on the basis of a breach of the head charterparty. I annex hereto marked "CPV.8" a copy of the applicant's full claim submissions in that respect. I am instructed by Messrs Hawkes and Prim that the facts alleged by the applicant in those submissions are all true and correct, that the applicant's claims have arisen and are now *prima facie* enforceable in London arbitration under English law both against Sea Fighters and, in terms of the agreement between Sea Fighters, the applicant and Tide Marine Limited dated 3 September 2004, against Tide Marine Limited.

31

I am further advised by Messrs Hawkes and Prim that both the arbitration by Daeyang against the applicant and that by the applicant against Sea Fighters and Tide Marine Ltd are likely to take five years to conclude from the time the claim against arose in July 2004, with the latter arbitration trailing the former by roughly six months, and that the arbitrators are likely to award interest at 5% compounded quarterly.

32

Messrs Hawkes and Prim further instruct that the both Daeyang and the applicant's recoverable costs in their respective arbitrations will conservatively be in an amount of US$75,000.00 and US$125,000.00 respectively.

33

In the circumstances the applicant seeks security for its claim in the sum of

Page 8

33.1    US$248,060.80, being the expenses and losses claimed by Daeyang against the applicant;

33.2    US$86,041.06, in respect of interest thereon;

33.3    US$75,000.00 in respect of Daeyang's recoverable costs;

33.4    US$3,500.00, being the additional expenses and losses claimed by the applicant against Sea Fighters and Tide Marine Ltd;

33.5    US$10,379.52, in respect of an extra six months interest subsequent to the conclusion of the Daeyang arbitration;

33.6    US$125,000.00 in respect of the applicant's recoverable costs,

which total US$547,981.38.

**JURISDICTION**

34

The applicant's claims are maritime claims in terms of section 1(1)(j), (ee) or (ff) of the Admiralty Jurisdiction Regulation Act, No 105 of 1983 ("the Act") and this Honourable Court has jurisdiction in terms of Section 2(1).

35

The applicant has an action *in rem* against the respondent herself in terms of section 3(4)(b) of the Act in respect of claim 1 and is entitled to arrest the respondent as an associated ship in terms of section 3(6) and (7) in respect of claim 2.

36

In amplification thereof I annex hereto marked "CPV.9" a copy of a transcript from Equasis, the European Commission and the French Maritime Administration initiative to collate existing information on ships from both public and private sources and making it available on the Internet, that confirms the registered ownership of the respondent is currently held by owners.

Page 9

**37**

With regard to the control of:

37.1 owners at the present time;

37.2 Sea Fighters at the time claim 2 arose, being in July 2004 when it was the owner of the vessel; and

37.3 Tide Marine Ltd at the time claim 2 arose against it when it took transfer of ownership of the vessel,

I am instructed that all three companies are registered in the Marshall Islands and, as all shares issued are bearer shares, it is not possible without the assistance of the shareholders themselves to obtain direct evidence of the control of those companies.

**38**

In the circumstances Messrs Hawkes and Prim commissioned a report on behalf of the applicant by Gray Page Intelligence Services Limited, a copy of which I annexed hereto marked "CPV.10". In order not to overly burden these papers I do not annex a copy of the documents referred to in that report but will have them available at Court should they be required.

**39**

Based on the information referred to in that report that Intelligence Service concludes "... that the same person or persons that currently operate what may loosely be termed the Soufalos family shipping business" (page 1 of the report):

39.1 controlled owners on 26 February 2007, being the date on which the report was finalised, (page 7 of the report);

39.2 controlled Sea Fighters from May 2001 until the vessel was sold to Tide Marine Ltd (bottom of page 13 of the report); and

39.3 controlled Tide Marine Ltd from the time she took transfer of ownership of the vessel until she was sold in December 2006 (bottom of page 13 of the report).

**40**

I am further advised by Messrs Hawkes and Prim that Gray Page Intelligence Services



16
Page 10

Limited further believe that control of owners has not changed since 26 February 2007 and that, therefore, owners are still currently controlled by such person or persons.

41

In any event the applicant avers that the same person or persons that currently control owners also controlled Sea Fighters and Tide Marine Ltd at the time the claims arose against those parties and, accordingly, the respondent is an associated ship as contemplated in section 3(6) and (7) of the Act.

## GENUINE AND REASONABLE NEED FOR SECURITY

42

As far as the applicant is aware the only asset of Sea Fighters and Tide Marine Ltd was the vessel, which is now no longer owned by those companies.

43

Furthermore, the only asset of owners is, as far as the applicant is aware, the respondent, which is mortgaged and is, of course, susceptible to the usual perils of the seas on every voyage undertaken.

44

In the circumstances it is submitted that the applicant has a genuine and reasonable need for security in respect of both claims 1 and 2.

45

Section 3(10)(a) of the Act is inapplicable as neither security nor an undertaking have been provided to the applicant in respect of its claims in order to procure the release from arrest or attachment or to prevent such arrest or attachment.

## URGENCY

46

The National Ports Authority at Richards Bay has given an estimated time of arrival for the Respondent at Richards Bay as 11h59 tonight to load a consignment of coal at the

Richards Bay Coal Terminal. In making enquiries of how quickly she will load and sail after arrival I have been told by those with a good working knowledge of loading coal in Richards Bay that it is realistically possible for her to berth, load and sail before 06h00 tomorrow morning. In the circumstances it is submitted that this matter ought to be treated as one of urgency.

## THE ORDER PRAYED

### 47

It is submitted that the usual practice of not giving notice of the arrest application is appropriate in this matter for fear of the respondent attempting to avoid the arrest either by diverting away from this jurisdiction, by transferring her ownership or otherwise.

### 48

In circumstances where a claimant arrests in terms of the South African admiralty jurisdiction in order to commence proceedings in the above Honourable Court it is open to the owner of the property arrested to establish security in order to obtain the release of the property arrested and thereafter to apply to set aside the arrest, which, if successful, terminates the proceedings and so renders the security of no effect.

### 49

If, however, the owner of the property arrested takes a step in the proceedings which constitutes a submission (for example, pleading to the claim, requesting security or asking for a postponement) it is not thereafter open to him or her to apply to court to set aside the arrest and the security established is thereby rendered unimpeachable.

### 50

The owner of property arrested by a claimant in terms of section 5(3) of the Admiralty Jurisdiction Regulation Act, No. 105 of 1983 also has the right to establish security in order to obtain the release of the property arrested and thereafter to apply to set aside the arrest, which, if successful, renders the security of no effect.

### 51

However, a step in the proceedings secured by the arrest has no effect on the right of the