UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
VOYAGER SHIPHOLDING CORP.,                          :

                                    Plaintiff,      :           07 Civ. 11123 (GEL)

                                                    :           ECF CASE
        - against -                                 :

                                                    :
HANJIN SHIPPING CO., LTD.,                           :

                                                    :
                                    Defendant.      :
-------------------------------------------------------------------X


PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S MOTION FOR COUNTERSECURITY


LENNON, MURPHY & LENNON, LLC
*Attorneys for Plaintiff*
Voyager Shipholding Corp.
420 Lexington Ave., Suite 300
New York, NY 10170
(212) 490-6050
Facsimile (212) 490-6070

Patrick F. Lennon (PL 2062)
Nancy R. Peterson (NP 2871)

# TABLE OF CONTENTS

PRELIMINARY STATEMENT………………………………………………….....…1

FACTS……………………………………………………………………………….3

    The Underlying Claim………………………………………………………….3

    Plaintiff's Application for Security in New York…………………………..……5

ARGUMENT…………………………………………………………………..…7

POINT I
COUNTERSECURITY IS NOT WARRANTED BECAUSE
DEFENDANT'S COUNTERCLAIMS DO NOT ARISE OUT
OF THE SAME TRANSACTION OR OCCURRENECE AS PLAINTIFF'S
CLAIMS AND THUS ARE NOT COMPULSORY COUNTERCLAIMS………………………7

POINT II
THE LANGUAGE OF RULE E(7) IS NOT MANDATORY ……………………………...8

    A. The Standard of Law…………………………………………………………8

    B. Defendant has failed to allege prima facie valid counterclaims, and in so much as they
       have been properly alleged, which is denied, they are entirely frivolous……………10

        1. Hanjin's deceit claim is frivolous on its face and thus it is not a prima facie
           valid maritime claim……………………………………………………14

        2. Hanjin's speed and performance claims are frivolous and their sole purpose is
           to vex, harass or exact retribution on the Plaintiff…………………………...17

POINT III
AT MOST, DEFENDANT IS ONLY ENTITLED TO RECIPROCAL SECURITY……..…...20

CONCLUSION……………………………………………………………………….21

Plaintiff, Voyager Shipholding Corp. (hereinafter "Voyager" or "Plaintiff"), by its undersigned counsel, Lennon, Murphy & Lennon, LLC, files the within Memorandum of Law in Opposition to Defendant's Motion for Countersecurity. For the reasons set forth herein, the motion of Defendant, Hanjin Shipping Co. Ltd. ("Hanjin" or "Defendant"), should be denied.

## PRELIMINARY STATEMENT

In the context of a Rule E(7) application, a grant of countersecurity is far from automatic. Rule (E)(7) limits a countersecurity application to counterclaims arising from the same transaction or occurrence that is the subject of the original action. Furthermore, outside of the requirements of Rule E(7), as confirmed by the Second Circuit Court of Appeals, the Court has considerable discretion in deciding whether to order countersecurity. In exercising this discretion the Court should be guided by two principles; placing the parties on equal footing and preventing the imposition of such burdensome costs on a plaintiff that it might prevent it from bringing suit. *See Result Shipping Co. v. Ferruzzi Trading USA*, 56 F.3d 394 (2d Cir. 1995); *see also North Offshore AS v. Rolv Berg Drive AS,* 2007 U.S. Dist. LEXIS 87648, *4 (November 29, 2007).

In addition, the Court has the discretion to deny a countersecurity application for cause shown, including where the counterclaim is frivolous, speculative, and/or clearly lacking in merit or where the plaintiff is financially unable to post countersecurity. This principle has been reaffirmed recently in *North Offshore v. Rolv Berg Drive,* 2007 U.S. Dist LEXIS 87648, *7 (November 29, 2007). In *North Offshore,* Judge Stein denied an application for countersecurity under Rule E (7) stating that the defendant's claim appeared to be frivolous on its face. *North Offshore, supra.*

1

As will be more fully addressed herein, Defendant's motion for countersecurity should be denied because: (1) Defendant's counterclaim, or a large part thereof, does not arise out of the same transaction or occurrence as the claims of Plaintiff; (2) Defendant has failed to allege prima facie valid maritime claim(s); (3) Defendant's claims for countersecurity are frivolous; (4) Defendant's speed and performance claims have been waived (or are subject to collateral estoppel) as they were not raised in a prior proceeding to obtain security; and (5) equity favors the Plaintiff against the plain backdrop of the Defendant's contrived effort to obtain leverage.

Defendant is trying to "game" the system with its motion for countersecurity. Defendant would have the Court award it over $350,000.00 in countersecurity on highly speculative and frivolous claims, the sole purpose of which is to vex or harass the Plaintiff. By raising large (yet legally and factually unsound) counterclaims, Defendant is attempting to thwart Plaintiff's attachment.

Hanjin's counterclaims are the epitome of frivolous, *i.e.* they are vague, speculative and totally lacking in merit. Hanjin's deceit claim is wholly unsupported by any facts. The Master of the Vessel has submitted a declaration in this matter *definitively showing that the facts necessary to support Plaintiff's deceit claim are not present. See accompanying Vernan Declaration.* In addition, Defendant has failed to allege a legally sound claim for deceit under English Law, as it has failed to identify any false or misleading statement made by the Plaintiff upon which it relied in paying Plaintiff for the early redlivery of Plaintiff's vessel under the parties' charter party contract.

As to Defendant's remaining claims for the Vessel's speed and performance during the course of the charter party, a cursory review of the time line of events reveals that they have been

asserted solely as retaliation in response to Plaintiff's commencement of this action and should be deemed waived and/or Hanjin should be estopped from raising them on an equitable basis.

As Defendant has failed to meet the requirements of Rule E(7) and/or good cause has been shown, Defendant's motion for countersecurity should be denied.

## FACTS

The background facts are set forth in full in the accompanying Declarations of Joel. E. Varnal (Master of the M/V KEN) ("Varnal Declaration"), Plaintiff's foreign counsel, Douglas William Bateson ("Bateson Declaration") and Plaintiff's New York counsel, Nancy R. Peterson ("Peterson Declaration"). However, a short summary of the facts germane to this application is provided below.

### The Underlying Claim

Pursuant to a charter party dated May 7, 2004, Plaintiff Voyager chartered the Vessel "KEN" to Hanjin for the carriage of cargo. Under the charter party, the earliest the Vessel could be redelivered was March 1, 2006. However, Hanjin redelivered the Vessel on February 18, 2006 in breach of the charter party. Under English Law, where the redelivery date falls short of the minimum warranted period under the charter party, charterers can be held liable to compensate the owner of the vessel for the period between the early redelivery date and the minimum warranted period.

Upon redelivery, Plaintiff made reasonable mitigation efforts to seek new employment for the Vessel in order to mitigate its damages. Plaintiff ultimately arranged to have the Vessel chartered to new charterers with a commencement date of February 23, 2006.

In the meantime, while searching for employment, Plaintiff had the Vessel's Docking and Intermediate Survey conducted. The Vessel was in no way due for this survey, which could have

3

been performed at any opportune port and without any interference to the operation or employment of the Vessel. As attested by the Master, the survey only took 7 ½ hours and was completed by divers.  And, while it took place on February 21, 2006 between the hours of 10:30 a.m. and 6:00 p.m., it also could have easily taken place without loss of time when the Vessel was redelivered on February 18, 2006.

The survey was conducted because the Vessel was idle during the time between the early redelivery by Defendant and the commencement of her next employment under the mitigation charter party contract.  Hanjin redelivered the Vessel early, the Plaintiff was searching for alternate employment and the Vessel was not otherwise employed.  Thus, it was only logical that routine surveys be conducted during the time the Vessel was otherwise idle and unemployed. Using the idle time to conduct surveys while continually searching for employment provides no basis for Hanjin to escape its liability for redelivering the Vessel early.

Rather, notwithstanding the survey, Plaintiff maintained an early redelivery claim against Hanjin for the hire which it would have been earned during the period of February 18, 2006 to February 23, 2006.  Ultimately, Hanjin paid Plaintiff $125,377.66 in full and final settlement of the redelivery claim.

Subsequent to the above, in 2007, Hanjin arrested the Vessel in South Africa for security for other alleged claims unconnected with the early redelivery claim which had been settled, not only in relation to the "KEN" charter party dated May 7, 2004, but also for claims in relation to other vessels.  During the arrest proceedings, Hanjin's counsel submitted an Affidavit affirmatively representing to the court that in making the application, Hanjin "prepared a complete reconciliation of the financial relationship of the parties flowing from the charter party." *See Affidavit annexed hereto as Exhibit "A."* In order words, Hanjin attested that all of

4

its claims against Plaintiff had been brought forward in the 2007 arrest proceeding in South Africa.

It is dubious in the extreme that Hanjin only sought to assert the speed and performance claims from 2005 *after* Plaintiff commenced this proceeding seeking security for its own claims. Clearly, *Hanjin failed to assert, or chose not to assert, in its 2007 arrest action in South Africa the speed and performance claims it now raises as a counterclaim in this proceeding.* As will be discussed in greater detail herein, because Defendant failed to assert this known speed and performance claim in the South African arrest proceeding, Hanjin has waived it and under the doctrine of collateral estoppel should be precluded from seeking countersecurity for that claim in this proceeding because Plaintiff has already secured Hanjins' claims and because the claim was clearly asserted as a retaliatory tactic.

At this time, Hanjin has failed to initiate substantive proceedings against Plaintiff on its deceit claim. In addition, Hanjin has failed to assert the speed and performance claims in the ongoing arbitration between the parties. This is yet further evidence that Hanjin's claims lack substance and have been asserted as counterclaims in this proceeding solely as retaliation for Plaintiff's attachment.

## Plaintiff's Application for Security in New York

During the course of the charter, disputes arose between the parties regarding Hanijn's failure to pay Plaintiff all of the amounts due and owing under the charter party dated May 7, 2004. As a result, Plaintiff sustained damages in the principal amount of $85,750.00, exclusive of interest, litigation costs, and attorneys' fees.

On August 24, 2007, in order to obtain jurisdiction over Hanijn and to obtain security for its claims, Plaintiff commenced this action and applied for an Ex Parte Order of Maritime

Attachment Garnishment against the Defendant's property within this District. Plaintiff's application was granted and an Ex-Parte Order and accompanying Writ of Attachment were issued in the amount of $242,075.85.

Plaintiff served the Ex Parte Order(s) and Process of Maritime Attachment on garnishee banks within this District believed to be holding Defendant's funds, including, *inter alia*, Bank of America. And, pursuant to the Ex-Parte Order and Process of Maritime Attachment, Bank of America restrained approximately $242,075.85 of Defendant's property on or about December 12, 2007.

On December 26, 2007, Defendant made the instant application for countersecurity. Defendant has requested security for three counterclaims in this action. All three counterclaims are frivolous, general, speculative and/or have been waived

Two of the claims arise from Plaintiff's alleged breach of speed and performance warranties set forth in the charter party. Particularly, these claims concern the voyages from Shanghai to Kohsichang to Stockton in July 2005 which occurred while the Vessel was performing under the May 7, 2004 charter party. Plaintiff denies these claims.

In addition, and more significant to the instant motion for countersecurity, **Hanjin failed to raise the 2005 speed and performance claims against Plaintiff when seeking security in South Africa where it arrested the Vessel.** Hanjin already had the opportunity to request security for ALL of its claims under the May 7, 2004 charter party. However, it made the election not to include this known claim, to the extent it exists at all, in the South African Arrest proceedings.

Defendant's claim for "deceit" is based on the false assertion that Plaintiff gainfully employed the Vessel during the period between charters (February 18- February 23). As there is

6

no factual basis whatsoever for Defendant's deceit (fraud) counterclaim, and the allegations of fraud have not been pled with particularity, the motion for countersecurity in respect of such claim must be denied.

As will be shown herein, Defendant's counterclaims are frivolous and Defendant's motion for countersecurity must be denied.

## **ARGUMENT**

### POINT I

### **COUNTERSECURITY IS NOT WARRANTED BECAUSE DEFENDANT'S COUNTERCLAIMS DO NOT ARISE OUT OF THE SAME TRANSACTION OR OCCURRENCE AS PLAINTIFF'S CLAIMS AND THUS ARE NOT COMPULSORY COUNTERCLAIMS**

Supplemental Rule E(7) is identical to Rule 13(a) of the Federal Rules of Civil Procedure in that is only permits countersecurity for counterclaims that are compulsory. *Sea Terminal, Inc. v. Independent Container Lines*, 89 Civ. 6931 (MBM), 1900 U.S. Dist LEXIS 11561, *5 (S.D.N.Y. Sept 4, 1990). Accordingly, when determining whether a counterclaim arises "out of the same transaction or occurrence" under Rule E(7), courts will apply the test for compulsory counterclaims under Rule 13(a). *See Incas & Monterey Printing & Packaging, Ltd. v. M/V SANG JIN*, 747 F.2d 958, 964-65 (5th Cir. 1984), cert. denied sub nom *Van Weelde Brother Shipping Ltd. v. I.N.C.A.S.*, 47 U.S. 1117 (1985); *Solomon v. Bruchhausen*, 305 F.2d 941 (2d Cir. 1962), cert. denied sub nom *Isbrandtsen v. Maximo*, 371 U.S. 951 (1963); *Seaplus Line Co. v. Bulkhandling Handymax AS*, 409 F. Supp. 2d 316, 324 (S.D.N.Y. 2005) (stating that "counterclaims falling within the purview of Supplemental E(7) are akin to compulsory counterclaims under Rule 13(a)"), overruled on other ground by *Aqua Stoli Shipping Ltd. v. Gardner Smith Party Ltd.*, 460 F. 3d 434, 445 (2d Cir. 2006).

Defendant's counterclaim for deceit does not arise from the "same transaction or occurrence" as Plaintiff's claims, namely a breach of the charter party dated May 7, 2004. Hence, it is not a compulsory counterclaim entitled to countersecurity under Supplemental Rule E(7).

To the contrary, Hanjin's deceit cause of action is a tort and thus, is not governed by provisions of the charter party.   Plaintiff's claim against Defendant for amounts outstanding arose from a breach of the charter party dated May 7, 2004.   However, according to Defendant, its claim for deceit arose out of Plaintiff's allegedly false statements, issued after the Vessel was redelivered and the charter party contract was at an end, which is why it claims it is entitled to recovery of the full amount paid, instead of just a portion thereof.

As Hanjin's deceit claim relates to Plaintiff's allegedly tortious actions, and not a breach of the "transaction or occurrence" forming the basis for Plaintiff's claims, i.e. the May 7, 2004 charter party, it is not a compulsory counterclaim.  Hanjin's claim relates to different transactions/occurrences than those claimed by Plaintiff in the Verified Complaint and, thus, do not quality for countersecurity under Rule E(7).

## POINT II

## <u>THE LANGUAGE OF RULE E(7) IS NOT MANDATORY</u>

### A. The Standard of Law

Rule E(7)(a) provides in relevant part:

When a person has given security for damages in the original action asserts a counter-claim that arises from the same transaction or occurrence that is the subject of the original action, a plaintiff for whose benefit the security has been given must give security for damages demanded in the counter-claim unless the court for cause shown, directs otherwise.

Fed. R. Civ. P. Supp. R. E.(7)(a).

8

While this rule's language makes it appear that the posting of countersecurity is mandatory whenever its conditions are satisfied, "the final clause of the quoted language makes clear that the trial court possesses broad discretion in deciding whether to order counter-security under such conditions." *Result Shipping Co. v. Ferruzzi Trading USA Inc.* 56 F.3d 394, 399 (2d Cir. 1995)(citing *Afram Lines Int'l, Inc. v. M/V CAPETAN YIANNIS*, 905 F.2d 347, 349 (11th Cir. 1990); *Titan Navigation Inc., v. Timsco, Inc.*, 808 F.2d 400, 403 (5th Cir. 1987); 7A James W. Moore Et Al., Moore's Federal Practice ¶E.15, at E-756 (2d ed. 1995)).

While the purpose of Rule E(7) is to permit a counterclaimant to likewise receive security in appropriate instances, countersecurity under Rule E(7) is not appropriate where a defendant asserts a frivolous counterclaim. *See e.g., Result Shipping*, 56 F.3d at 400; *see also Tital Navigation*, 808 F. 2d at 404; *Trinidad Foundry & Fabricating, Ltd. v. M/V KAS CAMILLA*, 776 F. Supp. 1555, 1558 (S.D. Fla. 1991). The posting of countersecurity likewise is not appropriate where the plaintiff is financially unable to post countersecurity. *Result Shipping*, 56 F.3d at 400 (citing *Titan Navigation*, 808 F.2d at 403-405; also citing *Washington-Southern Navigation Co. v. Baltimore & Philadelphia Steamboat Co.*, 23 U.S. 629, 632-36 (1924)). In each case, the court is to use its discretion to determine, based on the totality of circumstances, whether the posing of countersecurity should be ordered. *Result Shipping*, 56 F. 3d at 400 (quoting *Titan Navigation*, 808 F.2d at 404; citing *Afram Lines*, 905 F.2d at 349-50).

As shown by the Plaintiff's supporting declarations and documents and as discussed below, Defendant's countersecurity application should be denied because Defendant's "counterclaims" are a manufactured artifice designed to place Plaintiff at a tactical advantage, which is the very situation warned against in numerous decisions. Where a plaintiff must choose between maintaining security for its claims or having to surrender such security in the face of

unjustified counterclaims, courts have routinely have refused to grant a defendant's demand for countersecurity.

The situation here is even more acute than in a typical case because Defndant, Hanjin, has already obtained security from Plaintiff for all of its alleged claims by having arrested the Plaintiff's Vessel in South Africa last year. Moreover, the baseless nature of Defendant's claims, which even at face value lack any credibility and appear clearly to have been raised in retaliation for Plaintiff's attachment, militates heavily against granting Defendant's motion for countersecurity.

### B. Defendant has failed to allege prima facie valid counterclaims, and in so much as they have been properly alleged, which is denied, they are entirely frivolous

As stated above, Defendant has requested security for three counterclaims in this action. All three counterclaims are frivolous, general, speculative, and/or clearly lacking merit.

Rule E(7)(a) should not be permitted to be employed like a bludgeon to eliminate the Plaintiff's right to security for well-founded claims through the granting of countersecurity on a defendant's dubious counterclaims:

> [T]he court should not require countersecurity where the counterclaim is frivolous or so lacking in merit that the court can only conclude that the counterclaim was advanced solely to secure a negotiating advantage over the complainant.

*Titan Navigation*, 808 F.2d at 404. Courts in a variety of circumstances have refused to order the posting of countersecurity where a counterclaim is frivolous, lacking in merit, or too speculative to be entitled to the normal presumption that counter-security is appropriate. Several representative examples, discussed below, demonstrate how courts have addressed this issue.

In *Ythan Ltd. v. Americas Bulk Transport Ltd.,* 336 F. Supp. 2d 305 (S.D.N.Y. 2004), the defendant sought $4.4 million in countersecurity on a cargo indemnity claim. *Id.* at 39. In

10

denying that portion of the defendant's countersecurity request, the court rules that the "highly contingent" nature of the defendant's claim made posting of such countersecurity inappropriate.

In *Trinidad Foundry & Fabricating, Ltd. v. M/V KAS CAMILLA,* 776 F. Supp. 1555 (S.D. Fla. 1991), the plaintiff arrested the defendant's vessel in connection with its claims for repairs and necessaries. *Id.* at 1556. The defendant shipowner counterclaimed for damage to the vessel due to the plaintiff's alleged negligence, breach of warranty, and breach of contract and applied to the court for countersecurity under Rule E(7). *Id.* at 1558. In its application, the defendant contended that the plain language of Rule E(7) require the plaintiff to post counter-security. *Id.* The court disagreed and, after examining the facts surrounding defendant's purported "counterclaim" refused to order the posting of countersecurity:

> [Defendant] argues that the plain language of Rule E(7) requires Plaintiff to post a bond or other security on the Counterclaims filed in this action. The Court is not persuaded by Defendant's reasoning in this regard. Rule E(7) mandates the posting of countersecurity in this instant unless the Court, for cause shown, directs otherwise. In the present case, Defendant's authorized representative executed Plaintiff's Notice of Repairs Satisfactorily Completed, confirming that the repairs performed by Plaintiff to the Vessel has been satisfactorily completed. **The Undersigned believes that this fact alone indicates that Defendants' Counterclaims may be frivolous and constitutes sufficient cause shown to remove the presumption of countersecurity dictated by Rule E(7).** The Court would like to note parenthetically that this preliminary determination of the nature of Defendant's Counterclaims is germane only to the instant determination of the posting of countersecurity. It in no way speaks to the merits of Defendant's counterclaims and has no res judicata or collateral estoppel effect.

*Id. (emphasis added).*

In *Expert Diesel, Inc. v. Yacht FISHIN FOOL,* 627 F. Supp. 432 (S.D. Fla. 1986), the court refused to grant the defendants' request for countersecurity on counterclaims similar to those asserted by the defendant in KAS CAMILLA. *See id.* In so holding, it stated "the court is reluctant to compel Plaintiff to post a bond in light of Defendant's damage claims of a general rather than a precisely detailed, nature." *Id.* at 433.

11

In *U.S. Maritime Services Inc. v. Trade Ventures Inc.*, No. CIV A. 98-0499, 1998 U.S. Dist. LEXIS 10608, (E.D. La. July 8, 1998), the defendants counterclaimed for damages arising over a lost charter party. *Id. at *6.* In denying the defendant's motion for countersecurity, the court ruled that the counterclaim was too speculative and insufficiently supported to justify an order directing the posting of counter-security.

> The defendant's claim for the alleged lost charter is too speculative to sustain an order for countersecurity.  Unlike plaintiff's claim which is based on past events reasonably able to be ascertained and quantified, defendant's losses due to a 'road not taken' cannot be so readily ascertained and quantified. **The Baldwin affidavit is insufficient by itself to determine what the defendants estimated actual loss is after expenses and other items are deducted, even assuming the voyage would have occurred but for the plaintiff's alleged broken agreement.**

*Id. (emphasis added).*

Here, Defendant has offered even less substance than the defendants in the cases cited above. Defendant summarily asserts via attorney affidavit that it has claim for over $350,000.00 dollars, but is does not produce any witness statements, or other evidence or proof that its claims have any basis in fact. As the cases cited above make clear, general claims or unsupported allegations are not given a presumption of validity that a well-supported and documented claim is to receive.

Defendant has only submitted an attorney affidavit in support of its claim and *the claims have not even been asserted in a formal action, i.e.* the London arbitration proceeding between the parties. Accordingly, even assuming that Defendant's application for countersecurity is facially proper, Defendant's claims are far too speculative to warrant an order directing the posting of countersecurity.

As will shown at Point II(B)(1), below, Defendant's claim for deceit, requesting reimbursement of the full amount paid in settlement to the Plaintiff in respect of the early

redlivery of the Vessel, is premised on nothing more than idle speculation and suspicion, not

fact. As set forth in the accompanying Declaration of Douglas Bateson, Plaintiff's English

solicitor, such a remedy is not available unless the claimant can prove it relied to its detriment on

the defendant's affirmatively fraudulent representations. *See Bateson Decl., ¶12.* Here,

Defendant Hanjin has failed to allege in its counterclaim *any* facts which would support its claim

that Plaintiff made a fraudulent statement upon which Hanjin relied to its detriment. Even if it

had alleged such facts in its counterclaim in its motion for countersecurity, Hanjin has failed to

provide any documentation or affidavits to substantiate such allegations. Accordingly, absent

such proof Hanjin's deceit claim is frivolous under English law and should be seen for what it is,

*i.e.* retaliation for the Plaintiff having attached Hanjin's property in this proceeding. *See Bateson

Decl., ¶9.*

Other court's considering issues such as those presented by Hanjin's motion for

countersecurity have concluded that it is inappropriate to award highly speculative damages,

even when under a certain sets of facts such damages could be theoretically awarded on the

underlying action. *Sea Transp. Contrs., Ltd. v. Indus. Chemiques Du Sengal*, 411 F. Supp. 2d

386, 396 (S.D.N.Y. 2006)(reducing security sought as even though contract could theoretically

run interminably, notwithstanding the merits of the claim under English law and finding that this

was not enough to support a claim for damages). In *Sea Transp. Contractors,* the plaintiff

sought security for a contract, which if not breached, could have been renewed interminably.

Thus, as the contract could theoretically have been renewed forever, plaintiff requested security

for loss of profits over 30 years! While this was theoretically possible, the court found it highly

improbable. As the security sought was in respect of damages that were highly speculative and

remote, the court denied the claimants request for security.

Hanjin's claim for deceit is similarly speculative. In order to be awarded the return of the entire redelivery settlement payment, Hanjin would have to prove Plaintiff's dishonesty and/or fraud which it has not even alleged in its counterclaim, let alone alleged with any particularly. For this reason alone, the Court can and should exercise its discretion to deny Defendant's motion for countersecurity on the "deceit" claim.

However, there is another reason to deny Defendant's request for security on the deceit claim. Particularly, if the Court were to permit Defendant to utilize Supplemental Admiralty Rule E(7) as a shield and a sword, then every time a breach of contract was alleged by a claimant, the respondent would raise a frivolous and concocted counterclaims. The initial claim made would be neutralized by the farfetched and unsupported counterclaim asserted. Defendants should not be permitted to seek countersecurity for whatever dubious counterclaims they can concoct, especially where they have exercised arrest or attachment proceedings in other jurisdictions and obtained security against the Plaintiff for other, related claims, as is the case here.

For these and the reasons set forth below, the Court should decline to grant security for Defendant's frivolous counterclaims.

### 1. Hanjin's deceit claim is frivolous on its face and thus it is not a prima facie valid maritime claim

The tort of deceit is better known as fraud. Under governing English law, the tort involves a party making a false representation, knowing it to be untrue, or being reckless as to whether it is true and intending that the claimant should act in reliance on it, so in that in so far as the latter does so and suffers loss the party is liable for that loss. *Bateson Declaration, ¶12.* Furthermore, as a general rule, a positive act or representation is required for the tort of deceit.

14

Mere silence no matter how morally wrong, will not support an action for deceit under English law. *Bateson Declaration, ¶13.*

Hanjin's deceit claim does not stand up to even mild scrutiny and by any measure fails for a lack of proof. The uncontroverted facts of this matter reveal that no false representations were made and thus Hanjin could not have relied on any such statements when settling the redelivery claim.

Plainttiff has also submitted the accompanying Declaration of Joel E. Varnal, the Master of the Vessel during the time relevant to Hanjin's deceit claim. Capt. Varnal affirms that the Vessel was indeed idle during the period of February 18 to February 23. *See Varnal Declaration, ¶6.* That is, it had no gainful employment during this period. The diving survey referred to in Hanjin's counterclaim, lasting all of 7 ½ hours, in no way affected the Vessel's ability to perform another charter. *See Varnal Declaration, ¶5.* Hanjin's suggestion that the dive survey was conducted while the Vessel was "on paid time" is nothing more than reference to the fact that Hanjin had already compensated the Plaintiff for the time period during which the dive survey was conducted.

Rather than admit that it has no facts or evidence to support its claim, Hanjin attempts to distract the Court with vague references to Plaintiff's shareholder circular which states that the surveys were conducted "whilst on paid time." Defendant disingenuously suggests that this is evidence of deceit. However, the circular does not support Hanjin's claim. On the contrary, the circular was accurate in that while the Vessel was awaiting further orders, during the time covered under the redelivery settlement (e.g. on paid time), a survey was performed. *This is no way contradicts the fact that the Vessel was idle, i.e. not otherwise employed, from February 18 to February 23.* Thus, it is clear that even assuming Hanjin could allege a *prima facie* valid

15

deceit claim under English law, which is denied, it has failed to do so and its claim nevertheless must fail due to a lack of evidentiary support.

Despite the opportunity to provide this Court with evidence and affidavits providing the factual support necessary to substantiate its motion for countersecurity, Hanjin failed to submit any evidence to contravene the Master's account or to explain in light of those facts, how Plaintiff could be deemed to commit a fraud by confirming the Vessel was idle during the relevant time[1]  Plaintiff's London solicitor, Mr. Bateson, affirms that based on the facts set forth in Hanjin's counterclaim and motion submissions that there is absolutely no prospect of the deceit claim succeeding in London.  *See Bateson Declaration, ¶9.*  Unsurprisingly, Defendant has failed to submit any Declaration on the applicable law with its motion papers.

Where the counter-claim alleged does not square with the facts, it should be deemed frivolous and dismissed, as shown in the following excerpt from *North Offshore AS v. Rolv Berg Drive:*

> "The premise that countersecurity will not be required on the basis of frivolous counterclaims is a sound one," *Finecom Shipping*, 2005 U.S. Dist. LEXIS 25761, at *3-4, and a court "should not require countersecurity where the counterclaim is frivolous or so lacking in merit that the court can only conclude that the counterclaim was advanced solely to secure a negotiating advantage over the complainant," *Titan Navigation, Inc. v. Timsco, Inc.,* 808 F.2d 400, 404 (5th Cir. 1987). Mindful that the "ability to understand the merits of a dispute at an early stage is limited," *Finecom Shipping*, 2005 U.S. Dist. LEXIS 25761, at *4, the Court nonetheless finds that [claimant] RBD's counterclaim is highly speculative -- relating to its alleged lost profits from the failure to obtain continued use of the ALDOMA -- and RBD has provided no rebuttal to North Offshore's position that the claim is without merit. Those deficiencies weigh against directing North Offshore to post countersecurity. *See Ythan Ltd. v. Americas Bulk Transport Ltd.,* 336 F. Supp. 2d 305, 309 (S.D.N.Y. 2004) (rejecting motion for countersecurity where the counterclaim was "highly contingent"); *U.S. Maritime Services, Inc. v. Trade Ventures, Inc.,* No. 98-0499 Section "C", 1998 U.S. Dist. LEXIS 10608, at *6 (E.D. La. July 8, 1998) (denying countersecurity because defendants' counterclaim was too speculative -- "[u]nlike plaintiff's claim which is based on past events reasonably due to be ascertained and

---

[1]   It is noteworthy that undersigned counsel provided an email copy of the Master's statement regarding the relevant time period *prior* to Hanjin's filing of the motion for countersecurity in this action, together with a request that the deceit claim and motion be withdrawn.

quantified, defendants' losses due to a 'road not taken' cannot be so readily ascertained and quantified").

2007 U.S. Dist LEXIS 87648, *8-9.

Like in *North Offhore*, the factual deficiencies in Hanjin's claim weigh against the Court directing Plaintiff to post countersecurity. The Master's Declaration proves that the Vessel was idle during the applicable period, and, Hanjin has failed to offer any evidence to rebut this. Moreover, the Court should require an even higher pleading standard from Hanjin with reference to its deceit claim as fraud must generally be plead with particularity. *See* Fed. R. Civ. P. 9(b). In all fairness, there is no escaping the conclusion that particularity is not a hallmark of Hanjin's deceit claim.

Therefore, because Hanjin has failed to allege any facts tending to show that Plaintiff has committed fraud (deceit), it has failed to allege a prima facie valid maritime claim and the Court should decline to grant security for the deceit claim.

### 2. Hanjin's speed and performance claims are frivolous and their sole purpose is to vex, harass or exact retribution on the Plaintiff

A review of the time line of events reveals Hanjin's speed and performance counterclaims asserted in this action have been concocted solely as a means to harass Plaintiff, and thus should be denied as improper and/or frivolous.

The charter party was executed between the parties on May 7, 2004. The alleged speed and performance claims set out in Hanjin's counterclaim in this action arose in 2005. Hanjin arrested Plaintiff's Vessel in South Africa last year to obtain security for various claims including those related to the May 7, 2004 charter party. In the arrest proceedings, Hanjin's South African counsel stated that it had completed "**a complete reconciliation of the financial relationship of the parties**" flowing from the charter party. *See Affidavit of Hanjin's South*

*African counsel dated June 11, 2007 annexed to this Memorandum of Law as Exhibit "A."*
Hanjin's speed and performance claims from 2005 are conspicuously absent from the "complete
reconciliation" Hanjin offered the South African court. In any event, Plaintiff provided security
to Hanjin for all of the claims Hanjin raised in the South African Vessel arrest action on the basis
of its attestations and other documents submitted in the proceeding. Had Hanjin revealed that its
request for security in the South African proceedings did not include *all* of its claims arising
under the charter party, it is unlikely that Plaintiff would have agreed to provide security in
South Africa in the first place.

    Plaintiff then initiated the instant action. Hanjin's property was attached pursuant to
Court's Ex-Parte Order, issued herein on or about December 12, 2007. Then, and only then, did
Hanjin "discover" its speed and performance claims dating back to 2005, *i.e.* more than two
years ago.

    Hanjin's counterclaims mysteriously manifested themselves to Hanjin only *after* its
property was attached in this action. The dubious timing of Hanjin's "discovery" is too
convenient to be believed. Hanjin's assertions are incredible. Hanjin would have the Court
believe that after it arrested Plaintiff's ship in 2007, attesting to the South African court that it
had conducted "**a complete reconciliation of the financial relationship of the parties,**" and
obtained security therefore, it was still unaware of claims dated from 2005. And, it was only
after its funds were attached in this action that these claims were "newly" discovered. As a side
note, to the extent Hanjin actually intends to pursue security for these claims, it should be
directed by this Court to return to the South African court to consider such an application,
especially given what appear to be representations made by its counsel under oath in that action
regarding Hanjin's claims.

In sum, Plaintiff maintains that Hanjin's counterclaims asserted in this action: (1) are fabricated and/or frivolous; or (2) should be precluded under the doctrine of estoppel from consideration in this action as they were not first raised in the South African proceeding. It would be inequitable to award security for these claims at this point. Plaintiff relied on Hanjin's attestations in South Africa when the LOU was issued. Allowing Hanjin to assert new claims, which date back to before its 2007 South African arrest proceeding would prejudice Plaintiff and undermine the undertaking Hanjin gave to Plaintiff when it accepted the security provided in that proceeding. The net effect would be to grant Hanjin an open ended right to seek security for any claims it contrives in the future. Where security has been or *could have been obtained* in the full amount necessary to secure all discoverable claims, a claimant should not be allowed to go "security" shopping in different forums. As set recently confirmed by the Second Circuit Court of Appeals, where a claimant has already obtained sufficient security in another forum, a further request for security in this Court should be denied. *See Aqua Stoli Shipping Ltd.,* 460 F.3d at 444) (holding that the district court may vacate an attachment if the claimant has already obtained sufficient security for the potential judgment, by attachment or otherwise).

In light of the foregoing, Hanjin's assertion of new claims which arose before the 2007 arrest proceeding is inequitable, and is nothing more than a tactic employed to harass Plaintiff for having sought security for its legitimate claims.

Hanjin exercised its right to seek security for its claims by initiating the South African arrest proceedings. Having made that choice to proceed in South Africa, it should be bound by that choice and any request for further security or for an increase in the security it has already obtained should be presented to the South African court, not in this action. In any event, having had the opportunity in South Africa to seek security for the counterclaims it asserted in this

19

action, Hanjin should be estopped from seeking such security in this proceeding, especially given the attestation made by its South African counsel to the court that it had made "**a complete reconciliation of the financial relationship of the parties**" prior to initiating that action. Thus, this Court should deny Hanjin's motion for countersecurity as to its 2005 speed and performance claims.

**POINT III**

**AT MOST, DEFENDANT IS ONLY ENTITLED TO RECIPROCAL SECURITY**

It is a well-settled principle that where the court finds countersecurity to be appropriate it should only be awarded up to the amount the plaintiff has attached. In other words, a defendant's countersecurity should be reciprocal to that enjoyed by the plaintiff.

In *Clipper Shipping Lines, Ltd. v. Global Transportes Oceanico S.A.*, 06-Civ.-15299 (PKL), (2007 U.S. Dist. LEXIS 18827, *4-5 (S.D.N.Y. 2007), Judge Leisure confirms this principle and ordered a plaintiff to post countersecurity in such a manner. The *Clipper Shipping Lines* court held as follows:

> [Plaintiff] Clipper does not dispute that Rule E(7) entitles [defendant] Global to be secured for the full value of its counterclaim while Clipper is secured only for roughly nine percent of its claim. This position is consistent with the approach Judge Lynch recently took in a similar situation. In that case, as here, the value of the counterclaim that defendant sought to secure exceeded the amount that the plaintiff had managed to attach as security for its original claim. *Judge Lynch ordered the plaintiff to provide security in the same amount that it has succeeded in attaching and that it provide additional security matching any additional property it should subsequently succeed in attaching. Finecom Shipping Ltd. v. Multi Trade Enterprises AG*, 05 Civ. 6695 (GEL), 2005 AMC 2952, 2005 U.S. Dist. LEXIS 25761, at *6, 2005 WL 2838611, at *2 (S.D.N.Y. Oct. 24, 2005).
>
> ***
>
> Clipper is ordered to post a bond or other satisfactory security in the sum of $154,647.73…and to provide additional security matching any additional property Clipper has restrained or is able to restrain in the future in any jurisdiction in connection with the underlying arbitration, up to a maximum of $2,077,173.90

20

*Clipper Shipping Lines Ltd. v. Global Transporte Oceanico S.A.,* 06-Civ.-15299 (PKL)(S.D.N.Y.

Feb. 26, 2007) at 6 (citations omitted). Consistent with the holdings in *Clipper Shipping Lines*

*and Finecom Shipping,* if this Court deems that countersecurity should be awarded, it should

order Plaintiff to post countersecurity in an amount equal or less than the amount of security that

Plaintiff has obtained from Defendant, ($242,075.85).

## CONCLUSION

As Defendant's counterclaims do not meet the requirements of Rule E(7) and are

otherwise frivolous, general, speculative, inequitable and/or clearly lacking merit, this Court

should deny Defendant's motion for countersecurity.

Dated: January 18, 2008
New York, NY


Respectfully submitted,
The Plaintiff,
VOYAGER SHIPHOLDING CORP


By: _____
Patrick F. Lennon (PL 2162)
Kevin J. Lennon (KL 5072)
Nancy R. Peterson (NP 2871)

LENNON, MURPHY & LENNON, LLC
The Gray Bar Building
420 Lexington Ave., Suite 300
New York, NY 10170
(212) 490-6050 - phone
(212) 490-6070 - fax

21

## AFFIRMATION OF SERVICE

I hereby certify that on January 18, 2008, a copy of the foregoing Memorandum of Law was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF system.

By: _____
Nancy R. Peterson

EXHIBIT "A"

IN THE HIGH COURT OF SOUTH AFRICA

DURBAN AND COAST LOCAL DIVISION                              7

EXERCISING ITS ADMIRALTY JURISDICTION          CASE NO: A≡ ?    /2007

NAME OF SHIP: mvs "KEN" and "MARK"

In the matter between:

HANJIN SHIPPING CO. LTD                                    Applicant

and

mv "KEN"                                                Respondent

AND IN THE MATTER of an *ex parte* application for
the arrest of mv "KEN" in terms of Section 5(3) of the
Admiralty Jurisdiction Regulation Act, No. 105 of
1983.

---

## AFFIDAVIT

---

I, CATHERINE VIVIEN PITMAN, make oath that:

1

I am an attorney of the High Court of South Africa and practise as such as a director of
GARLICKE & BOUSFIELD INC., at 24th Floor, Durban Bay House, 333 Smith Street,
Durban, Kwa-Zulu Natal.

2

I am duly authorised on behalf of the applicant to depose to this affidavit and to bring this
application on its behalf.

3

The matters deposed to in this affidavit are to the best of my knowledge and belief, true and
correct and, to the extent that any allegations of fact are hearsay, the information upon
which they are based has been made available to me by telephone and telefax copier
messages from Ian Hawkes and Eduardo Prim, a partner and assistant respectively of the
applicant's London solicitors, MFB of 45 Moorfields, London, which is a firm of maritime
and insurance lawyers that operates in specialised fields: the carriage of goods by sea; the
commercial operation of ships; the sale and purchase of goods; insurance and reinsurance.
Both Messrs Hawkes and Prim are solicitors of England and Wales.

8

Page 2

4

The applicant is Hanjin Shipping Co Ltd, a company duly incorporated and registered in accordance with the company laws of South Korea. The applicant is an owner and operator of ships and provides liner, bulk and logistics services. It operates about one hundred and forty five vessels that cover eighty major ports in thirty five countries. Additionally, it operates eleven dedicated terminal facilities. It has two hundred offices and third-party agents are spread across fifty three countries. It carries on business from its place of business at 25 – 11, Yoido-Dong, Youngdeungpo-Ku, Seoul, Korea.

5

The respondent is the motor vessel "Ken", owned by Voyager Shipholding Corporation, a company duly incorporated and registered in accordance with the company laws of the Marshall Islands ("owners"). The respondent is, as will become apparent, managed by Union Commercial Inc of 5-7 Kanari Street, Piraeus, Greece.

**CLAIM 1**

6

On 7 May 2004 and at New York the applicant and owners concluded a charterparty on an amended New York Produce Exchange Form of the respondent by owners to the applicant for eighteen months with the applicant having an option of a further two months, a copy of which is annexed hereto marked "CPV.1".

7

The respondent was duly delivered by owners to the applicant on 29 August 2004 at 20h30 Greenwich Mean Time ("GMT") and was subsequently redelivered by the applicant to owners on 18 February 2006 at 19h24 GMT.

8

The applicant has prepared a complete reconciliation of the financial relationship of the parties flowing from the charterparty, a copy of which is annexed hereto marked "CPV.2", and which shows the various payments and debts that have arisen during the period of the charterparty.


no print

9

9

The appears from the reconciliation the applicant claims that it is owed an amount of US$140,732.47.

10

I am advised that the items making up that balance under dispute by owners are items 6, 7, 8 and 9 on the reconciliation, all dealing with issues of the speed of the respondent in relation to fuel (both intermediate fuel oil and marine diesel oil) consumption.

11

In that respect in lines 9 and 10 of the charterparty owners promised that the respondent would be "... capable of steaming, full laden, under good weather conditions *throughout the currency of Charter Party* about *13.5/14* knots on a consumption of about *28 / 29 metric* tons of *IFO (380 CST) no MDO* at sea ...."

12

Furthermore, clause 45 of the charterparty provides-

"Speed / Consumption Ballast / Laden respectively:

Ballast: Abt 14KT/14.5KT on 28/29 MT

Laden: Abt 13.5KT /14KT on 28/29 MT

Always +0.1MT MDO"

13

Finally, additional clause 12 provides-

"Vessel's speed and consumption as per description.   For the purpose of this Charter Party good weather condition is considered not to exceed Beaufort Scale 4 and Douglas Sea State 3."

14

I am advised by Messrs Hawkes and Prim that under English law the effect of those clauses taken together with the respondent's configuration, size, draft, trim, etc in respect of the particular voyages concerned is that the she would be required to achieve an average speed of 13.5 knots in a loaded condition on a consumption of 29 metric tonnes of

intermediate fuel oil and 0.1 metric tonnes of Marine Diesel Oil in the weather conditions provided for in additional clause 12.

15

I annex hereto marked "CPV.3", "CPV.4", "CPV.5" and "CPV.6" calculations based on four different loaded voyages by the respondent from Suez to Penang in respect of a voyage from Liverpool to Penang in April 2005, Punto Cardon to Sepetiba in January 2005, Tubarao to Saldanha in February 2005 and Pengang to Paradip in May 2005 respectively. All of the calculations, except that in respect of item 9, have been prepared by weather companies that have full details of weather and sea conditions on the route of the respondent at the time. These companies specialise in calculating speed relative to fuel consumption. The required speed of the respondent has been adjusted by them to compensate for any deleterious effect of wind and current on her during those voyages. The calculation in respect of item 9 was prepared by North China Shipping, the sub-charterers in respect of the respondent during that voyage. Messrs Hawkes and Prim have checked that calculation and found it to be in all respects correct.

16

The results of those calculations were reflected on the applicant's hire statement by converting the time lost due to slow speeds in number of hours to days or portions thereof and multiplying by the daily hire rate of US$25,500.00 and then deducting 2½ percent for the commission that had been paid on that hire by virtue of clause 28 of the charterparty. Any over consumption of Intermediate Fuel Oil and Marine Diesel Oil was reflected after multiplying the quantity over consumed by the price of the fuel paid for the fuel concerned.

17

In this respect I note that the applicant incorrectly reflected an under consumption of Marine Diesel Oil as an over consumption on its hire statement. Consequently, an amount of US$135.00 should be deducted from the total amount owed.

18

In the circumstances the applicant claims US$140,732.47 less US$135.00 from owners, being an amount of US$140,597.47.

19

The claims are subject to London arbitration and English law in terms of clauses 17 and 90

of the charterparty and I am advised that Mr Patrick O'Donovan has been appointed sole arbitrator by the applicant and owners in respect of all disputes between the parties. Sub-charterers commenced arbitration proceedings in respect of their claim against the applicant in respect of item 9 and, consequently, the applicant has commenced arbitration proceedings against owners in respect of that item and submissions have been exchanged, both parties reserving rights to serve further submissions dealing with other issues. The submissions that have been exchanged run to over one hundred pages and, consequently, in order not to overburden these papers I do not annex them. I do, however, reserve the right to supplement these papers with them should the need arise. I am told that the factual allegations of the applicant in the submissions are all true and correct.

20

I am further advised by Messrs Hawkes and Prim that the claim is *prima facie* enforceable in terms of English law, that the arbitration is only likely to be concluded in respect of the claims five years from the time they arose, being May 2010, and that the arbitrator is likely to award interest at 6% compounded quarterly on the claims. On that basis the applicant requires security for interest in an amount of US$48,813.76.

21

Messrs Hawkes and Prim further instruct that the applicant's recoverable costs will conservatively be in an amount of £200,000.00 sterling including the costs of this application.

22

In the circumstances the applicant seeks security for its claim in the sum of US$140,732.47 in respect of the capital claim, US$48,813.76 in respect of interest thereon and £200,000.00 sterling in respect of legal costs.

### CLAIM 2

23

On 13 December 2001 and at Seoul the applicant chartered the mv "Mark" ("the vessel") from Sea Fighters Marine Corporation ("Sea Fighters") on an amended New York Produce Exchange form ("the head charterparty"). During the course of that charter the applicant sub-chartered her to Daeyang Shipping Co Ltd ("Daeyang") of Seoul, South Korea at Seoul

on 30 June 2003 on essentially back to back terms ("the Daeyang charterparty") and during the course of that charter Daeyang again sub-chartered her to STX Pan Ocean (then named Panocean Shipping Co Ltd ("Pan Ocean") of Seoul, South Korea on 28 April 2004, also on essentially back to back terms ("the Pan Ocean charterparty").

24

During the course of the Pan Ocean charterparty Pan Ocean supplied the vessel with 680.22 mt of Fuel Oil 380 and 60.20 mt of Marine Gas Oil at Balboa, Panama on or about 17 June 2004.   Sea Fighters alleged that the fuel was not in accordance with the specification agreed in the head charterparty and refused to abide the instructions of Panocean in terms of lines 77 and 78 of clause 8 to proceed with the voyage until either the fuel was removed from the vessel or the applicant provided an undertaking on terms acceptable to it.

25

It was and remains the position of Pan Ocean as against Daeyang, Daeyang as against the applicant and the applicant as against Sea Fighters that the fuel was within contractual specification and that the refusal to abide the instructions to proceed with the voyage concerned constituted a breach of lines 77 and 78 of clause 8 of the relevant charterparties.

26

In order to break the deadlock and to avert further delays Daeyang arranged for the fuel to be replaced between 9 to 12 July 2004, always reserving its legal position and a right to recover all damages, costs and expenses from the applicant.

27

In terms of clauses 17 and 90 of the respective charterparties any disputes are subject to English law and London arbitration.

28

On 3 September 2004 an agreement was concluded between Sea Fighters, the applicant and Tide Marine Ltd, purchasers of the vessel, in terms of which Tide Marine Ltd became jointly and severally responsible with Sea Fighters for any and all claims of the applicant under the terms of the head charterparty on the day on which the agreement was signed and the Protocol of Delivery and Acceptance of the vessel between Sea Fighters and Tide Marine Ltd was executed.   I annexed hereto marked "CPV.7" a copy of that agreement.

The applicant does not have knowledge of precisely when ownership in the vessel was transferred to Tide Marine Ltd but submits that the earliest it would have been transferred would have been when the Protocol of Delivery and Acceptance of the vessel between Sea Fighters and Tide Marine Ltd was executed, which is the time at which the applicant's claim against Tide Marine Ltd arose in terms of the tripartite agreement.

29

Daeyang subsequently commenced proceedings against the applicant to recover the losses and damages it allegedly incurred as a result having to replace the fuel.

30

The applicant has, in turn, commenced arbitration proceedings against Sea Fighters to recover whatever it has had to pay out to Daeyang on various grounds, including on the basis of a breach of the head charterparty. I annex hereto marked "CPV.8" a copy of the applicant's full claim submissions in that respect. I am instructed by Messrs Hawkes and Prim that the facts alleged by the applicant in those submissions are all true and correct, that the applicant's claims have arisen and are now *prima facie* enforceable in London arbitration under English law both against Sea Fighters and, in terms of the agreement between Sea Fighters, the applicant and Tide Marine Limited dated 3 September 2004, against Tide Marine Limited.

31

I am further advised by Messrs Hawkes and Prim that both the arbitration by Daeyang against the applicant and that by the applicant against Sea Fighters and Tide Marine Ltd are likely to take five years to conclude from the time the claim against arose in July 2004, with the latter arbitration trailing the former by roughly six months, and that the arbitrators are likely to award interest at 5% compounded quarterly.

32

Messrs Hawkes and Prim further instruct that the both Daeyang and the applicant's recoverable costs in their respective arbitrations will conservatively be in an amount of US$75,000.00 and US$125,000.00 respectively.

33

In the circumstances the applicant seeks security for its claim in the sum of

33.1    US$248,060.80, being the expenses and losses claimed by Daeyang against the applicant;

33.2    US$86,041.06, in respect of interest thereon;

33.3    US$75,000.00 in respect of Daeyang's recoverable costs;

33.4    US$3,500.00, being the additional expenses and losses claimed by the applicant against Sea Fighters and Tide Marine Ltd;

33.5    US$10,379.52, in respect of an extra six months interest subsequent to the conclusion of the Daeyang arbitration;

33.6    US$125,000.00 in respect of the applicant's recoverable costs,

which total US$547,981.38.


**JURISDICTION**

34

The applicant's claims are maritime claims in terms of section 1(1)(j), (ee) or (ff) of the Admiralty Jurisdiction Regulation Act, No 105 of 1983 ("the Act") and this Honourable Court has jurisdiction in terms of Section 2(1).

35

The applicant has an action *in rem* against the respondent herself in terms of section 3(4)(b) of the Act in respect of claim 1 and is entitled to arrest the respondent as an associated ship in terms of section 3(6) and (7) in respect of claim 2.

36

In amplification thereof I annex hereto marked "CPV.9" a copy of a transcript from Equasis, the European Commission and the French Maritime Administration initiative to collate existing information on ships from both public and private sources and making it available on the Internet, that confirms the registered ownership of the respondent is currently held by owners.



37

With regard to the control of:

37.1    owners at the present time;

37.2    Sea Fighters at the time claim 2 arose, being in July 2004 when it was the owner of the vessel; and

37.3    Tide Marine Ltd at the time claim 2 arose against it when it took transfer of ownership of the vessel.

I am instructed that all three companies are registered in the Marshall Islands and, as all shares issued are bearer shares, it is not possible without the assistance of the shareholders themselves to obtain direct evidence of the control of those companies.

38

In the circumstances Messrs Hawkes and Prim commissioned a report on behalf of the applicant by Gray Page Intelligence Services Limited, a copy of which I annexed hereto marked "CPV.10". In order not to overly burden these papers I do not annex a copy of the documents referred to in that report but will have them available at Court should they be required.

39

Based on the information referred to in that report that Intelligence Service concludes "... that the same person or persons that currently operate what may loosely be termed the Scufalos family shipping business" (page 1 of the report):

39.1    controlled owners on 26 February 2007, being the date on which the report was finalised, (page 7 of the report);

39.2    controlled Sea Fighters from May 2001 until the vessel was sold to Tide Marine Ltd (bottom of page 13 of the report); and

39.3    controlled Tide Marine Ltd from the time she took transfer of ownership of the vessel until she was sold in December 2006 (bottom of page 13 of the report).

40

I am further advised by Messrs Hawkes and Prim that Gray Page Intelligence Services

Limited further believe that control of owners has not changed since 26 February 2007 and that, therefore, owners are still currently controlled by such person or persons.

41

In any event the applicant avers that the same person or persons that currently control owners also controlled Sea Fighters and Tide Marine Ltd at the time the claims arose against those parties and, accordingly, the respondent is an associated ship as contemplated in section 3(6) and (7) of the Act.

## GENUINE AND REASONABLE NEED FOR SECURITY

42

As far as the applicant is aware the only asset of Sea Fighters and Tide Marine Ltd was the vessel, which is now no longer owned by those companies.

43

Furthermore, the only asset of owners is, as far as the applicant is aware, the respondent, which is mortgaged and is, of course, susceptible to the usual perils of the seas on every voyage undertaken.

44

In the circumstances it is submitted that the applicant has a genuine and reasonable need for security in respect of both claims 1 and 2.

45

Section 3(10)(a) of the Act is inapplicable as neither security nor an undertaking have been provided to the applicant in respect of its claims in order to procure the release from arrest or attachment or to prevent such arrest or attachment.

## URGENCY

46

The National Ports Authority at Richards Bay has given an estimated time of arrival for the Respondent at Richards Bay as 11h59 tonight to load a consignment of coal at the

Richards Bay Coal Terminal. In making enquiries of how quickly she will load and sail after arrival I have been told by those with a good working knowledge of loading coal in Richards Bay that it is realistically possible for her to berth, load and sail before 06h00 tomorrow morning. In the circumstances it is submitted that this matter ought to be treated as one of urgency.

## THE ORDER PRAYED

### 47

It is submitted that the usual practice of not giving notice of the arrest application is appropriate in this matter for fear of the respondent attempting to avoid the arrest either by diverting away from this jurisdiction, by transferring her ownership or otherwise.

### 48

In circumstances where a claimant arrests in terms of the South African admiralty jurisdiction in order to commence proceedings in the above Honourable Court it is open to the owner of the property arrested to establish security in order to obtain the release of the property arrested and thereafter to apply to set aside the arrest, which, if successful, terminates the proceedings and so renders the security of no effect.

### 49

If, however, the owner of the property arrested takes a step in the proceedings which constitutes a submission (for example, pleading to the claim, requesting security or asking for a postponement) it is not thereafter open to him or her to apply to court to set aside the arrest and the security established is thereby rendered unimpeachable.

### 50

The owner of property arrested by a claimant in terms of section 5(3) of the Admiralty Jurisdiction Regulation Act, No. 105 of 1983 also has the right to establish security in order to obtain the release of the property arrested and thereafter to apply to set aside the arrest, which, if successful, renders the security of no effect.

### 51

However, a step in the proceedings secured by the arrest has no effect on the right of the

owner of the property arrested to subsequently apply to this Honourable Court for an order setting aside the arrest thereby rendering the security of no effect.

52

The applicant is entitled to know sooner rather than later whether any security established is unimpeachable or not so that it knows whether to seek other security or not. Consequently, it is essential that the respondent be obliged to bring any application for the setting aside of the arrest within a limited time in order to establish the unimpeachability or otherwise of that security.

53

It is for that reason that paragraph 4 has been included in the draft order prayed.

WHEREFORE the applicant humbly prays that it may please this Honourable Court to grant an Order in terms of the draft Order annexed to the Notice of Motion prefixed hereto, or in such other terms as the Court may deem meet.

_____
CATHERINE VIVIEN PITMAN

I CERTIFY that the deponent has acknowledged that he knows and understands the contents of this Affidavit which was signed and sworn to before me at DURBAN on this 11 June 2007, the Regulations contained in Government Gazette No. R 1648 of the 19th August 1977 having been complied with.

_____
COMMISSIONER OF OATHS

Full Names:
Address:
Designation:

**LANCE NDUMISO LUTHULI**
COMMISSIONER OF OATHS
ATTORNEY PRACTISING AT:
SUITE 1302, 13th FLOOR
DURBAN BAY HOUSE
333 SMITH STREET, DURBAN
REPUBLIC OF SOUTH AFRICA