UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

VOYAGER SHIPHOLDING CORP.,

Plaintiff,

- against -

HANJIN SHIPPING CO., LTD.,

Defendant.

07 Civ. 11123 (GEL)

**DECLARATION OF DOUGLAS WILLIAM BATESON IN SUPPORT OF PLAINTIFF'S OPPOSITION TO MOTION FOR COUNTERSECURITY**

I, Douglas William Bateson, declare under penalty of perjury of the laws of the United States of America as follows:-

1. I am a partner at the international shipping solicitors firm of Thomas Cooper and I am managing partner of their Greek office.

2. I am instructed on behalf of the Plaintiff, Voyager Shipholding Corp, in this matter and am authorized to make this declaration on their behalf in relation to an alleged claim now being brought by the Defendant, Hanjin Shipping Co., Ltd, that the Plaintiff practiced a "deception" on the Defendant.

3. The background to this claim is that the Defendant in breach of Charterparty re-delivered the Vessel early on 18 February 2006, rather than on the earliest on which the Defendant could validly re-deliver the Vessel under the Charterparty on 1 March 2006.

4. As per the Plaintiff's Provisional Final Hire Statement (Exhibit 1 to this declaration) the Defendant paid the Plaintiff USD125,377.66 in full and final settlement towards this aspect of the claim, covering the period from re-delivery on 18 February 2006 until 23 February 2006 when the Vessel was delivered to her new charterers, which the Plaintiff had found in mitigation of their loss brought about by the Defendant's breach in re-delivering the Vessel prior to 1 March 2006.

5. Subsequent to the above, in 2007, the Defendant arrested the vessel "KEN" in South Africa for security for other alleged claims unconnected with the early re-delivery claim which had been settled, not only in relation to the "KEN", but also for claims in relation to other vessels. A dispute about the validity of that arrest for security for the claims in respect of the other vessels continues in South Africa ("the South African dispute").

6.    In the course of disclosure in relation to the South African dispute, the Plaintiff disclosed a circular to its shareholders in relation to the vessel "KEN" (Exhibit 2) which stated that:-

> "The vessel was re-delivered from her 18-month employment to Messrs Hanjin, at the port of Nemrut Bay (which is close to Izimir in Turkey and within a "hopping" distance from the Greek island of Chios) on 18th February, 2006. This re-delivery date fell short of the minimum warranted period under the charter party by about a week which under English law still held the Charterers liable for payment to Owners for the unutilized days. With Owners' blessings, Managers considered this a most opportune time to undergo – whilst on paid time – the ordinarily very expensive exercise of renewing the vessel's due [sic] Docking and Intermediate surveys.    Taking further advantage of the vessel's proximity to Piraeus, the vessel was ordered to sail there upon re-delivery precisely for this purpose and taking still further advantage of vessel's young age, the need (and expense) of drydocking the vessel was avoided by means of a so-called "in lieu of drydocking" underwater inspection by a Class approved diver, who, in fact, found her bottom in very good condition. As a result, both surveys were renewed with minimum cost and vessel was credited with new certificates valid until 26th April, 2008."

7.    This was a puff or marketing to the shareholders of the vessel "KEN" by the Owners, in which the Owners stated that they had done a good job in getting the survey work conducted at a time when the Vessel was idle and was searching a new employment after the breach by the Defendant in re-delivering the Vessel early for which period Hanjin were paying.

8.    The Defendant has jumped on this statement and says that the agreed compensation paid was somehow obtained by the deceit of the Plaintiff in deceiving the Defendant as to the true losses of the Plaintiff and now intimate a claim for the recovery of USD125,377.66 plus interest plus costs.

9.    The above claim is simply frivolous on its face and has, in my opinion, no prospect of success in London arbitration or at all and should never have been ever intimated and should be withdrawn.

10.   At Exhibit 3 to this Declaration is Chapter 18 of Clerk & Lindsell on Torts, which deals with the tort of deceit.

11.   First, the tort of deceit is perhaps better known by the simple term "fraud" (Exhibit 2 para 18-01).

12.   The tort involves a party making a false representation, knowing it to be untrue, or being reckless as to whether it is true, and intending that the Claimant should act in

reliance on it, so in that in so far as the latter does so and suffers loss the party is liable for that loss (Exhibit 2 para 18-01).

13.    Further, the general rule, which would be applicable in this case is that a positive act or representation is required: "mere silence no matter how morally wrong, will not support an action for deceit" (Exhibit 2 para 18-05).

14.    However, in my respectful opinion, it is simply not necessary to read the detail of the tort of deceit in view of the actual and undisputed facts in this matter.

15.    Appended at Exhibit 4 to this declaration is the uncontroverted declaration of the Master of the Vessel at the time of the re-delivery which shows that the necessary diving survey for the renewal of her Class and trading certificates took place on 21 February 2006 between 10:30 hrs and 18:00 hrs local time. A time period of precisely 7 ½ hours. As is also pointed out in that declaration, the diving survey could in fact have also been carried out without loss of time whilst the Vessel was at Nemrut Bay, when she was re-delivered to Owners by the Defendant on 18 February 2006, or indeed after the Vessel's delivery to her new charterers at Mylaki in Greece on 23 February 2006. The diving survey was conducted on 21 February 2006, as the Vessel was idle (between the period of her early re-delivery by the Defendant on 18 February 2006 and her delivery to her new charterers on 23 February 2006) and it was convenient to conduct the diving survey at that time.

16.    Accordingly, on the facts the intimated new claim from the Defendant is wholly without merit and frivolous on its face. The Defendant simply has no evidence at all on which to base a claim as serious as fraud or at all.

17.    I would, further point out that in the Plaintiff's Preliminary Final Hire Statement including the claim for the Vessel's idle time (at Exhibit 2 to this declaration), the Owners simply claim for the time between the Vessel's early re-delivery from the Defendants up until the time they had secured new employment from her subsequent charterers, which delivery under the subsequent charter was prior to the minimum period of the charter with the Defendant.

18.    One can see that the Plaintiff made no express or implied statement about whether or not any diving or other survey had been conducted on the Vessel or whether any other work had been conducted regarding the renewing of the Vessel's docking and intermediate surveys or otherwise.

19.    Accordingly, the Plaintiff and the Defendant reached a perfectly sensible and legitimate commercial settlement of the Plaintiff's claim against the Defendant for early re-delivery and that settlement is not tainted in any way by fraud (for that is what deceit is) on the part of the Plaintiff.

20.    For completeness, the Defendant cannot even arguably state that they have been deceived whether expressly or impliedly.

21. The Owners of the Vessel may have slightly over played their hand in their circular to their shareholders, but if anything this was mere puff or marketing and as the actual facts show, absolutely no time was lost or saved by the conducting of the diving survey during the week that the Vessel was idle awaiting delivery under her new fixture to her new charterers after the breach by the Defendant in re-delivering the Vessel early and certainly no deception, deceit, or fraud was perpetrated against the Defendant in their commercially settling this claim. In any event, Hanjin clearly did not and could not have relied on the circular to shareholders dated 21 March 2006 because it only made available to them in the South African Arrest proceedings in 2007 long after settlement and payment of the re-delivery claim.

22. As stated at the beginning of this declaration, the declaration deals only with the allegation made by the Defendant of deceit and all other aspect of this matter are dealt with in the other papers being filed in this matter on behalf of the Plaintiff.

Executed on January 11, 2008 at 10 a.m.

Douglas Bateson

THOMAS COOPER
11 Kanari Street Kolonaki
106 71 Athens Greece
T +30 210 361 4840 F +30 210 361 4842
E info@thomascooperlaw.com
www.thomascooperlaw.com

**AFFIRMATION OF SERVICE**

I hereby certify that on January 18, 2008, a copy of the foregoing Declaration of Douglas William Bateson was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF system.

By: ____________________
Nancy R. Peterson

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| VOYAGER SHIPHOLDING CORP.<br><br>Plaintiff,<br><br>- against -<br><br>HANJIN SHIPPING CO., LTD.,<br><br>Defendant. | : | 07 Civ. 11123 (GEL) |

**EXHIBIT 1 TO**
**DECLARATION OF DOUGLAS WILLIAM BATESON**
**IN SUPPORT OF PLAINTIFF'S**
**OPPOSITION TO MOTION FOR COUNTERSECURITY**
**DATED 11 JANUARY 2008**

THOMAS COOPER
11 Karari Street Kolonaki
106 71 Athens Greece
T +30 210 361 4840 F +30 210 361 4842
E info@thomascooperlaw.com
www.thomascooperlaw.com

Final M/V Bonaler Mamata

**MV KEN**

**HANJIN SHIPPING CO LTD - CP DATED 07-MAY-2004**

| | |
|---|---|
| DELIVERY: | 29-AUG-2004 0830 HRS GMT |
| REDELIVERY: | 18-FEB-2006 1924 HRS GMT |
| BROB DELIVERY: | 1063.70MT FO, 128.50 MT DO |
| BROB REDELIVERY: | 1027.33MT FO, 92.51 MT DO |

| | | | | |
|---|---|---|---|---|
| **HIRE** | | | | |
| 538 DAYS 10 HRS 54 MINS | | | | |
| 538.45416 DAYS | | | $ | 13,730,581.23 |
| ADDRESS COMMISSIONS 2.5% | $ | 343,264.53 | | |
| BROKERAGE RESERVE 1.25% | $ | 171,632.27 | | |
| CEV PRORATA | | | $ | 23,333.01 |
| **BUNKERS ON DELIVERY** | | | | |
| 1063.70 MT FO AT USD170/MT | | | $ | 180,829.00 |
| 128.50 MT DO AT USD270/MT | | | $ | 34,695.00 |
| **BUNKERS ON REDELIVERY** | | | | |
| 1027.33 MT FO AT USD170/MT | $ | 174,646.10 | | |
| 92.51 MT DO AT USD270/MT | $ | 24,977.70 | | |
| **CLAIM FOR EARLY REDELIVERY (SEE NEXT TAB FOR DETAILS)** | | | **$** | **174,708.80** |
| **OFF HIRE** | | | | |
| 19 JUNE 2005 - 0.25 DAYS | | | | |
| OFF HIRE DUE CRANE 0.246528 DAYS | | | | |
| TTL | $ | 12,661.46 | | |
| OFF HIRE COMMISSIONS | | | $ | 474.80 |
| OFF HIRE CEV | $ | 21.52 | | |
| OFF HIRE BUNKERS | $ | 227.91 | | |
| **ILOHC** | | | $ | 5,000.00 |
| **INTERMEDIATE HOLDS CLEANING** | | | | |
| INTERIM HOLDS CLEANING 15 VOY | | | $ | 41,250.00 |
| CEMENT CLEANING FEE (1 VOY) | | | $ | 2,500.00 |
| SALT LIMEWASHING (1 VOY) | | | $ | 2,500.00 |
| PETCOKE CLEANING FEE (2 VOY) | | | $ | 5,000.00 |
| **OWNERS EXPENSES** | | | | |
| PANAMA | $ | 977.57 | | |
| PUERTO QUETZAL | $ | 993.63 | | |
| PANAMA | $ | 1,086.81 | | |
| NEW ORLEANS | $ | 73.05 | | |

| | | | | |
|---|---|---|---|---|
| LAZARO CARDENAS | $ | 7.87 | | |
| PHILADELPHIA | $ | 1,356.40 | | |
| ZINGANG | $ | 100.48 | | |
| BOSTON | $ | 2,299.04 | | |
| ACAJUTLA | $ | 871.74 | | |
| SEPETIBA | $ | 1,930.93 | | |
| SALDANHA BAY | $ | 518.64 | | |
| PORT ELIZABETH | $ | 732.44 | | |
| LA CORUNNA | $ | 2,154.58 | | |
| BOSTON | $ | 199.07 | | |
| PUNTA CARDON | $ | 1,325.62 | | |
| TOTAL | **$** | **14,627.87** | | |
| CHARTERERS OUTLAY COMMISSION | **$** | **365.70** | | |
| **CHARTERERS EXPENSES** | | | | |
| SUPERCARGO EXPENSES (13-17 FEB 2005- VICTUALLING) | | | $ | 50.00 |
| UNREPAIRED STEVEDORING DAMAGES PENANG | | | $ | 35,000.00 |
| UNREPAIRED STEVEDORING DAMAGES NEMRUT BAY | | | $ | 40,750.00 |
| US TAX 1Q2005 | | | $ | 24,480.00 |
| US TAX 2Q2005 | | | $ | 30,090.00 |
| **CHARTERERS REMITTANCES** | | | | |
| HIRE 1 | $ | 584,330.25 | | |
| HIRE 2 | $ | 368,806.25 | | |
| HIRE 3 | $ | 368,806.25 | | |
| HIRE 4 | $ | 368,806.25 | | |
| HIRE 5 | $ | 368,806.25 | | |
| HIRE 6 | $ | 368,806.25 | | |
| HIRE 7 | $ | 368,806.25 | | |
| HIRE 8 | $ | 368,806.25 | | |
| HIRE 9 | $ | 367,804.24 | | |
| HIRE 10 | $ | 368,806.25 | | |
| HIRE 11 | $ | 368,806.25 | | |
| HIRE 12 | $ | 368,806.25 | | |
| HIRE 13 | $ | 368,806.25 | | |
| HIRE 14 | $ | 328,155.66 | | |
| HIRE 14-1 | $ | 40,650.59 | | |
| HIRE 15 | $ | 368,806.25 | | |
| HIRE 16 | $ | 367,812.62 | | |
| HIRE 17 | $ | 367,719.44 | | |
| HIRE 18 | $ | 368,806.25 | | |
| HIRE 19 | $ | 368,806.25 | | |
| HIRE 20 | $ | 363,979.96 | | |
| HIRE 21 | $ | 368,806.25 | | |
| HIRE 22 | $ | 362,659.48 | | |

| | | | | |
|---|---|---|---|---|
| HIRE 23 | $ | 362,744.85 | | |
| HIRE 24 | $ | 368,806.25 | | |
| HIRE 25 | $ | 368,806.25 | | |
| HIRE 26 | $ | 368,806.25 | | |
| HIRE 27 | $ | 368,806.25 | | |
| HIRE 28 | $ | 368,806.25 | | |
| HIRE 29 | $ | 368,806.25 | | |
| HIRE 30 | $ | 368,806.25 | | |
| HIRE 31 | $ | 363,336.25 | | |
| HIRE 32 | $ | 367,243.44 | | |
| HIRE 33 | $ | 368,806.25 | | |
| HIRE 34 | $ | 368,806.25 | | |
| HIRE 35 | $ | 173,786.90 | | |
| HIRE 35-1 | $ | 194,997.85 | | |
| HIRE 36 | $ | 5,759.75 | | |
| | | | | |
| **TOTAL** | **$** | **13,844,756.33** | **$** | **14,331,241.85** |
| **DUE OWNERS** | **$** | **486,485.52** | | |

TELiX MSG: 01BBC-00 27/02/06 13:20

!SUBJECT: KEN/Hanjin
THIS IS UNION COMMERCIAL PIRAEUS

To: NJ Costalas

Geo/JK

Re: MV Ken/Hanjin - Ealry Redelivery
-----------------------------------

Vessel redelivered on Feb 18th at 1924 hrs GMT prior to the charter party minimum period expiring March 1, 0830 hrs GMT.

Owners managed to secure her next employment from February 23rd 2200 HRS GMT at a reduced hire rate.

Gross Hire Hanjin/Ken: USD25,500
Gross Hire Eitzen/Ken: USD13,950

Difference: USD11,550-

====

**VESSEL IDLE**

Accordingly, Owners claim for the loss of revenue as follows:

February 18, 2006 1924 HRS GMT to
February 23, 2006 2200 HRS GMT

5 Days 2 Hrs 36 Mins or,
5.108333 days at USD25,500 PDPR:....................USD130,262.50
Less Add Com and Brokerage Reserve..................USD 4,884.84
=============
Due Owners USD125,377.66

**VESSEL ON REDUCED HIRE**

From February 23, 2006 2200 HRS GMT to
March 01, 2006 0830 HRA GMT, 4 Days 10 Hrs 30 Mins or,
4.4375 days at USD11,550 PDPR:......................USD 51,253.13
Less Add Com and Brokerage Reserve..................USD 1,921.99
=============
Due Owners USD 49,331.14

**Grand total due Owners for loss of revenue: USD174,708.80**
*****************

QUOTE

For Chrs Reference:
Vessel's Redelivery Nemrut Bay:

AA. DLOSP @ PORT NEMRUT BAY FEBRUARY 18,2006 @ 2124H L/T (1924H GMT)
BB. FEBRUARY 18,2006 @ 2124H L/T (1924H GMT) M/V KEN REDELIVERED FROM

HER T/CHTRS. HANJIN SHIPPING TO HER OWNERS VOYAGER
SHIPHOLDING CORP.

Vessel's Delivery to her next employment:
BB. ON FEBRUARY 24,2006 @ 0001H L/T (23RD/2201H GMT) M/V KEN DELIVERED TO
HER T/CHTRS. EITZEN BULK A/S FROM HER OWNERS VOYAGER
SHIPHOLDING CORP.


UNQUOTE

Please confirm receipt of this message and advise when funds will be remitted
to Owners.

Awaiting yours,

Best Regards,

Union Commercial
As Agents Only


|
|=== MESSAGE INFORMATION: [size: 2310 bytes] [2] [M]
|=== END
|================================= System notice  27/02/06 13:20:38
|LgINT ref #=2702_132037
|From:Union Commercial Inc. <unioncom@hol.gr>
|To..:chartering@costalas.com
|Sent:Mon, 27 Feb 2006 13:20:37 +0200
|Subj: KEN/Hanjin (REF:0601BBC00)
|Smtp:250 2.0.0 k1RBLI6e020844 Message accepted for delivery
|**ATTENTION**: Status 'S' means submitted to Internet (with above SMTP id)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VOYAGER SHIPHOLDING CORP.,<br>Plaintiff,<br>- against -<br>HANJIN SHIPPING CO., LTD.,<br>Defendant. | 07 Civ. 11123 (GEL) |

**EXHIBIT 2 TO
DECLARATION OF DOUGLAS WILLIAM BATESON
IN SUPPORT OF PLAINTIFF'S
OPPOSITION TO MOTION FOR COUNTERSECURITY
DATED 11 JANUARY 2008**

THOMAS COOPER
11 Kanari Street Kolonaki
106 71 Athens Greece
T +30 210 361 4840 F +30 210 361 4842
E info@thomascooperlaw.com
www.thomascooperlaw.com

# VOYAGER SHIPHOLDING CORP.

21st March, 2006

**MEMORANDUM TO SHAREHOLDERS OF VOYAGER SHIPHOLDING CORP.**
**OWNERS OF MV "KEN"**

This will follow-up on our November report in connection to vessel's movements, performance and other pertinent developments.

A synopsis of her movements since we last reported to you is as follows:

The vessel's Charterers decided to discharge the cargo on Lazaro Cardenas (Mexico) only so arrived there on 8th December. She discharged her cargo in nine days and then sailed for Cedros Island, also in Mexico, where she arrived on 19th December and commenced loading a cargo of salt. She completed on 21st December and sailed for Boston, Massachusetts, via the Panama Canal (which she transited on 31st December 2005/1st January 2006). She arrived in Boston on 8th January, completed discharging on 12th January and then sailed for New Haven, Connecticut, where she arrived on 13th January. She loaded a part cargo of steel scrap and then sailed on 16th January for Newark, New Jersey, for the remaining cargo. She arrived the next day, completed loading in five days and sailed for Nemrut Bay, Turkey, where she arrived on 7th February. She completed discharging on 18th February.

The vessel was redelivered from her 18-month employment to Messrs. Hanjin, at the port of Nemrut Bay (which is close to Izmir in Turkey and within a "hopping" distance from the Greek island of Chios) on 18th February, 2006. This redelivery date fell short of the minimum warranted period under that charter party by about a week which under English law still held the Charterers liable for payment to Owners for the unutilized days. With Owners' blessings, Managers considered this a most opportune time to undergo - whilst on paid time - the ordinarily very expensive exercise of renewing the vessel's due Docking and Intermediate surveys. Taking further advantage of the vessel's proximity to Piraeus, the vessel was ordered to sail there upon redelivery precisely for this purpose and taking still further advantage of vessel's young age, the need (and expense) of drydocking the vessel was avoided by means of a so-called "in lieu of drydocking" underwater inspection by a Class- approved diver, who, in fact, found her bottom in very good condition. As a result, both surveys were renewed with minimum cost and vessel was credited with new certificates valid until 26th April, 2008.

c/o UNION COMMERCIAL INC.
5-7 Kanari, GR-185 37 Piraeus
Mailing Address: P.O.Box 80158 GR-185 10 Piraeus Greece
Telephone: 210 4283747 • Telex: 21 2561 • Fax 210 4283754
e-mail: unioncom@hol.gr

Upon renewal of the Docking and Intermediate Surveys and whilst always remaining "on hire", the vessel was fixed for a year's employment (minimum 11 to about 13 months period) to major Danish Charterers Eitzen Bulk A.S. at the prevailing market rate of $ 13,950 per day. This substantially lower-than-the-prior level is in line with our year-end prediction but, as also already foreseen, profitable enough to ensure substantial quarterly dividends.

Her first port of call after delivery to Eitzen was Mylaki, in the Greek island of Euboea, where she arrived in the morning of 24th February. She completed loading uneventfully a full cargo of bulk cement on 1st March and sailed immediately for Charleston, S. Carolina where, after a particularly strenuous passage due to adverse weather, she is due to arrive on 22nd March. At the time of the present writing, her discharging prospects as well as her next itinerary are unknown.

The vessel's value based on recent transactions is approximately $ 23,000,000 on the basis of the balance of charter attached.

As a result of vessel's ongoing profitability, we take pleasure in declaring a further dividend in the amount of $ 500,000, payable 31st March 2006. Incidentally, this will bring the total amount returned to shareholders since her acquisition in August of 2003 to $ 9,450,000. A further amount of $ 800,000 has been placed on an 8-month time deposit with vessel's mortgagees Messrs. Bremer Landesbank bearing an interest rate of 4.8% and is earmarked for either partial loan pre-payment or dividend distribution in a year's time, depending on market conditions which will be assessed at a date closer to that date.

Following the forthcoming loan repayment installment of April 30th, the vessel's outstanding loan will be reduced to $ 9,317,000.

As aforementioned above, having put behind us the renewal of the Docking and Intermediate Surveys at a minimal cost, we expect no additional cash outflows for the remainder of the year and as such we aspire for our Operating Expenses for 2006 to hover at around $ 4,150 per day.

Shareholders will continue to be kept advised of developments as and when they occur.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

VOYAGER SHIPHOLDING CORP.

Plaintiff,

- against -

HANJIN SHIPPING CO., LTD.,

Defendant.

07 Civ. 11123 (GEL)

**EXHIBIT 3 TO
DECLARATION OF DOUGLAS WILLIAM BATESON
IN SUPPORT OF PLAINTIFF'S
OPPOSITION TO MOTION FOR COUNTERSECURITY
DATED 11 JANUARY 2008**

THOMAS COOPER
11 Karari Street Kolonaki
106 71 Athens Greece
T +30 210 361 4840 F +30 210 361 4842
E info@thomascooperlaw.com
www.thomascooperlaw.com

CHAPTER 18

# DEECIT

| | PARA. |
|---|---|
| 1. Introduction | 18–01 |
| 2. Requirements | 18–04 |
| (a) Representation | 18–04 |
| (b) State of mind | 18–17 |
| (i) The belief of the defendant | 18–17 |
| (ii) State of mind: vicarious liability | 18–24 |
| (c) Representation intended to be acted on by the claimant | 18–28 |
| (d) Claimant must have been influenced by misrepresentation | 18–32 |
| 3. Damages | 18–36 |
| 4. Defences | 18–45 |
| 5. Misrepresentation as to credit of third persons | 18–48 |
| 6. Statutory liability for misstatements in a prospectus | 18–50 |
| 7. The action for fraud arising out of bribery | 18–51 |

## 1. INTRODUCTION

**Definition** The modern development of the tort of deceit (sometimes called simply "fraud") dates from *Pasley v Freeman*[1] in 1789. There, the defendant falsely represented to the claimant that a third party was creditworthy when he knew he was not; the plaintiff suffered loss as a result of extending credit to him. The claimant was held to have an action.[2] The tort involves a perfectly general principle.[3] Where a defendant makes a false representation, knowing it to be untrue, or being reckless as whether it is true, and intends that the claimant should act in reliance on it, then in so far as the latter does so and suffers loss[4] the defendant is liable for that loss. Each aspect of the tort is discussed in detail below.[5] **18–01**

---

[1] (1789) 3 T.R. 51.

[2] Though note that today the representation would have to be in writing: Statute of Frauds (Amendment) Act 1828. See para.18–48, below.

[3] An argument that it could not apply in a family context, or between cohabitees, was smartly rebuffed by Stanley Burnton J. in *P. v B. (Paternity: Damages for Deceit)* [2001] 1 F.L.R. 1041 (action by cohabitee against girlfriend for duping him into thinking a child was his and hence paying for its upkeep). The existence of liability, it was said, would not tend to subvert intimate relationships, particularly since a claimant was unlikely to sue while the relationship was still on foot. See too *Standard Chartered Bank v Pakistan National Shipping Corp (No.2)* [2003] 1 A.C. 959; [2002] UKHL 43, where the House of Lords rejected an argument that an agent who lied on his principal's orders could not be personally liable to the representee for loss suffered (on which, see Parker [2003] L.M. & C.L.Q. 1).

[4] Damage is the gist of the action; see *Smith v Chadwick* (1884) 9 App. Cas. 187, at 190 (Lord Blackburn).

[5] On summary judgment, an action for fraud is within the scope of CPR, r.24. However, it is likely that there would have to be very strong evidence of fraud for this to apply.

18–02 **Deceit and other liability for misrepresentation** Damages may, of course, be awarded for a misrepresentation even if it is not fraudulent. If a representation is a term of a contract, damages are available if it is false without even proof of fault: again, since the decision of the House of Lords in *Hedley Byrne & Co Ltd v Heller & Partners Ltd*,[6] it has been clear that misrepresentation can give rise to liability in the tort of negligence at common law, at least where there is something that can be construed as an acceptance of responsibility for its truth. In addition, under the Misrepresentation Act 1967, s.2(1), a person who induces another to contract with him by misrepresentation is liable unless he proves he was not at fault. Very often a claimant is much better advised to sue on one of these bases, given that "fraud must be distinctly alleged and as distinctly proved",[7] the strict rules about when a lawyer is entitled to plead it on his client's behalf,[8] the fact that the defendant's liability insurance may exclude liability for fraud, and the right of the defendant in an action for deceit (but not in one for negligence) to demand trial by jury.[9]

However, there may be advantages to suing for fraud. There is no need to show a special relationship or undertaking of responsibility (in contrast to *Hedley Byrne* liability)[10]; damages may not be reduced for contributory negligence[11] and may on occasion be more generous than elsewhere[12]; and s.32(1)(a) of the Limitation Act 1980 provides a more generous limitation regime, effectively preventing time from running at all until the claimant discovers the fraud[13] or could with reasonable diligence have discovered it.[14]

18–03 **Standard of proof in deceit claims** Despite early sporadic suggestions to the contrary,[15] the Court of Appeal made it clear in *Hornal v Neuberger Products Ltd*[16] that allegations of fraud need only be proved to civil standard of preponderance of probability and no more. Nevertheless, even if the standard is the civil

[6] [1964] A.C. 465. Liability for negligent misstatements is dealt with in paras 8–83 *et seq.*, above.
[7] *per* Thesiger L.J. in *Davy v Garrett* [1877] 7 Ch.D. 473 at 489. See also *Gardner Neptune Shipping v Occidental* [1990] 1 Lloyd's Rep. 330; Hooley (1991) 107 L.Q.R. 31. Note also that the Statute of Frauds (Amendment) Act 1828 (see below, para.18–48) does not apply to negligent misstatements.
[8] "Charges of fraud should not be lightly made or considered"—*Mason v Clarke* [1955] A.C. 778 at 794 (Viscount Simonds). It is unethical for a member of the Bar to allege fraud without clear instructions and reasonably credible evidence establishing a *prima facie* case. But note that this evidence need not necessarily be admissible in court: thus in the wasted costs decision in *Medcalf v Mardell* [2003] 1 A.C. 120; [2002] UKHL 27 the House of Lords declined to castigate as improper the pleading of fraud on the basis of documents subject to legal professional privilege.
[9] Supreme Court Act 1981, s.69; on which, see *Barclays Bank Ltd v Cole* [1967] 2 Q.B. 738, and *cf. Stafford Winfield & Cook Partners v Winfield* [1980] 3 All E.R. 759.
[10] For a discussion of this see above paras 8–83 and following.
[11] See para.18–45, below.
[12] See paras 18–36—18–44, below.
[13] Note that the word "fraud" in s.32(1) of the Limitation Act 1980 is not confined to deceit or dishonesty in the sense in which it is used in this chapter: *Beaman v A.R.T.S. Ltd* [1949] 1 K.B. 550; *Kitchen v R.A.F. Association* [1958] 1 W.L.R. 563. But this does not affect the point in the text
[14] Millett L.J. explained the subsection in *Paragon Finance plc v Thakerar & Co* [1999] 1 All E.R. 400, at 418, saying that claimants "must establish that they could not have discovered the fraud without exceptional measures which they could not reasonably have been expected to take". See too *Biggs v Sotnicks (a firm)* [2002] Lloyd's Rep. P.N. 331; [2002] EWCA Civ 272.
[15] *e.g. Thurtell v Beaumont* (1823) 1 Bing. 339.
[16] [1957] 1 Q.B. 247; followed in *Bromley v Att-Gen* [1968] N.Z.L.R. 75.

standard, in practice more convincing evidence will be required to establish fraud than other types of allegation: "The more serious the allegation the higher the degree of probability that is required."[17]

The Court of Appeal will not hold a defendant guilty of fraud contrary to the view of the trial judge unless it is completely satisfied that the latter was wrong. Doubts, even grave doubts, on the correctness of the judge's finding will be insufficient to persuade an appellate court to reverse it.[18]

## 2. REQUIREMENTS

### (a) *Representation*

**Misrepresentation required for liability** To found an action in deceit the claimant must show a clear misrepresentation of present fact or law. However, a representation may be either express or implied from conduct[19]; furthermore, adopting the representation of a third party can be sufficient.[20] Where an issue arises as to whether a representation is true or not, the issue is the meaning the representee was intended to put on it, rather than simply the literal meaning of the words used: 18–04

> "If a person makes a representation of that which is true, if he intends that the party to whom the representation is made should not believe it to be true, that is a false representation."[21]

Conversely, if a statement is in terms untrue, but is not intended to be interpreted in its literal sense, it cannot be charged as a deceit.[22]

**Misrepresentation and non-disclosure** The general rule is that a positive act or representation is required: "mere silence, however morally wrong, will not support an action of deceit".[23] However, there are, as might be expected, a number of qualifications to this principle. 18–05

---

[17] *ibid.* at 258, *per* Denning L.J. See too *Smith New Court Securities Ltd v Citibank N.A.* [1997] A.C. 254, at 274 (Lord Steyn). The intellectual underpinning of this principle was described by Lord Nicholls in *Re H. (Minors)* [1996] A.C. 563, at 586–7:

> "When assessing the probabilities the court will have in mind as a factor, to whatever extent is appropriate in the particular case, that the more serious the allegation the less likely it is that the event occurred and, hence, the stronger should be the evidence before the court concludes that the allegation is established on the balance of probability. Fraud is usually less likely than negligence . . . .".

[18] *Gross v Lewis Hillman Ltd* [1970] Ch. 445.

[19] See para.18–07, below. See too *Whyfe v Michael Cullen & Partners* [1993] E.G.C.S. 193 (business lease very obscurely worded, with rent inevitably uneconomic and surrender an inevitability: CA refuse to strike out action by lessees for deceit on basis that lease dressed up to look genuine when in fact not).

[20] *Bradford Third Equitable Benefit Building Society v Borders* [1941] 2 All E.R. 204, at 211 (Lord Maugham). (In fact fraud was held not established on the facts of the case.)

[21] See Alderson B. in *Moens v Heyworth* (1842) 10 M. & W. 147 at 158.

[22] See para.18–23, below.

[23] See Lord Maugham in *Bradford Third Equitable Benefit Building Society v Borders* [1941] 2 All E.R. 205, at 211.

**18–06** **Half-truths** A half-truth or fragmentary statement may amount to deceit if it is suggestive of a falsehood and intended so to be[24]: for example, where a defendant relays the favourable portion of a surveyor's report but omits the less favourable part.[25] As Lord Cairns stated in *Peek v Gurney*,[26] "there must . . . be some active misstatement of fact, or, in all events, such a partial and fragmentary statement of fact, as that the withholding of that which is not stated makes that which is stated absolutely false."[27] Thus in that case a share prospectus was held deceptive when it mentioned a price supposedly payable for a business by the promoters, but said nothing of other collateral agreements which effectively meant the promoters would not in fact pay a penny for it.

**18–07** **Active conduct or concealment** Active non-verbal conduct can amount to misrepresentation, and hence deceit, just as much as words can.[28] A straightforward example is positive steps taken to conceal defects in something being sold (as against merely keeping silent about them). So in *Gordon v Selico Ltd*,[29] the Court of Appeal awarded damages for deceit where a defendant fraudulently arranged to cover up infestations of dry rot in a flat before letting it to the claimant. Again, in the antique case of *Schneider v Heath*[30] a seller of a ship was held liable when he deliberately floated it so as to hide sub-waterline defects when the buyer came to inspect it.

**18–08** **Other qualifications** Three other qualifications are worth mentioning.

First, statements of belief or opinion generally carry an implication that the belief or opinion is reasonably held.[31] It follows that a defendant who affirms a belief while failing to disclose information in his possession indicating it is not reasonably held is guilty of a misrepresentation, and may (if a suitable state of mind is shown) be guilty of deceit.

Secondly, a defendant who has made a true statement is bound to correct it if, though true when made, it is later to his knowledge falsified by events. This is dealt with below.[32]

---

[24] *cf. Mentmore Manufacturing Co Ltd v Fomento (Sterling Area) Ltd* (1955) 72 R.P.C. 157; also *William Sindell Plc v Cambridgeshire CC* [1994] 1 W.L.R. 1016 (statement that vendor not aware of a defect in title carried implied representation that it had taken reasonable steps to ascertain whether any existed).

[25] The example is James L.J.'s: see *Arkwright v Newbold* (1881) L.R. 17 Ch.D. 301, at 318.

[26] (1873) L.R. 6 H.L. 377.

[27] (1873) L.R. 6 H.L. 377, at 403. See too Lord Steyn in *Smith New Court Securities Ltd v Scrimgeour Vickers (Asset Management) Ltd* [1997] A.C. 254 at 274 ("a cocktail of truth, falsity and evasion is a more powerful instrument of deception than undiluted falsehood").

[28] See the old criminal case of *R. v Barnard* (1837) 7 C. & P. 784 (buyer donned university garb to which not entitled and thus induced seller to give him credit: held, rightly convicted of obtaining by false pretences). A more modern instance (in a claim brought under s.2(1) of the Misrepresentation Act 1967) is *Spice Girls Ltd v Aprilia World Service BV* [2002] E.M.L.R. 510; [2002] EWCA Civ 15 (representation by conduct: participating in the filming of advertisements for the claimant constituted a representation that the group would not break up during the term of the advertising contract).

[29] (1986) 18 H.L.R. 219.

[30] (1813) 3 Camp 506. *cf. Reynell v Sprye* (1852) 1 De G.M. & G. 660; *Walters v Morgan* (1861) 3 De G.F. & J. 718, 723; and see too *Abel v McDonald* (1964) 45 D.L.R. (2d) 198.

[31] See below, para.18–11.

[32] Below, para.18–16.

Thirdly, it is sometimes suggested that there is a duty to disclose, and hence non-disclosure may amount to deceit, where the parties are dealing with a dangerous chattel (though this is more doubtful). This is discussed below.[33]

**Misrepresentation: promises and statements of intention** A representation as to the future will not as such found liability in deceit.[34] Nor will a broken promise, as such.[35] However, the limits of this principle must be borne in mind. 18–09

First, it is clearly established that a representation of present intention, whether the intention be that of the representor or of a third party,[36] is a sufficient representation of an existing fact to form the foundation of an action for deceit.[37] "The state of a man's mind", said Bowen L.J., "is as much a fact as the state of his digestion. It is true that it is very difficult to prove what the state of a man's mind at a particular time is, but if it can be ascertained it is as much a fact as anything else."[38] Therefore, in *Edgington v Fitzmaurice*,[39] it was held that a prospectus was deceptive when it contained false statements of what the company intended to do with investors' money once it got it.[40]

Moreover, a statement as to the future will often imply a statement as to present intention; as Lord Herschell has said, "that which is in form a promise may be in another aspect a representation".[41] Thus a promisor generally represents by implication that he has at the moment of making the promise the intention of fulfilling the obligations that he is undertaking; and if it can be shown that no such intention existed in his mind at that moment, he is guilty of a misrepresentation.[42] Nevertheless, this principle cannot be taken too far. The mere fact that the intention which was represented to exist was not eventually carried into effect is little or no evidence of the original non-existence of the intention. The representor may have subsequently changed his mind[43]; and in such a case there is no misrepresentation at all. 18–10

---

[33] See para.18–15, below.
[34] See the criminal cases of *R. v Sunair Holidays Ltd* [1973] 1 W.L.R. 1105 and *British Airways Board v Taylor* [1976] 1 W.L.R. 13 (statement that customers would be accommodated in the future not as such statements of fact, the requirement of a false statement under the relevant consumer protection legislation being the same as that in deceit).
[35] See *Beckett v Cohen* [1973] 1 All E.R. 120 and *R. v Sunair Holidays Ltd* [1973] 1 W.L.R. 1105 for a full discussion of the distinction between an implied statement of present fact which may form a promise and the breaking of a promise relating to future facts or conduct.
[36] *R. v Gordon* (1889) 23 Q.B.D. 354, at 360, (Wills J.); *Kettlewell v Refuge Assurance Co* [1908] 1 K.B. 545 (affirmed, [1909] A.C. 243); and *cf.* Theft Act 1968, s.15(4) and *DPP v Ray* [1974] A.C. 370.
[37] *Edgington v Fitzmaurice* (1885) 29 Ch.D. 459.
[38] *ibid.*, at 483.
[39] *ibid.*
[40] The prospectus said the money was wanted for further investment in the business: in fact it was needed to pay off existing debts.
[41] See *Clydesdale Bank Ltd v Paton* [1896] A.C. 381, at 394. Thus where a person orders goods on credit he states not only that he will pay for them but also that he intends to do so.
[42] *Re Shackleton* (1875) L.R. 10 Ch. 446; *Re Eastgate* [1905] 1 K.B. 465. See too *East v Maurer* [1991] 1 W.L.R. 461 (seller of business said he would not compete when he had every intention of doing so: accepted, liable in deceit).
[43] As in *Jordan v Money* (1854) 5 H.L.C. 185.

Furthermore, it should be noted that there is an exception where parties are in negotiation over price, in which case a misstatement as to the highest price which the one party has the intention to give, or the lowest price which the other has the intention to accept, will not afford a cause of action.[44] The law permits the seller some latitude in exaggerating the value of his goods and so the purchaser is not bound to disclose the highest price he chooses to give, but is "at liberty to do that as a purchaser which every seller in this town does every day, who tells every falsehood he can to induce a buyer to purchase".[45]

18–11 **Misrepresentation: statements of opinion** A mere statement that one thinks a given state of affairs exists is not a statement that it does in fact exist[46]; it follows that it cannot engender liability in deceit on that basis. However, this is not a very important limitation in practice. A statement of opinion is invariably regarded as incorporating an assertion that the maker does actually hold that opinion[47]; hence the expression of an opinion not honestly entertained and intended to be acted upon amounts to fraud.[48] And the same goes for projections as to the future: if a defendant says he expects an event to take place when he does not, he makes an untrue statement of fact.[49] The only obstacle in the way of maintaining an action for a false representation on this basis lies in the difficulty of proving what the defendant's real opinion was,[50] and in the difficulty of distinguishing a representation of the existence of an opinion from the representation of the existence of a fact on which that opinion is based.

18–12 Furthermore, at least where the facts are not equally well known to both sides, then a statement of opinion by one who knows the facts best will often carry with it a further implication of fact, namely that the representor by expressing that opinion impliedly states that he believes that facts exist which reasonably justify it.[51] If he does not actually believe such facts exist, it follows that he will be

---

[44] *Vernon v Keys* (1810) 12 East 632; affirmed (1812) 4 Taunt. 488. No doubt a similar principle applies to negotiations over other terms.

[45] *per* Mansfield C.J. in *Vernon v Keys* (1812) 4 Taunt. 488, at 493. This quotation must be read in its context relating to the price the purchaser was prepared to give. As an exception it must not be carried too far: see *Haygarth v Wearing* (1871) L.R. 12 Eq. 320, and *Armstrong v Strain* [1951] 1 T.L.R. 856, 860, *per* Devlin J. (affirmed, [1952] 1 K.B. 232). *cf. Smith New Court Securities Ltd v Citibank NA* [1997] A.C. 254 (false statement that third party had offered a given sum for securities accepted as sufficient to found liability).

[46] See the contract case of *Bisset v Wilkinson* [1927] A.C. 177 (vendor's statement of opinion as to capacity of farm: even though wrong, no misrepresentation allowing rescission of contract).

[47] "A representation of fact may be inherent in a statement of opinion and at any rate the existence of the opinion in the person stating it is a question of fact." (Lord Merrivale in *Bisset v Wilkinson* [1927] A.C. 177, at 182). See too Devlin J. in *Armstrong v Strain* [1951] 1 T.L.R. 856, at 860 (affirmed [1952] 1 K.B. 232); and Lord Evershed M.R. in *Brown v Raphael* [1958] Ch. 1636, at 641.

[48] See, *e.g. Commercial Banking Co of Sydney Ltd v R. H. Brown & Co* (1972) 126 C.L.R. 337 (opinion conveyed by bank as to client's financial standing not honestly held); also *Anderson v Pacific Insurance Co* (1872) L.R. 7 C. & P. 65, at 69 (Willes J.).

[49] See *Karberg's Case* [1892] 3 Ch. 1, at 11.

[50] See, *e.g. Peek v Gurney* (1873) L.R. 6 H.L. 377 at 404.

[51] *Barings Plc (In Liquidation) & Anor v Coopers & Lybrand (A Firm)* [2002] P.N.L.R. 823; [2002] EWHC (Ch) 461 at [48]–[52]. See too the contract cases of *Smith v Land & House Property Corp.* (1885) 28 Ch.D. 7, at 15 (Bowen L.J.), and *Brown v Raphael* [1958] Ch. 1636 (both concerned with the right to rescind, where the same requirement applies of a representation of fact, though not of a guilty state of mind).

liable in deceit.[52] In such a case, the test as to whether a statement of opinion involves such a further implied representation will involve a consideration of the meaning which is reasonably conveyed to the representee. The material facts of the transaction, the knowledge of the respective parties, their relative positions, the words of the representation and the actual condition of the subject-matter are all relevant to this issue.[53]

**Misrepresentation: statements of law** Throughout the nineteenth and twentieth centuries, propositions of law tended to be regarded as inherently non-factual.[54] Hence statements of law were treated as statements of opinion at most, demonstrable as false only by proof that the representor did not in fact entertain that view of the law which he expressed.[55] However, the distinction between factual and legal statements was difficult to draw at the best of times,[56] and has now been discredited elsewhere in the law.[57] It is therefore submitted that in the law of deceit misstatements of law now fall to be treated on a similar footing to misstatements of fact,[58] though given the uncertainty inherent in case law development and statutory interpretation, proof that a defendant knowingly misrepresented the law is likely in practice to be hard to come by. 18–13

**Mere puffs** There is no misrepresentation in the case of mere exaggerated praise by a vendor of his wares; he is entitled to assume that his statement will be construed as mere puffing. But though a vendor may entertain "sanguine expectations" of the advantages to be derived from his goods, and may employ 18–14

[52] *Barings Plc (In Liquidation) & Anor v Coopers & Lybrand (A Firm)* [2002] P.N.L.R. 823; [2002] EWHC (Ch) 461 at [48]–[52]. In fact the representor there, a banking executive who signed a representation to accountants that there was nothing untoward, had the necessary bona fide belief and therefore there was no liability.

[53] *Bisset v Wilkinson* [1927] A.C. 183; *Smith v Chadwick* (1884) 9 App.Cas. 187; *Brown v Raphael*, above; *Jaffray v Society of Lloyds* [2002] EWCA Civ 1101 at para.58.

[54] Thus a contract could not be rescinded on the basis of a misrepresentation or mistake of law (*Eaglesfield v Londonderry (Marquis)* (1876–77) 4 Ch. D. 693) (though there were suggestions that fraudulent statements of law might be on a different footing (*West London Commercial Bank v Kitson* (1884) 13 Q.B.D. 360, at 362–363)); nor was money thought to be recovered if paid by mistake of law rather than fact (*e.g. Bilbie v Lumley* (1802) 2 East. 469).

[55] See *Beattie v Ebury (Lord)* (1872) L.R. 7 Ch. 777, at 802 (Mellish L.J.).

[56] See the convoluted, and hardly informative, example given by Jessel M.R. in *Eaglesfield v Londonderry (Marquis)* (1876–77) 4 Ch.D. 693, at 702–703 (statement that a woman is married may be factual or legal according to the circumstances). Statements as to the legal effect of a document could be remarkably awkward in this connection. Compare *West London Commercial Bank v Kitson* (1884) 13 Q.B.D. 360 (whether Act of Parliament gave power to directors to sign for company matter of fact) with *Eaglesfield v Londonderry (Marquis)* (1876–77) 4 Ch.D. 693 (ranking of share issues *inter se* matter of law).

[57] The leading case, *Kleinwort Benson Ltd v Lincoln City Council* [1999] 2 A.C. 349, reversed previous authorities and decided that money paid by mistake of law could be recovered on the same basis as if the mistake had been factual. *Pankhania v Hackney LBC* [2002] EWHC 2441 (Ch) then decided that statements of law were misrepresentations under the Misrepresentation Act 1967. See too *Brennan v Bolt Burdon* [2005] Q.B. 303; [2004] EWCA Civ 1017 (legal mistakes as capable of impugning a contract as factual ones).

[58] Even, it would seem, where the law is unexpectedly changed with retrospective effect by legal decision, as happened in *Kleinwort Benson Ltd v Lincoln City Council* [1999] 2 A.C. 34, above. But proof of a guilty state of mind in such a case, so as to establish liability in deceit, would be well-nigh impossible.

"high colouring and even exaggeration" in his description of them, he must make no misstatement of any material facts or circumstances.[59]

18–15 **Misrepresentation: dangerous and defective chattels** There is no doubt that a seller[60] of goods who states that they are sound when he knows they are not is liable to the buyer or anyone else who relies on his statement and suffers loss. So in the old case of *Langridge v Levy*[61] the seller of a shotgun who told the buyer that it was safe when he knew it was not was held liable in deceit to the buyer's son who relied on the assertion and was injured when the firearm exploded. In *Langridge*'s case, however, there was it seems a positive representation by the defendant.[62] What is the position where there is no such representation, but merely a sale or circulation of a chattel the defendant knows is defective? It has been suggested that anyone who sells a chattel he knows is likely to cause injury is potentially liable in fraud.[63] But this, it is suggested, is highly doubtful. In *Ward v Hobbs*[64] a farmer sold pigs that, to his knowledge, were diseased and which duly infected the buyer's own herd. Bramwell B. clearly thought that the farmer was not liable in deceit in the absence of a positive representation over and above the marketing of the pigs.[65] Of course, it may be possible in some cases to construct a representation: if a car were sold without an engine, the seller might well be guilty of a misstatement in describing it as a car at all. But such cases aside, it is submitted that if there is to be liability for selling dangerous or defective goods, it is better regarded as liability in negligence[66] rather than in the tort of deceit.[67]

---

[59] See Lord Chelmsford in *Central Ry Co of Venezuela v Kisch* (1857) L.R. 2 H.L. 99, 113. It is suggested that the "mere puffs" principle is largely an outgrowth of the rule that statements of opinion are not as such statements of fact.

[60] Doubtless the same principle applies to a lender or a person letting out goods on hire.

[61] (1837) 2 M. & W. 519. *cf. Dobell v Stevens* (1825) 3 B. & C. 623; *Patterson v Landsberg* (1905) 7 F. 675.

[62] See (1837) 2 M. & W. 519, at 530 (Parke B.). Admittedly, on the facts the evidence seems scanty: see the comments of Lord Atkin on *Langridge*'s case in *Donoghue v Stevenson* [1932] A.C. 562, at 587–588.

[63] "Knowledge of a dangerous defect in a product may provide a foundation for a case of fraud against a person who makes or circulates a dangerous product without warning of the danger of physical damage known to him."—*Hamble Fisheries Ltd v L. Gardner & Sons Ltd* [1999] 2 Lloyd's Rep. 1, at 9 (Mummery L.J.). *cf. Bodger v Nichols* (1873) 28 L. T. 441.

[64] (1877) 3 Q.B.D. 150. See too *Keates v Cadogan* (1851) 10 C.B. 591 at 600 (no liability in respect of known defects in real property: disponor must show "aggressive deceit").

[65] See (1877) 3 Q.B.D. 150, at 157. The House of Lords upheld the decision on the basis that the pigs had been expressly sold unwarranted, leaving open whether Bramwell B.'s wide statement was correct: (1878) 4 App.Cas. 13. See too *Baglehole v Walters* (1811) 3 Camp. 154 (sale of ship "with all faults": seller not liable unless he used artifice to conceal the faults from buyer); *Hurley v Dyke* [1979] R.T.R. 265, esp. at p.303.

[66] Or, where appropriate, under s.14 of the Sale of Goods Act 1979 or the strict liability provisions of the Consumer Protection Act 1987.

[67] Compare the cases concerned with the liability of bailors, which have normally been put on the basis of negligence rather than the specific tort of deceit: *e.g. Blakemore v Bristol, etc., Ry* (1858) 8 E. & B. 1035, at 1051. Similarly with donors: *Coughlin v Gillison* [1889] 1 Q.B. 145; *MacCarthy v Young* (1861) 6 H. & N. 329. It is instructive to note that a more recent case similar to *Ward v Hobbs* (1877) 3 Q.B.D. 150, involving the sale of a car known to be dangerous, was regarded by the House of Lords as essentially turning on negligence liability: *Hurley v Dyke* [1979] R.T.R. 265.

**Continuing representations** The tort of deceit is complete only when the representation is acted upon.[68] Where there is an interval between the time when the representation is made and the time when it is acted on, and the representation relates to an existing state of things, the representation is deemed to be repeated throughout the interval. Hence if it is false to the maker's knowledge at the time when it is relied on there will be a deceit at that time.[69] 18–16

Thus if, during the time between the making of the representation and the claimant acting upon it, the defendant discovers it to be false or circumstances change to his knowledge so that it is now untrue, liability may be incurred.[70] Again, in *Briess v Woolley*[71] a managing director fraudulently made a false representation to induce the sale of a business before his appointment as agent of the shareholders to negotiate the sale. Some time after his appointment as agent, the sale was effected as a result of the previous false representation. The shareholders were held liable for the fraud of the managing director as their agent; the representation was a continuing representation which they (through him) had fraudulently failed to correct after his appointment.

### (b) *State of mind*

#### (i) *The belief of the defendant*

**The state of mind necessary for liability in deceit** Although the decision in *Pasley v Freeman*[72] established the existence of a tort based on fraud, it did not make entirely clear what state of mind was required in the defendant in order to establish it. The leading case on this point is the later decision of the House of Lords in *Derry v Peek*.[73] There, Lord Herschell laid down the essentials of fraud in the following propositions: 18–17

> "First, in order to sustain an action of deceit, there must be proof of fraud and nothing short of that will suffice. Secondly, fraud is proved when it is shown that a false representation has been made (i) knowingly, (ii) without belief in its truth, or (iii) recklessly, careless[74] whether it be true or false. Although I have treated the second and third as distinct cases, I think the third is but an instance of the second, for one who makes a statement under such circumstances can have no real belief in the truth of what he states. To prevent a false statement from being fraudulent, there must, I think, always be an honest belief in its truth."[75]

---

[68] *Northern Bank Finance Ltd v Charlton* [1979] I.R. 149, at 166.

[69] *Briess v Woolley* [1954] A.C. 333, at 353–354 (Lord Tucker); *DPP v Ray* [1974] A.C. 370, HL. Conversely, if a statement known to be false when made becomes true before it is acted on there will be no liability: see *Ship v Crosskill* (1870) L.R. 10 Eq. 73, and *Briess v Woolley* [1954] A.C. 333, at 353.

[70] e.g. *Slough Estates plc v Welwyn-Hatfield DC* [1996] 2 P.L.R. 50 (statement of intent originally true: defendant guilty of deceit when changed mind but did not tell plaintiff); see too *Jones v Dumbrell* [1981] V.R. 199. *cf.* the contractual misrepresentation case of *With v O'Flanagan* [1936] Ch. 575, and also *Spice Girls Ltd v Aprilia World Service BV* [2002] E.M.L.R. 510; [2002] EWCA Civ 15 at [51] (Morritt V.C.) (a case decided under the Misrepresentation Act 1967, but still in point).

[71] [1954] A.C. 333.

[72] (1789) 3 T.R. 51.

[73] (1889) 14 App.Cas. 337.

[74] In the sense of not caring.

[75] (1889) 14 App.Cas. 337, at 376.

It follows from this that a statement honestly believed to be true, however implausible it may be, is not capable of amounting to fraud. Thus in *Niru Battery Manufacturing Co v Milestone Trading Ltd*[76] a bank presented a letter of credit to a buyer for payment, despite the fact that it was obvious to any reasonable person that no payment was due under it since the goods had never been shipped. But this fact was not in the mind of the relevant bank officer when he arranged the presentation: it followed that, however casual or naïve he might have been, no claim lay in deceit. Similarly, in *Derry v Peek*[77] itself a company prospectus stated that the company had certain parliamentary powers which in fact it did not possess. Shareholders who had bought shares on the faith of the statement in the prospectus sued the promoters in deceit when the company went into liquidation. Their action failed: it had not been proved that the directors lacked honest belief in what they had said.[78]

Nevertheless, although the unreasonableness of the grounds of the belief will not of itself support an action for deceit, it will of course be evidence from which fraud may be inferred. As Lord Herschell has pointed out, there must be many cases

> "where the fact that an alleged belief was destitute of all reasonable foundation would suffice of itself to convince the court that it was not really entertained, and that the representation was a fraudulent one."[79]

**18–18** **Motive irrelevant** It should be noted that if the requisite degree of knowledge or recklessness is shown, the defendant's motive in making the representation is immaterial: "If fraud be established it is immaterial that there was no intention to cheat or injure the person to whom the false statement was made."[80] The fact that the representor was not actually dishonest,[81] or acted with the aim of facilitating a bona fide business transaction,[82] is irrelevant (though of course lack

---

[76] [2004] Q.B. 985; [2003] EWCA Civ 1446, upholding [2002] 2 All E.R. (Comm) 705, [2002] EWHC 1425 (Comm).

[77] (1889) 14 App.Cas. 337.

[78] *ibid.*, at 376. See too *Angus v Clifford* [1891] 2 Ch. 449 to the same effect. Note, however, that directors in the position of the defendants in *Derry v Peek* are under a statutory liability which does include negligence: see Financial Services and Markets Act 2000, s.90, reenacting the Directors' Liability Act 1891, and para.18–50, below.

[79] See *Derry v Peek* (1889) 14 App.Cas. 337, at 376; also *Gross v Lewis Hillman* [1970] Ch. 445, at 465.

[80] *Bradford Third Benefit Building Society v Borders* [1941] 2 All E.R. 205, at 211 (Viscount Maugham); also *Foster v Charles* (1830) 6 Bing. 396, 7 Bing. 105; *Polhill v Walter* (1832) 3 B. & Ad. 114; *Derry v Peek* (1889) 14 App.Cas. 337, at 365, 409; *Watts v Spence* [1976] Ch. 165, at 176.

[81] "It is not necessary that the maker of the statement was 'dishonest' as that word is used in the criminal law. The relevant intention is that the false statement shall be acted upon by a person to whom it is addressed."—*Standard Chartered Bank v Pakistan National Shipping Corp'n (No.2)* [2000] 1 Lloyd's Rep. 218, at 224 (Evans L.J.).

[82] See *Standard Chartered Bank v Pakistan National Shipping Corp (No.2)* [2000] 1 Lloyd's Rep. 218, esp. at 224 (date of presentation of letter of credit falsified to speed up business deal: presenter still guilty of deceit. The case was reversed on other grounds at [2003] 1 A.C. 959; [2002] UKHL 43). A similar type of case is *Shinhan Bank Ltd v Sea Containers Ltd* [2000] 2 Lloyd's Rep. 406 (buyer signing receipts for undelivered goods to accommodate seller, knowing seller would then use them to obtain bank finance: buyer liable to bank for deceit); and see too *Brown Jenkinson and Co Ltd v Percy Dalton (London) Ltd* [1957] 2 Q.B. 631 (agreement to issue clean bills of lading for damaged goods deceitful and hence promise to indemnify shipowner for liability ineffective), and also *Ansbacher (Henry) & Co Ltd v Brinks Stern (a firm)* [1998] P.N.L.R. 221.

of dishonest intent may be powerful evidence of a bona fide belief in the truth of the facts asserted by the defendant[83]).

**18–19** **Absence of belief in truth; recklessness** If the defendant knows his statement to be untrue he will be responsible for any loss suffered as a result.[84] Little more need be said on this point. However, liability goes further than this. Even if the party making the representation may have had no knowledge of its falsehood, he will still be responsible if he had no belief in its truth and made it, "not caring whether it was true or false".[85] As Lord Herschell put it:

> "Any person making such a statement must always be aware that the person to whom it is made will understand, if not that he who makes it knows, yet at least that he believes it to be true. And if he has no such belief he is as much guilty of fraud as if he had made any other representation which he knew to be false, or did not believe to be true."[86]

**18–20** **Timing: defendant forgetting facts once known** Since the tort of deceit is committed at the time the claimant relies on the defendant's false statement, it is not enough to show that the defendant once knew facts contrary to the representation made by him, if at the time of making it he had honestly forgotten them. In an action of deceit it is essential that the defendant should be without honest belief in the truth of his statement at the time of making it[87] (though no doubt when it can be shown that the defendant has at one time known facts inconsistent with the truth of his statement, this will be strong evidence that he knew such facts at the time of making the statement).

**18–21** **Timing: defendant's later knowledge** In the converse case, where the defendant does not acquire knowledge of the untruth of his statement until after it has been made, but becomes aware of it before the claimant has acted upon it, it follows from general principle that he is bound to communicate the truth and will be answerable in damages if he does not.[88]

**18–22** **Timing: statement becoming untrue *ex post facto*** It may be that a statement was in fact true at the time when made, but before being acted upon by the party to whom it was made had been rendered untrue by reason of later events. In such

---

[83] *Barings plc v Coopers & Lybrand (No.5)* [2002] P.N.L.R. 823; [2002] EWHC 461 (Ch).

[84] *Pasley v Freeman* (1789) 3 T.R. 51. This was the first case in which fraud was held to give a cause of action between persons not parties to a contract.

[85] See *per* Smith J. in *Joliffe v Baker* (1883) 11 Q.B.D. 255, at 275.

[86] *per* Lord Herschell in *Derry v Peek* (1889) 14 App.Cas. 337, at 368; see also *ibid.* at 361, and *Pritty v Child* (1902) 71 L.J.K.B. 512 (where a contractual relation was held to impose a duty to refrain from reckless statements).

[87] See *Derry v Peek* (1889) 14 App.Cas. 337, at 343 (Lord Halsbury); *Angus v Clifford* [1891] 2 Ch. 449, at 471; *Bradford Third Benefit Building Society v Borders* [1941] 2 All E.R. 205, at 220 (Lord Wright); *Armstrong v Strain* [1951] 1 T.L.R. 856, at 870–871 (Devlin J.) (affirmed [1952] 1 K.B. 232).

[88] See (*obiter*) *per* Lord Blackburn in *Brownlie v Campbell* (1880) 5 App.Cas. 925, at 950; *cf. Briess v Woolley* [1954] A.C. 333. In *Ansbacher (Henry) & Co Ltd v Brinks Stern (a firm)* [1998] P.N.L.R. 221, the point was raised but it became unnecessary to decide it, though the court would have found it difficult to accept that the defendant continued to hold the honest belief he claimed to have had.

a case, then if the defendant was aware of those events he will be liable in deceit.[89]

**18–23** **Ambiguous representations** Where a statement is capable of being understood in more than one sense, it is essential to liability in deceit that the party making the statement should have intended it to be understood in its untrue sense, or at the very least that he should have deliberately used the ambiguity for the purpose of deceiving the claimant.[90] Even though the more natural and reasonable interpretation of the statement is that put upon it by the claimant, and though on that interpretation it is untrue to the knowledge of the defendant, that will not suffice if the defendant did not intend it to be so understood.[91] Thus in *Akerhielm v De Mare*[92] a buyer of shares who had relied on an ambiguous statement in a company prospectus failed in his action in deceit once it was shown that the defendants had honestly believed the statement to be true in the sense in which they had intended it to be read. Even if the claimant's interpretation was a proper one, they had not shown the requisite knowledge of falsity in the defendants. On the other hand, if the defendant alleges that he understood his statement in a way that a reasonable person would not have understood it, then as a matter of evidence this may well weigh with the court in deciding whether he honestly understood it in that sense.[93]

### (ii) *State of mind: vicarious liability*

**18–24** **Knowledge: vicarious liability of employer**[94] There is no doubt that a blameless employer may be vicariously liable for a deceit committed by a dishonest employee in the course of his employment,[95] in the same way as he can be liable for any other deliberate tort.[96] However, there are two important limitations on the employer's potential liability in this connection.

[89] *Incledon v Watson* (1862) 2 F. & F. 841; *With v O'Flanagan* [1936] Ch. 575 at 584; *Bradford Third Benefit Building Society v Borders* [1941] 2 All E.R. 205, at 220 (Lord Wright); Bigwood [2005] C.L.J. 94. Compare the reasoning in *Briess v Woolley* [1954] A.C. 333 (see para.18–16, above) on continuing representations.

[90] See now *Whyfe v Michael Cullen & Partners* [1993] E.G.C.S. 193.

[91] *Hallows v Fernie* (1868) L.R. 3 Ch.App. 467, at 476–477; *Arkwright v Newbold* (1881) 17 Ch.D. 301; (1884) 9 App.Cas. 187, at 201, *per* Lord Blackburn; *Low v Bouverie* [1891] 3 Ch. 82, at 101–106; *Aaron's Reefs Ltd v Twiss* [1896] A.C. 273, at 282; *Akerhielm v De Mare* [1959] A.C. 789, at 805–806; *Gross v Lewis Hillman Ltd* [1970] Ch. 445.

[92] [1959] A.C. 789. The case was applied by the Court of Appeal in *Ansbacher v Brinks Stern* [1998] P.N.L.R. 221.

[93] *ibid.* at 805.

[94] See above, Ch.6 for vicarious liability generally.

[95] *e.g. Lloyd v Grace, Smith and Co* [1912] A.C. 716 (solicitor's clerk defrauding client); *Barings plc (in liquidation) v Coopers & Lybrand (issues re Liability)* [2003] P.N.L.R. 639; [2003] EWHC 1319 (Ch) (lies told by unauthorised traders to company's auditors to cover up their trail: *held*, employers liable on principle to auditors on basis of vicarious liability). *cf. Barwick v English Joint Stock Bank* (1867) L.R. 2 Ex. 259, at 265 (Willes J.). Equally it does not matter for these purposes that the fraud was as much against the employer as the claimant: *cf. Kwei Tek Chao v British Traders and Shippers Ltd* [1954] 2 Q.B. 459, at 470 (Devlin J.).

[96] See, *e.g. Morris v Martin* [1966] 1 Q.B. 716 (conversion by theft). For what amounts to "course of employment" in this connection, see generally *Lister v Hesley Hall Ltd* [2002] 1 A.C. 215; [2001] UKHL 22 and above, para.6–26.

First, it has to be shown that the employee in the course of his employment not only acted dishonestly, but actually committed the principal act amounting to the tort of deceit. The point was neatly illustrated by *Crédit Lyonnais Nederland NV v Export Credits Guarantee Department*.[97] As part of a scheme to induce a bank to buy forged bills of exchange relating to bogus export transactions, a fraudster obtained certain guarantees from the defendants, which he had suborned X, a dishonest employee of theirs, to authorise on their behalf. The bank sued the defendants in deceit, arguing (correctly) that the employee was liable to them as an accessory of the fraudster, and that in issuing the guarantees to aid the fraudster he had acted within the scope of his employment. The House of Lords nevertheless held that the action failed. The essential elements of the tort of deceit had been committed by the fraudster and not by X, and the mere fact that X had abetted a tort in the course of his employment did not make the defendants liable for it as his employers.

Secondly, the rule that an act may be done in the course of employment even if entirely unauthorised[98] is modified in the case of deceit. An employer will be vicariously liable for a statement made by his employee only if the employee had actual or ostensible authority to make it.[99] So in *Armagas Ltd v Mundogas SA*[1] an employee of the defendant shipping company, while negotiating on their behalf but without their authority, defrauded the claimants into thinking that the defendants were contracting to charter a ship for three years. The claimant's action for breach of contract having failed because the employee had no authority to contract on their behalf, the House of Lords held that their action in deceit on the basis of vicarious liability for their employee's deception was equally doomed: absent authority to make representations, there could be no liability in tort for unauthorised statements.[2]

**18–25** **Knowledge and agency: the fraudulent agent** A principal is liable for torts committed by his agent acting within his authority.[3] It follows that where an agent makes a representation he knows to be false, and it was within his actual or ostensible authority to make that representation, the principal will be liable even if personally entirely innocent.[4] The innocent principal will equally be liable where the fraudulent agent passes on the representation indirectly, for example through another (innocent) agent of the same principal,[5] or for that matter by giving it to the principal himself who then in good faith transmits it to

[97] [2000] 1 A.C. 486. See too *Dubai Aluminium Co Ltd v Salaam* [2003] 2 AC 366; [2002] UKHL 48 (similar principles applied to liability under Partnership Act 1890, s.10).

[98] *e.g. Limpus v London General Omnibus Co* (1862) 1 H. & C. 862.

[99] See *Lloyd v Grace, Smith & Co.* [1912] A.C. 716, esp. at 736 (Lord Macnaghten); *Armagas Ltd v Mundogas SA* [1986] A.C. 717, below.

[1] [1986] A.C. 717.

[2] A rule which seemingly applies to negligent misstatement as well: *Kooragang Investment Pty Ltd v Richardson & Wrench* [1982] A.C. 462.

[3] See *Bowstead & Reynolds on Agency*, (17th ed.), para.8–183.

[4] *Briess v Woolley* [1954] A.C. 333; *cf. Pearson v Dublin Corp'n* [1907] A.C. 351(*semble*) and *Anglo-Scottish Beet Sugar Corporation Ltd v Spalding U.D.C.* [1937] 2 K.B. 607, at 621. If the principal is not innocent, he will of course be liable with the agent as a joint tortfeasor.

[5] *London County Properties v Berkeley Property Co* [1936] 2 All E.R. 1039, CA, as interpreted by the Court of Appeal in *Armstrong v Strain* [1952] 1 K.B. 232; *cf. Anglo-Scottish Beet Sugar Corp. v Spalding U.D.C.* [1937] 2 K.B. 607.

the claimant.[6] However, if he is himself an intended victim of the fraud he will not be vicariously liable to other victims of that fraud.[7]

18–26    **Knowledge and agency: other cases** The previous paragraph deals with the fraudulent agent of a blameless principal. We now turn to the converse situation, namely where the agent who makes the representation believes it to be true but the principal knows facts which show that it is not.

If the principal expressly authorises his agent to make a statement which he himself knows to be false, he is of course liable[8] (if the agent knows of the falsity as well, he will of course be a joint tortfeasor[9]). Equally, there will be fraud on the part of the principal if he deliberately employs an agent, from whom he conceals facts in the expectation that as a result of his ignorance the latter will give false information to some third party.[10]

However, to render the principal liable in an action of deceit in such a case, it must it seems be proved that there was a fraudulent state of mind on the part of the principal[11]: that is, that the principal intended the claimant to be misled or at the very least was indifferent as to whether he might be. Where a false representation has been made innocently by an agent acting within his authority, the mere fact that the principal knows the facts which render the representation false will not make the latter liable if he has not expressly authorised the representation or deliberately concealed facts from the agent with a view to the claimant being misled.[12] So in *Armstrong v Strain*[13] estate agents with general authority to make representations about a house on their books innocently told a purchaser that it

---

[6] *Pearson & Son Ltd v Dublin Corp.* [1907] A.C. 351; *Anglo-Scottish Beet Sugar Corp. v Spalding U.D.C.*, above at 619–620.

[7] See *Kwei Tek Chao v British Traders and Shippers Ltd* [1954] 2 Q.B. 459 (forwarding agents acting for sellers of goods produce falsified bills of lading; sellers innocently present bills to buyers; sellers not liable for acts of forwarding agents). *cf. Bradford Third Benefit Building Society v Borders* [1941] 2 All E.R. 205, at 223, 226.

[8] *e.g. London County Freehold Properties Ltd v Berkeley Property Co Ltd* [1936] 2 All E.R. 1039, as interpreted in *Armstrong v Strain* [1952] 1 K.B. 232 (seller of investment properties knowingly arms agents with false information as to state of rent roll for transmission to buyers: liable in deceit).

[9] It was once doubted whether an agent who knowingly lied on the orders of a guilty principal was personally liable at all: but this heresy was scotched by the House of Lords in *Standard Chartered Bank v Pakistan National Shipping Corp (No.2)* [2003] 1 A.C. 959; [2002] UKHL 43 (on which see Parker [2003] L.M. & C.L.Q. 1). See too para.18–01, above.

[10] See *Standard Chartered Bank Ltd v Pakistan National Shipping Corp'n (No.2)* [2000] 1 Lloyd's Rep. 218, esp. at 225 (bank gave stale letter of credit to agent for presentation knowing agent would present it to issuing bank who did not know it was stale: bank guilty of fraud). See too *Cornfoot v Fowke* (1840) 6 M. & W. 358, at 373 (Parke B.); *Ludgater v Love* (1881) 44 L.T. 694; *Armstrong v Strain* [1951] 1 T.L.R. 856, at 861. *cf. Bradford Third Benefit Building Society v Borders* [1941] 2 All E.R. 205, at 220 (Lord Wright).

[11] The claimant must "bring home fraud to the principal": *Cornfoot v Fowke* (1840) 6 M & W 358, 370 (Rolfe B.).

[12] *Armstrong v Strain* [1952] 1 K.B. 232; *Cornfoot v Fowke* (1840) 6 M & W 358; *Gordon Hill Trust Ltd v Segall* [1941] 2 All E.R. 379.

[13] [1952] 1 K.B. 232; *cf. Awaroa v Commercial Securities Ltd* [1976] 1 N.Z.L.R. 19. *Street on Torts* (11th ed., 2003), p.125 queries the result in *Armstrong v Strain*; but, with respect, it seems sensible. If neither principal nor agent had any positive intent to mislead, it seems odd to visit either with liability in deceit.

was sound when, as the owner knew, it was not. The Court of Appeal upheld a finding that the owner was not liable to the purchaser in deceit.

18–27 **Partners** Under s.10 of the Partnership Act 1890, partners are liable for wrongful acts committed by any one of their number while "acting in the ordinary course of the business of the firm". This liability may of course include cases of fraud committed by a partner, provided the act of the errant partner is closely connected to the business of the firm, as where a partner in an accountancy firm forges share transfers and then fraudulently confirms their genuineness to stockbrokers.[14] But the limits of this liability should be noted: if no reasonable person would think the transaction was part of the firm's ordinary business, then the firm will not be liable.[15] Furthermore, the same restriction applies here as with vicarious liability[16]: all the acts of the partner which were necessary to make him liable in deceit must have been committed in the course of the firm's business.[17]

### (c) *Representation intended to be acted on by the claimant*

18–28 **Representation must be intended to be acted on by claimant** In order to give a cause of action in deceit, not only must the statement complained of be untrue to the defendant's knowledge, but it must in addition be made with intent to deceive the claimant: with intent, that is to say, that it shall be acted upon by him.[18] It seems that intent, for these purposes, includes not only the case where the defendant actually desires the claimant to rely on what he says, but also where he appreciates that in the absence of some unforeseen intervention he will actually do so.[19] But if intent of this kind is not shown, then the claimant will fail. So where the defendant, a director of an oil company, untruly stated to a broker that the company had received no news of a major find, intending by this untruth to protect the company's interests and not to induce shareholders to sell their holdings, it was held that no action for fraud lay at the suit of a shareholder.[20] But provided the defendant intended the claimant to act on the representation, it is

[14] *McHugh v Kerr* [2003] EWHC 2985 (Ch). *cf. Dubai Aluminium Co Ltd v Salaam*, [2003] 2 AC 366; [2002] UKHL 48 (similar principles re dishonest breach of fiduciary duty).

[15] *Coughlan (JJ) Ltd v Ruparelia* [2004] P.N.L.R. 56; [2003] EWCA Civ 1057 (solicitor, supposedly acting in his capacity as partner, dishonestly puffs a fraudulent investment scheme promising implausible returns of 6,000% per year: no liability, since cannot be said that "viewed fairly and properly, it is the kind of transaction which forms part of the ordinary business of a solicitor".).

[16] Above, para.18–24.

[17] *Dubai Aluminium Co Ltd v Salaam* [2003] 2 AC 366; [2002] UKHL 48 (actually concerning dishonest breach of fiduciary duty, but still in point).

[18] *Peek v Gurney* (1873) L.R. 6 H.L. at 377, 411–413 (Lord Cairns); *Bradford Third Benefit Building Society v Borders* [1941] 2 All E.R. 205, at 211; *Kitcher v Fordham* [1955] 2 Lloyd's Rep. 705, at 707.

[19] *Shinhan Bank Ltd v Sea Containers Ltd* [2000] 2 Lloyd's Rep. 406 (buyer signing receipts for undelivered goods knowing seller would use then to obtain bank finance: liable to bank in deceit when seller collapsed). This criterion of "intent" is borrowed from criminal law: see *R. v Woollin* [1999] 1 A.C. 82.

[20] *Tackey v McBain* [1912] A.C. 186. See too *Goose v Wilson Sandford & Co (No.2)* [2001] Lloyd's Rep. P.N. 189.

immaterial whether he intended him so to act in the precise way in which he did.[21]

18–29 **Representation not made to claimant directly** A representation made to the claimant directly causes no problems. But a representation made to a third party with intent that it be passed on to the claimant to be acted on by him will equally suffice.[22] Thus in *Swift v Winterbotham*[23] a plaintiff who gave credit on the basis of a fraudulent banker's reference successfully sued in deceit even though the reference had been sent not to him but to his own bank. All that is required for these purposes is that the representation be intended, in one way or another, to reach the claimant in order to induce him to act on it.[24] Nor is it even necessary that the defendant know precisely who the statement is intended for, provided he intends it to be relied on by someone in the claimant's position[25]; thus in another banker's reference case a bank was held liable when it sent a fraudulent reference to another bank for the benefit of a customer of whose identity it was entirely unaware.[26] Indeed, in one case it was even held that an action for deceit could be based on a newspaper advertisement, provided the claimant showed that he was one of the class of persons at whom it was directed.[27]

18–30 Nevertheless, it must be shown that there was an actual intention to deceive the claimant in question, whether individually or by reference to a class to which he belongs; it will not be enough merely to show that the misstatement is reasonably

---

[21] *Goose v Wilson Sandford & Co (No.2)* [2001] Lloyd's Rep. P.N. 189.

[22] "Every man must be held responsible for the consequences of a false representation made by him to another, upon which a third person acts, and so acting is damnified, provided it appear that such false representation was made with the intent that it should be acted upon by such third person in the manner that occasions the injury or loss", *per* Page Wood V.C. in *Barry v Croskey* (1861) 2 J. & H. 1, 23. This case was approved by Lord Cairns in *Peek v Gurney* (1873) 6 H.L. 377, at 412. And see *Brown Jenkinson and Co Ltd v Percy Dalton (London) Ltd* [1957] 2 Q.B. 631; *Commercial Banking of Sydney v R. H. Brown & Co* (1972) 126 C.L.R. 337.

[23] (1873) L.R. 8 Q.B. 244 (appealed on other grounds, L.R. 9 Q.B. 301). See also *Langridge v Levy* (1837) 2 M. & W. 519, 4 M. & W. 337 (untrue statement to buyer that shotgun was sound relayed to buyer's son, who was injured using it: son successfully recovered in deceit); *Pilmore v Hood* (1838) 5 Bing. N.C. 97 (false representations made to X regarding sale of business. P knew X passed on to P; D sold to P without correcting).

[24] "In order to enable a person injured by a false representation to sue for damages, it is not necessary that the representation should be made to the plaintiff directly; it is sufficient if the representation is made to a third person to be communicated to the plaintiff, or to be communicated to a class of persons of whom the plaintiff is one, or even if it is made to the public generally, with a view to its being acted on, and the plaintiff as one of the public acts on it and suffers damage thereby."

Quain J. in *Swift v Winterbotham* (1873) L.R. 8 Q.B. 244, at 253, cited with approval by Blackburn J. in *Richardson v Silvester* (1873) L.R. 9 Q.B. 34, at 36. See also *Pilmore v Hood* (1838) 5 Bing. N.C. 97 (false representations made to X regarding sale of business. P knew X passed on to P; D sold to P without correcting); *Barry v Croskey* (1861) 2 J. & H. 1, 23; *Brown Jenkinson and Co Ltd v Percy Dalton (London) Ltd* [1957] 2 Q.B. 631.

[25] See *Standard Chartered Bank v Pakistan National Shipping Corporation (No.2)* [1998] 1 Lloyd's Rep. 684, at 696: enough that claimant "within the class of persons within their contemplation as likely to be deceived".

[26] *Commercial Banking Co of Sydney v R. H. Brown & Co* (1972) 126 C.L.R. at 337. *cf. Brown Jenkinson & Co Ltd. v Percy Dalton (London) Ltd.* [1957] 2 Q.B. 621 (carrier who knowingly issued false bills of lading liable to consignees in deceit, since he intended them to be relied on by any number of consignees, bankers and indorsees).

[27] *Richardson v Silvester* (1873) L.R. 9 Q.B. 34 (false advertisement that farm for sale: would-be buyer can recover wasted expenses).

calculated to deceive him. Thus the House of Lords in *Peek v Gurney*[28] held that promoters of a company, who issued a fraudulent prospectus as a prospectus and as nothing more, were not liable for so doing to persons who, not being original allottees of the company's shares, purchased their shares in the market; the reason being that the promoters had no object in making the false statements except to get the shares taken up; they had no intent to influence market dealings.[29] Again, in *Gross v Lewis Hillman Ltd*[30] sellers of commercial property made certain misrepresentations to the buyers about it: the buyers agreed to purchase it, but then assigned the benefit of the contract to the plaintiffs. The plaintiffs' claim in deceit failed: even if the representations had been fraudulent (which they had not) they had been made to the buyers and the plaintiffs could not sue in respect of them.

**18–31** It is obviously a question of fact whether in a particular case a person was intended to rely on a false statement. In practice, however, the test is often whether it was in the defendant's interest that he should do so. So where persons spread a false rumour for the purpose of raising the price of certain stock, they were not liable in damages to those who dealt with other persons on the faith of such rumour being true,[31] there being no intention to deceive any persons other than those who dealt with the defendants themselves, given the defendants had nothing to gain unless the investors dealt with themselves.[32]

### (d) *Claimant must have been influenced by misrepresentation*

**18–32** **The claimant must have been influenced by the misrepresentation** To entitle a claimant to succeed in an action in deceit, he must show that he acted in reliance on the defendant's misrepresentation.[33] If he would have done the same thing even in the absence of it, he will fail.[34] However, the misrepresentation need not have been the sole cause of the claimant acting as he did: provided

---

[28] (1873) L.R. 6 H.L. 377. See too *Tackey v McBain* [1912] A.C. 186 (untrue denial of major find by oil company made to protect company's interests generally, not to influence market: no liability to shareholder who sold on faith of it).

[29] *cf. Andrews v Mockford* [1896] 1 Q.B. 372, where there was an intent to boost the shares in the market generally, and hence a purchaser in that market successfully sued.

[30] [1970] Ch. 445.

[31] See *per* Page Wood V.C. in *Barry v Croskey* (1861) 2 J. & H. 1, 18; also *per* Lord Cairns in *Peek v Gurney* (1873) L.R. 6 H.L. 377, at 412.

[32] Note in *Langridge v Levy* (1837) 2 M. & W. 519; 4 M. & W. 337, the defendant having sold a gun to the plaintiff's father for the use of himself and his son and sold it as sound and secure when he knew it to be unsafe, was held liable in an action of deceit to the plaintiff, who was wounded by the bursting of the gun. There, the court upheld the verdict expressly upon the ground that the declaration contained an averment that the gun was sold for the use of the purchaser and his son. Lord Atkin in *Donoghue v Stevenson* [1932] A.C. 562 at 587–588 referring to this case said: "User by the plaintiff was one of the acts contemplated by the fraudulent defendant." The case can hardly be regarded as having decided any principle of general application.

[33] See, *e.g. Holmes v Jones* (1907) 4 C.L.R. 1692. The correct criterion is whether the claimant would have acted as he did had the representation not been made: if he would not, then causation is made out: the fact that he would have acted in the same way had he been told the truth is irrelevant. See *Downs v Chappell* [1997] 1 W.L.R. 426.

[34] *e.g. Smith v Chadwick* (1883–84) 9 App.Cas. 187; *Nash v Calthorpe* [1905] 2 Ch. 237 (company prospectus cases: plaintiffs failed to prove reliance).

it substantially contributed to deceive him, that will be enough.[35] If the claimant's mind was partly influenced by the defendant's misstatements the defendant will not be any the less liable because the claimant was also partly influenced by a mistake of his own.[36]

It seems clear that the claimant must have acted himself to his detriment. If his loss results, not from his own reliance, but from that of third parties, the defendant may be liable for torts of unlawful interference with trade,[37] passing off or malicious falsehood, or even negligence[38]: but he will not be liable in deceit.[39]

18–33 An ambiguous statement, true in one sense but not in another, may be fraudulent if intended to be read in its untrue connotation.[40] Nevertheless, in such a case the claimant must of course show that he acted upon it in the sense in which it is false. In *Arkwright v Newbold*,[41] Cotton L.J. said:

> "In my opinion it would not be right in an action of deceit to give a plaintiff relief on the ground that a particular statement, according to the construction put on it by the court, is false, when the plaintiff does not venture to swear that he understood the statement in the sense which the court puts on it."

18–34 **Carelessness of claimant in not discovering the untruth no defence** A person to whom a misrepresentation is made is not deceived if he actually knows the truth. But it is no answer to an action for deceit that the claimant might have discovered the falsity by the exercise of ordinary care: it does not lie in the mouth of a liar to argue that the claimant was foolish to take him at his word.[42] Thus, where a vendor of a public-house was sued in deceit for misrepresenting the takings of the business, it was held to be no defence that the vendor's books were in the house at the time and would have disclosed the truth had the plaintiff chosen to look at them.[43] Nor can the representor escape liability on the ground

---

[35] *Paul & Vincent v O'Reilly* (1913) 49 Ir.L.T. 89. *cf.* the negligent misrepresentation case of *J.E.B. Fasteners Ltd v Marks Bloom & Co* [1983] 1 All E.R. 583, at 589 (Stephenson L.J.).

[36] See *Edgington v Fitzmaurice* (1885) 29 Ch. 459, at 483 (Bowen L.J.); also *Peek v Derry* (1887) 37 Ch.D. 541. *cf. Tatton v Wade* (1856) 18 C.B. 371.

[37] In *National Phonograph Co v Edison-Bell* [1908] 1 Ch. 335, lies told to third parties in order to gain an economic advantage at the expense of the plaintiff were held to be unlawful means, though no action in deceit could have been brought by the third parties, who themselves were not harmed. *National Phonograph* has been accepted by the Court of Appeal in *Lonrho v Fayed*, Dillon L.J. asserting that liability for unlawful interference with trade did not depend on "a complete tort": [1990] 2 Q.B. 479, at 489.

[38] *cf. Ministry of Housing v Sharp* [1970] 2 Q.B. 223 (negligent statement by registrar to purchaser of house causing incumbrancer to lose charge).

[39] See the Australian decision in *Larkins v Chelmer Holdings Ltd* [1965] Qd.R. 68 (architect misrepresented that work not completed; money as a result withheld from builder; no action in deceit).

[40] See para.18–23, above.

[41] (1881) 17 Ch.D. 301, at 325.

[42] See Lord Chelmsford in *Venezuela Central Ry v Kisch* (1857) L.R. 2 H.L. 99 at 120; see also *Whyfe v Michael Cullen & Partners* [1993] E.G.C.S. 193 and *Commission for the New Towns v Cooper (Great Britain) Ltd*, *The Times*, March 3, 1995, CA (party to a contract can be bound by its induced mistake). Nor is the Law Reform (Contributory Negligence) Act 1945 available here to reduce the damages: see para.18–45 below.

[43] *Dobell v Stevens* (1825) 3 B. & C. 623, and see *Pilmore v Hood* (1838) 5 Bing.N.C. 97. *cf.* too the contract case of *Redgrave v Hurd* (1881) 20 Ch.D. 1 and *Buxton v Birches Time Share Resort Ltd* [1991] 2 N.Z.L.R. 641, NZCA.

that knowledge of the truth must be imputed to the representee; as, for example where the representee's agent knew the true facts.[44]

**Reliance and materiality** Since the reasonableness of the claimant's reliance is not relevant to liability in deceit, it is submitted that it equally follows that the materiality or otherwise of the defendant's statement is out of account. All that is required is reliance: once this is shown the fraudulent defendant should not be permitted to argue that what he said would not have induced a reasonable person to so act.[45] **18–35**

## 3. DAMAGES[46]

**Proof of damage** Deceit is not actionable *per se*: damage, in other words, is of the gist of the action.[47] The damage recovered in deceit cases is normally pecuniary loss: but it may take the form of personal injury, loss of property, real inconvenience or discomfort, or substantial mental distress.[48] **18–36**

**Measure of damages** The measure of damages in deceit is the loss directly flowing from the claimant's reliance on the defendant's statement[49]: that is, generally speaking, the sum that will put him in the same position as if he had not relied on it.[50] Credit must of course be given for any gains made by the claimant.[51] **18–37**

**Position if representation true irrelevant** Since the claimant's entitlement is to be put in the position he would have occupied had he not relied on the defendant's representation, it follows that no account is taken of what his **18–38**

---

[44] *Wells v Smith* [1914] 3 K.B. 722. See, however, *Strover v Harrington* [1988] Ch. 390, where the agents were purchaser's solicitors who by implication had actual authority to receive all relevant information on their client's behalf. *Wells v Smith* was distinguished as a case where the plaintiff's agent himself was a party to the defendant's fraud. *Sed quaere*.

[45] Compare the contract decision in *Museprime Properties Ltd v Adhill Properties Ltd* (1990) 61 P. & C.R. 111.

[46] Treitel, *Damages for Deceit* (1969) 32 M.L.R. 556; Tettenborn *et al.*, *Law of Damages*, paras 17.64–17.87.

[47] See *Smith v Chadwick* (1884) 9 App. Cas. 187, at 190 (Lord Blackburn); *Diamond v Bank of London & Montreal Ltd* [1979] Q.B. 333, at 349 (Stephenson L.J.).

[48] See below, para.18–42.

[49] "The defendant is bound to make reparation for all the actual damages directly flowing from the fraudulent inducement."—Lord Denning M.R. in *Doyle v Olby (Ironmongers) Ltd* [1969] 2 Q.B. 158, at 167. See too *Clark v Urquhart* [1930] A.C. 28, at 67–68 (Lord Atkin).

[50] See *Doyle v Olby (Ironmongers) Ltd* [1969] 2 Q.B. 158, at 167 (Lord Denning M.R.).

[51] *Smith New Court Securities Ltd v Citibank N.A.* [1997] A.C. 254, at 267 (Lord Browne-Wilkinson). See, *e.g.* *Komerçni Banka AS v Stone & Rolls Ltd* [2003] 1 Lloyd's Rep. 383; [2002] EWHC 2263 (Comm) (bank deceived into paying out on fraudulent letter of credit: credit for fee received for issuing it). The defendant bears the burden of proving such benefits: *Midco Holdings Ltd v Piper* [2004] N.P.C. 59, [2004] EWCA Civ 476.

position would have been had that representation been true.[52] Two consequences follow from this.

First, if the claimant is duped into buying an asset, he is generally entitled to recover the difference between the price paid and the market value of the property he received in exchange, and not the difference between the market value and the amount the defendant said the property was worth.[53] Thus in *Doyle v Olby (Ironmongers) Ltd*,[54] where the plaintiff was deceived into buying a run-down and infructuous business, an award of the latter sum was overturned by the Court of Appeal.

Secondly, if the claimant is deceived into entering into a transaction by a statement as to the gains to be made from it, he can recover only the amount he loses as a result of relying on the representation and not the profit the defendant said he would make. So in *East v Maurer*,[55] where the seller of a business fraudulently overstated the profits available, the Court of Appeal reversed a judgment at first instance awarding the buyer the amount of those extra profits.[56]

However, the loss flowing from reliance on the defendant's representation may, in an exceptional case, approximate to restoring his position had the statement been true. Thus in *BHP Billiton Ltd v Dalmine SpA*[57] quality control employees of a subcontractor supplying pipes for an offshore oil project certified pipes as sound which they knew to be substandard. In due course the pipes leaked. The project owner sued the subcontractor in deceit. It was accepted that it was entitled to be put in the position it would have occupied had the pipes in fact been up to standard: the reason being that, had the subcontractor's employees not mis-certified the pipes concerned, they would have been rejected and sound pipes supplied in their stead without further charge.

18–39 **Claims for would-be profits** Although the "reliance measure" outlined above precludes the recovery of stated profits as such, this does not necessarily mean that the claimant is limited to out-of-pocket losses, or that all claims for lost profits are precluded. Suppose a claimant is deceived into entering into a transaction by a fraudulent statement as to the profits to be made, and can show in addition that if he had not relied on the defendant's statement he would have made some other gainful investment (or for that matter would have laid his money out at interest). In such a case it is clear that he can recover the would-be

[52] See *e.g. McConnell v Wright* [1903] 1 Ch. 546, at 554 (Collins M.R.); *Doyle v Olby (Ironmongers) Ltd* [1969] 2 Q.B. 158, at 166 (Lord Denning M.R.); *East v Maurer* [1991] 1 W.L.R. 461, 465; *Smith New Court Securities Ltd v Citibank N.A.* [1997] A.C. 254, at 281–282 (Lord Steyn).

[53] Thus if a defendant fraudulently says the asset is worth £120 when it is in fact worth £90, and the claimant buys it for £110, damages in deceit are £20 and not £30. For statements of this principle, see *e.g. Pearson v Wheeler* (1825) Ry. & M. 303, 304; *Doyle v Olby (Ironmongers) Ltd* [1969] 2 Q.B. 158 at 166 (Lord Denning M.R.); *Saunders v Edwards* [1987] 1 W.L.R. 1116, at 1121 (Kerr L.J.); *Smith New Court Securities Ltd v Citibank N.A.* [1997] A.C. 254, at 281–282 (Lord Steyn).

[54] [1969] 2 Q.B. 158.

[55] [1991] 1 W.L.R. 461. See too the negligence case of *Swingcastle Ltd v Alastair Gibson* [1991] 2 A.C. 223 (valuers misvalue property for mortgagees: mortgagors insolvent: no recovery for interest that mortgagors should have paid and which would have been recoupable from property if valuation correct).

[56] Though it did award the plaintiff the profits she would have made had she bought another similar business. See below, para.18–39.

[57] [2003] B.L.R. 271; [2003] EWCA Civ 170.

profits or interest, as the case may be, that he would have made from that other investment.[58] Indeed, an action may lie for deceit even in respect of a transaction which turned out highly gainful for the claimant, if by reason of the deceit he was prevented from investing his money elsewhere so as to turn an even greater profit.[59]

18–40 **Timing** *Prima facie* damages in deceit are reckoned as at the time of reliance on the representation.[60] Thus where an asset is bought as a result of the defendant's fraud damages are generally the difference between price and value at the time of purchase,[61] without reference to the fact that the value has since risen[62] or fallen.[63] However, this is not an "strict and inflexible rule",[64] and on occasion some other date has been taken.

First, where the claimant is effectively "locked in" to a transaction, or where, acting reasonably, he can only be expected to escape from it some time later, then damages will generally be reckoned as at that later time so as to allow the claimant to claim any extra losses suffered as a result.[65] Thus in *Doyle v Olby (Ironmongers) Ltd*,[66] a person tricked into buying a failing business recovered the

---

[58] See, *e.g. East v Maurer* [1991] 1 W.L.R. 461 (purchaser duped into buying business by overstated profits: recovers profits she would have made from alternative business she would have bought). See too *Clef Aquitaine SarL v Laporte Minerals (Barrow) Ltd* [2001] Q.B. 488, below. And *cf.* the negligence case of *Swingcastle Ltd v Alastair Gibson* [1991] 2 A.C. 223 (valuers misvalue property for mortgagees: though no recovery for interest that mortgagors should have paid, court can award interest that would otherwise have been earned on sums advanced).

[59] See *Clef Aquitaine SarL v Laporte Minerals (Barrow) Ltd* [2001] Q.B. 488 (misrepresentation to proposed distributor re prices that he could sell products for: distributorship in fact profitable, but damages for loss of opportunity to negotiate lower prices from manufacturer and make a bigger profit).

[60] See the old cases on buyers of shares misled by optimistic prospectuses, where the claimant was invariably awarded the difference between price and value at the time of purchase: *e.g. Twycross v Grant* (1877) 2 C.P.D. 469; *Peek v Derry* (1887) 37 Ch.D. 541 (reversed on other grounds: see *Derry v Peek* (1889) 14 App. Cas. 337); *McConnell v Wright* [1903] 1 Ch. 546. That this was the *prima facie* measure was confirmed by Lord Browne-Wilkinson in *Smith New Court Securities Ltd v Scrimgeour Vickers (Asset Management) Ltd* [1997] A.C. 254, at 267.

[61] See the cases referred to in the previous note; also *Waddell v Blockey* (1879) 4 Q.B.D. 678 and *Saunders v Edwards* [1987] 1 W.L.R. 1116, a case concerning the purchase of a flat, where the Court of Appeal held that the correct date for the quantification of the plaintiff's loss was the completion date, that being the date of actual loss.

[62] See, *e.g. Great Future International Ltd v Sealand Housing Corp* [2002] EWHC 2454, *The Times*, December 17, 2002 (claimant deceived into buying shares: shares rose in value after purchase: no account of later rise in determining damages).

[63] *Waddell v Blockley* (1879) 4 Q.B.D. 678. See too the example given by Cockburn C.J. in *Twycross v Grant* (1877) 2 C.P.D. 469, at 544–545: if D dupes C into buying a racehorse which later dies from some unconnected cause, C must credit the value of the horse on purchase and cannot claim the whole price paid and since wasted.

[64] *Smith New Court Securities Ltd v Scrimgeour Vickers (Asset Management) Ltd* [1997] A.C. 254, at 267 (Lord Browne-Wilkinson).

[65] See *Smith New Court Securities Ltd v Scrimgeour Vickers (Asset Management) Ltd* [1997] A.C. 254, at 266 (Lord Browne-Wilkinson); *Doyle v Olby (Ironmongers) Ltd* [1969] 2 Q.B. 158. But it does not seem that the defendant can use this as a means of reducing his liability: see *Great Future International Ltd v Sealand Housing Corp* [2002] EWHC 2454, *The Times*, December 17, 2002, referred to above.

[66] [1969] 2 Q.B. 158. See too *Downs v Chappell* [1997] 1 W.L.R. 426 (a similar case) and *Standard Chartered Bank v Pakistan National Shipping Corp (Assessment of Damages)* [2001] 1 All E.R. (Comm) 822; [2001] EWCA Civ 55 (buyers deceived by false bills of lading into accepting substandard bitumen: damages reckoned on later resale price).

difference between what he paid for it and the sum for which he later (and reasonably) disposed of it. Again, in *Smith New Court Securities Ltd v Scrimgeour Vickers (Asset Management) Ltd*[67] stockjobbers were induced by fraud into buying a block of shares which later collapsed in value owing to a previously undiscovered fraud against the company. It was held by the House of Lords that they only had to credit the reduced amount they later received on resale: they could not have been expected to sell earlier.

Secondly, where an asset purchased by the claimant later drops in price as a result of the correction of a false market created by the defendant himself, then not surprisingly damages are reckoned by reference to the later, lower, price.[68]

18–41 **Causation** The claimant in deceit must, of course, show that his loss results from the defendant's misrepresentation. So if a buyer is deceived into buying bonds which he then chooses to retain as a business decision, and those bonds later decline in value, he cannot recover in respect of the subsequent decline: this is due to his own commercial choice, not to the original deceit.[69]

However, it should be noted that rules of causation are often manipulated in favour of deceit claimants.[70] Thus where a defendant deceives the claimant into entering a business transaction, the claimant is entitled to recover the loss he suffers as a result, without reference to the fact that he might otherwise have invested his money in some other unprofitable way and lost it anyway.[71]

18–42 **Consequential losses** Damages in deceit are at large and in principle are available to compensate the claimant for all his damage, including consequential losses.[72] Any damage directly flowing from the fraudulent inducement may be recovered unless it is caused by the claimant behaving completely without prudence or common sense.[73] Thus in *Hornal v Neuberger Products Ltd*[74] a buyer recovered for seven weeks' downtime on a machine tool he had been

[67] [1997] A.C. 254.
[68] See *Broome v Speak* [1903] 1 Ch. 856 (affirmed, *Shepheard v Broome* [1904] A.C. 342); *McConnell v Wright* [1903] 1 Ch. 546 (both misleading prospectus cases).
[69] *Waddell v Blockley* (1879) 4 Q.B.D. 678. But if the choice is affected by the misrepresentation, or his choice is constrained by good business reasons, he will recover his whole loss: *Smith New Court Securities Ltd v Scrimgeour Vickers (Asset Management) Ltd* [1997] A.C. 254.
[70] As admitted by Lord Hoffmann in *Smith New Court Securities Ltd v Scrimgeour Vickers (Asset Management) Ltd* [1997] A.C. 254: see at 280, 285.
[71] See *Slough Estates Ltd v Welwyn-Hatfield District Council* [1996] 2 P.L.R. 50 (developer duped into buying into unprofitable shopping centre: irrelevant that would otherwise have sunk money in other infructuous venture). Noting dicta by Lord Steyn in *Smith New Court Securities Ltd v Scrimgeour Vickers (Asset Management) Ltd* [1997] A.C. 254, at 281, the court declined to follow the contrary decision in *Downs v Chappell* [1997] 1 W.L.R. 426 on this point. This attitude, it is suggested, is difficult to defend. If the claimant can increase his recovery by showing he would have invested his money profitably (see para.18–39, above), by parity of reasoning the defendant ought to be able to reduce his exposure by showing that, but for his deceit, the claimant would have lost it in any case.
[72] *Cemp Properties (UK) Ltd v Dentsply Research and Development Corp* [1991] 34 E.G. 62.
[73] *Doyle v Olby (Ironmongers) Ltd* [1969] 2 Q.B. 158; *Banque Bruxelles Lambert SA v Eagle Star Insurance Co Ltd* [1997] A.C. 191, HL. *Royscot Trust Ltd v Rogerson* [1991] 2 Q.B. 297. *cf. N.Z Refrigerating Co Ltd v Scott* [1969] N.Z.L.R. 30.
[74] [1957] 1 Q.B. 247.

defrauded into buying; and in *Archer v Brown*,[75] a person swindled into paying for shares he never received recovered interest on the money borrowed to finance the transaction.[76] There is equally no bar to recovery in respect of property damage or personal injury: thus in an old case the seller of a shotgun falsely stated to be sound was liable for injury suffered when it exploded,[77] and on a similar basis the deceitful vendor of a plague-infested cow was held liable to the buyer for the loss of his herd which the beast infected.[78]

Non-pecuniary damage is, it seems, recoverable for matters such as distress[79] or inconvenience.[80]

**Remoteness** The claimant in deceit is entitled to recover all damage directly flowing from the defendant's tort.[81] In particular there is no requirement that the losses be foreseeable: "it does not lie in the mouth of the fraudulent person to say that they could not reasonably have been foreseen."[82] Thus it does not matter that the claimant's loss is increased by some entirely extraneous unanticipated event, such as a sudden downturn in the property market.[83] However, this does not mean that the claimant is under no duty to mitigate his loss in so far as he can reasonably do so. Thus the buyer of a business from a fraudulent seller is bound to extricate himself as soon as he reasonably can by selling it rather than allowing losses to accumulate further.[84] 18–43

**Aggravated and exemplary damages**[85] There is little doubt that aggravated damages may be awarded to compensate the claimant for injury to his feelings 18–44

[75] [1985] Q.B. 401.

[76] See too *KBC Bank v Industrial Steels (UK) Ltd* [2001] 1 Lloyd's Rep. 370 (knowing presentation of false documents to bank under letter of credit: presenter liable *inter alia* for cost of litigation brought by bank against other banks in the chain before it discovered the falsity).

[77] *Langridge v Levy* (1837) 2 M. & W. 519, 4 M. & W. 337. See too *Burrows v Rhodes* [1899] 1 Q.B. 816; *Banks v Cox* [2002] EWHC (QB) 2166 (buyer swindled into buying unprofitable nursing-home recovers for depressive illness caused thereby).

[78] *Mullett v Mason* (1866) L.R. 1 C. & P. 559. So also with damage to the thing fraudulently sold: see *Nicholls v Taylor* [1939] V.L.R. 119 (car damaged when tyre fraudulently misrepresented as new burst).

[79] £500 was given for distress in *Saunders v Edwards* [1987] 1 W.L.R. 1116, and also in *Shelley v Paddock* [1979] Q.B. 120 (affirmed [1980] Q.B. 348). See too *Shaw v Sequence (UK) Ltd* [2004] All E.R. (D) 232 (Nov), [2004] EWHC 3249 (QB) (annoyance of clients deceived by their estate agent: £1,000 basic award plus £1,500 aggravated damages); and the colourful Canadian decision in *Beaulne v Ricketts* (1979) 96 D.L.R. (3d) 550 (plaintiff deceived into bigamous marriage)

[80] *Mafo v Adams* [1970] 1 Q.B. 548 (loss of benefit of a regulated tenancy).

[81] See *Doyle v Olby (Ironmongers) Ltd* [1969] 2 Q.B. 158, at 168 (Winn L.J.); *Smith New Court Securities Ltd v Scrimgeour Vickers (Asset Management) Ltd* [1997] A.C. 254, at 284 (Lord Steyn). See above para.2–113.

[82] *Doyle v Olby (Ironmongers) Ltd* [1969] 2 Q.B. 158, at 167 (Lord Denning M.R.). See too *Smith New Court Securities Ltd v Scrimgeour Vickers (Asset Management) Ltd* [1997] A.C. 254, at 264–267 (Lord Browne-Wilkinson), at 281 (Lord Steyn); also *Royscot Trust Ltd v Rogerson* [1991] 2 Q.B. 297 (decided under s.2(1) of the Misrepresentation Act 1967, where the measure is the same).

[83] *Slough Estates Ltd v Welwyn-Hatfield District Council* [1996] 2 P.L.R. 50 (claimant bought into commercial development: defendant liable for increased loss due to property meltdown).

[84] *Downs v Chappell* [1997] 1 W.L.R. 426 (duped buyer of business only recovered losses up to time he ought to have sold on); see too *Smith New Court Securities Ltd v Scrimgeour Vickers (Asset Management) Ltd* [1997] A.C. 254, at 266 (Lord Browne-Wilkinson).

[85] Below paras 29–137 *et seq*.

arising from a blatant or callous exercise in deceit.[86] As for exemplary damages, since the decision in *Kuddus v Chief Constable of Leicestershire*[87] they are clearly available in principle, at least where the deceit was by a public authority or was calculated to make a profit over and above any damages received,[88] and possibly even where it was not.[89]

### 4. DEFENCES

18–45 **Contributory negligence and deceit** It is now clear that damages for deceit, which were never subject to any defence of contributory negligence at common law,[90] equally cannot be reduced under the Law Reform (Contributory Negligence) Act 1945.[91]

18–46 **Exclusion of liability by contract or notice** It is now clear that at common law a person cannot as a matter of public policy rely on a contract or notice to exclude liability for his own fraud.[92] But this absolute prohibition, it seems, applies only where the person seeking to protect is himself complicit in the fraudulent conduct. Thus there is no objection on principle to a suitably-worded clause excluding liability in respect of the fraud of an agent or employee for whose acts a person would otherwise be liable.[93] On the other hand, such a clause is, of course, subject to the usual statutory limitations on exemption clauses.[94]

---

[86] *Archer v Brown*, above (though note *McGregor on Damages* (17th ed., 2003, para.41–037). See also *Mafo v Adams* [1970] 1 Q.B. 548 at 558; *Saunders v Edwards* [1987] 1 W.L.R. 1116; *Shaw v Sequence (UK) Ltd* [2004] All ER (D) 232 (Nov), [2004] EWHC 3249 (QB) (deceit by estate agent of client: damages of £1,000 for vexation increased to £2,500 for over-contentious attitude and non-apology).

[87] [2002] 2 A.C. 122; [2001] UKHL 29: above, para.29–145.

[88] *i.e.* Lord Devlin's categories in *Rookes v Barnard* [1964] A.C. 1129; above, para.29–140.

[89] Lord Nicholls in *Kuddus*'s case at [66] doubted whether the "type of action" limitations that had previously constrained exemplary damages claims continued to survive. It remains to be seen whether this suggestion is followed.

[90] See Mummery J.'s analysis of the common law position in *Alliance & Leicester Building Society v Edgestop Ltd* [1993] 1 W.L.R. 1462, at 1474.

[91] The point was put beyond doubt in *Standard Chartered Bank v Pakistan National Shipping Corp'n (Nos 2 and 4)* [2003] 1 A.C. 959; [2002] UKHL 43. See too the earlier decisions in *Alliance & Leicester Building Society v Edgestop Ltd* [1993] 1 W.L.R. 1462 and *Corporación Nacional del Cobre de Chile v Sogemin Metals Ltd* [1997] 1 W.L.R. 1396.

[92] "There is no doubt that a party cannot contract that he shall not be liable for his own fraud."—Lord Hoffmann in *HIH Casualty & General Insurance Ltd v Chase Manhattan Bank* [2003] 2 Lloyd's Rep. 61, [2003] UKHL 6 at [76]. See too Lord Bingham at [2003] 2 Lloyd's Rep. 61, [2003] UKHL 6 at [16]; also *Pearson & Son Ltd. v Dublin Corporation* [1907] A.C. 351, at 353–354 (Lord Loreburn), 356 (Lord Halsbury).

[93] See the judgment of the Court of Appeal in *HIH Casualty & General Insurance Ltd v Chase Manhattan Bank* [2001] 2 Lloyd's Rep. 483; [2001] EWCA Civ 1250 at [109]. The House of Lords left the point open ([2003] 2 Lloyd's Rep. 61), though Lord Scott seemingly agreed with the Court of Appeal ([2003] 2 Lloyd's Rep. 61; [2003] UKHL 6 at [122]). In *Frans Maas (UK) Ltd. v Samsung Electronics (UK) Ltd* [2004] 2 Lloyd's Rep. 251; [2004] EWHC 1502 (Comm) Gross J. was prepared to uphold a clause protecting an employer from liability for dishonest conduct by his employees; although that case involved theft, by parity of reasoning the principle presumably applies to deceit too.

[94] In particular the Misrepresentation Act 1967, s.3; the Unfair Contract Terms Act 1977; and the Unfair Terms in Consumer Contracts Regulations 1999 (SI 1999/2083).

Furthermore, there is a very strong presumption that exception clauses do not cover fraud,[95] and very specific wording is likely to be required in order to overcome it.[96]

**Public policy defences to deceit liability** Public policy usually demands that nobody be permitted to found an action on an illegal act.[97] So if the claimant suffers loss as a result of dealings with the defendant which are intrinsically illegal, he will not normally be able to recover damages for that loss even though his loss resulted from fraudulent misrepresentations made by the defendant.[98] However, as this is an issue of public policy, the nature and true quality of the illegality are important. The mere fact that the deceit arose in connection with a contract itself unenforceable for illegality will not suffice.[99] Thus in *Saunders v Edwards*,[1] an action for fraudulent misrepresentation concerning the sale of a flat, it was established that both purchaser and vendor had grossly inflated the price of the fixtures to reduce the incidence of stamp duty. However, as the plaintiff purchaser was not seeking to sue on the contract,[2] the court allowed him to sue in deceit,[3] the plaintiff having an "unassailable" claim for damages.[4] In order to make out a defence based on public policy, the defendant must establish that the claimant's conduct is so clearly reprehensible as to justify its condemnation by the court and that the conduct is so much part of the claim against the defendant as to justify refusing any remedy to the claimant.[5] This can be difficult to show.[6] Thus in *Standard Chartered Bank plc v Pakistan National Shipping Corporation*

18–47

[95] They were held not to do so in *Pearson & Son Ltd. v Dublin Corporation* [1907] A.C. 351 and *HIH Casualty & General Insurance Ltd v Chase Manhattan Bank* [2003] 2 Lloyd's Rep. 61; [2003] UKHL 6.

[96] "[I]t is in my opinion plain beyond argument that if a party to a written contract seeks to exclude the ordinary consequences of fraudulent or dishonest misrepresentation or deceit by his agent, acting as such, inducing the making of the contract, such intention must be expressed in clear and unmistakable terms on the face of the contract."—Lord Bingham in *HIH Casualty & General Insurance Ltd v Chase Manhattan Bank* [2003] 2 Lloyd's Rep. 61; [2003] UKHL 6 at [16].

[97] *Holman v Johnson* (1775) 1 Cowp. 341 at 343; *Thackwell v Barclays Bank* [1986] 1 All E.R. 676.

[98] The text here was approved by Gross J. in *Colin Buchanan & Partners Ltd v Marcus de Berg* [2003] EWHC 839 (QB) at [112] (where, however, the defence was not made out on the facts).

[99] *e.g. Dott v Brickwell* (1906) 23 T.L.R. 61 (unlicensed moneylender could not sue for repayment of loan but could sue borrower in fraud for deceiving him into lending). See too *The Siben (No.2)* [1996] 1 Lloyd's Rep. 35.

[1] [1987] 1 W.L.R. 1116.

[2] Whether he could have done so was left open by Kerr L.J.: see [1987] 1 W.L.R. 116, at 125.

[3] The vendor had lied that the flat he was selling included a roof terrace. *A fortiori*, when a plaintiff is fraudulently induced to enter into an illegal transaction by the defendants, and is unaware of the illegal nature of the transaction: *Shelley v Paddock* [1980] Q.B. 348; see also *Dott v Brickwell* (1906) 23 T.L.R. 61.

[4] See the discussion of *Saunders v Edwards* by Lord Goff in *Tinsley v Milligan* [1994] 1 A.C. 340, at 360. In that case, Lord Browne-Wilkinson and Lord Goff disapproved of the "public conscience" test formulated in *Saunders* (whereby the court would have regard to the extent to which the public conscience would be affronted by recognising rights acquired by illegal transactions) but thought the actual decision to be correct.

[5] See the judgment of Cresswell J. in *Standard Chartered Bank v Pakistan National Shipping Corporation (No.2)* [1998] 1 Lloyd's Rep. 684 at 705–6, upheld by Evans L.J. on appeal as summarising the law "impeccably" (see [2000] 1 Lloyd's Rep. 218, at 226).

[6] Indeed, it seems that in no English case has the *ex turpi causa* defence been successfully raised in an action for deceit.

*(No.2)*[7] a confirming bank induced to pay a letter of credit by presentation of falsified bills of lading successfully claimed from the presenters despite the fact that it had itself presented the documents to the issuing bank at a time when it knew the credit was stale.

## 5. MISREPRESENTATION AS TO CREDIT OF THIRD PERSONS

18–48 **The Statute of Frauds Amendment Act 1828** Under s.6 of the Statute of Frauds Amendment Act 1828[8]:

> "No action shall be brought whereby to charge any person upon or by reason of any representation or assurance made or given concerning or relating to the character, conduct, credit, ability, trade, or dealings of any other person, to the intent or purpose that such other person may obtain credit, money, or goods upon, unless such representation or assurance be made in writing, signed by the party to be charged therewith."

Despite the generality of its wording, it has been held that the Act applies to fraudulent misrepresentations only, and not to actions in contract[9] or for negligent misrepresentation.[10]

18–49 A representation as to credit is essentially one which relates to the ability of a person effectually to perform and satisfy the engagement of a pecuniary nature into which he has proposed to enter and upon the faith of which he is to obtain money, credit or goods.[11] A bank's assurance that brokers offering to sell sugar were respectable and reliable has been held to come within the Act in as far as it concerned the reliability of the brokers it was a representation as to credit, but not otherwise[12]; similarly, a statement by a bank to a person requested to sign accommodation bills that the person primarily liable is fit to be accommodated is also covered.[13] In *Lyde v Barnard*,[14] the court was equally divided on the question whether the Act covered a representation that a life interest in certain trust funds was charged with only a certain specified sum; but it is suggested that the better view is that it does not.[15]

Where the representor is an individual, it has been held that the signature must be that of the defendant personally in order to satisfy the Act: his agent's

---

[7] [2000] 1 Lloyd's Rep. 218 (appealed on other grounds, [2003] 1 Lloyd's Rep. 227; [2002] UKHL 43).
[8] Commonly known as Lord Tenterden's Act.
[9] *Banbury v Bank of Montreal* [1918] A.C. 626.
[10] *W. B. Anderson & Sons Ltd v Rhodes (Liverpool) Ltd* [... ] 2 All E.R. 850; [1967] C.L.J. 155. But the Court of Appeal in *U.B.A.F. Ltd v European American Banking Corporation* [1984] Q.B. 713 accepted that s.6 of the 1828 Act did apply to a claim brought under s.2(1) of the Misrepresentation Act 1967.
[11] See *Lyde v Barnard* (1836) 1 M & W. 101, 119 (Lord Abinger).
[12] *Diamond v Bank of London and Montreal Ltd* [1979] Q.B. 333.
[13] *Clydesdale Bank Ltd v Paton* [1896] A.C. 381 (decided under the Scottish equivalent of the 1828 Act, s.6 of the Mercantile Law (Scotland) Amendment Act, 1856).
[14] (1836) 1 M. & W. 101.
[15] This is because it is essentially a representation, not as to the credit of the owner of the interest, but as to the value of the security he offers to support his obligation.

signature, even if authorised, will not suffice.[16] As regards companies, however, the position is different. Despite some earlier authority to the contrary,[17] the Court of Appeal in *U.B.A.F. Ltd v European American Banking Corporation*[18] has made it clear that the signature of any duly authorised agent of the company satisfies the requirements of the 1828 Act.

### 6. STATUTORY LIABILITY FOR MISS TEMENTS IN A PROSPECTUS

**18–50** **Company prospectuses: statutory liability of directors and others** The law governing compensation for false or misleading particulars contained in a company prospectus is now largely contained in the Financial Services and Markets Act 2000. Section 90(1) of that Act renders the persons responsible for any listing particulars liable to pay compensation to anyone who has acquired any of the securities in question and has suffered loss in respect of them as a result of any untrue or misleading statement in the particulars. For unlisted securities, a right to compensation for false or misleading statements in a prospectus is provided by the Public Offers of Securities Regulations 1995.[19] It should be noted that the grounds on which this liability can arise cover negligent misstatements as well as deceitful ones, the burden of proof as to lack of negligence lying on the defendant.[20]

It should also be noted that the remedies in the 2000 Act are cumulative with those existing at common law.[21]

### 7. THE ACTION FOR FRAUD ARISING OUT OF BRIBERY

**18–51** **Fraud and bribery** When an agent is bribed to persuade his principal to enter into a transaction on terms disadvantageous to the latter, he may of course make himself liable in deceit: for example, if he untruthfully tells his principal that the terms are the best that can be obtained. But even if he does not, and merely deals on the principal's behalf, this event itself gives rise to a tortious liability[22] in both himself and the briber to the principal for loss suffered by the latter.[23] This head

[16] *Swift v Jewsbury* (1874) L.R. 9 Q.B. 301.
[17] *Hirst v West Riding Union Banking Co* [1901] 2 K.B. 560.
[18] [1984] Q.B. 713.
[19] Public Offers of Securities Regulations (SI 1995/1537), regs 13–15.
[20] Financial Services and Markets Act 2000, Sch.10, para.1.
[21] Financial Services and Markets Act 2000, s.90(6).
[22] There is a parallel compensatory claim in equity against the agent for breaking his fiduciary duty, and against the briber for helping him break it (see *Royal Brunei Airlines Sdn. Bhd. v Tan* [1995] 2 A.C. 378). But in *Fyffes Group Ltd v Templeman* [2000] 2 Lloyd's Rep. 643, at 660 Toulson J. pointed out that the measure of damages was the same under either head (save possibly for the availability of compound interest in an equitable claim).
[23] Examples are numerous. See, *e.g.* *Salford Corporation v Lever* [1891] 1 Q.B. 168, CA; *Grant v Gold Exploration and Development Syndicate Ltd* [1900] 1 Q.B. 233; *Hovendon Sons v Millhoff* (1900) 83 L.T. 41; *Arab Monetary Fund v Hashim* [1993] 1 Lloyd's Rep. 543 (employer paid contractor the full amount due under a contract which was induced by a bribe paid to the employer's agent; employer entitled to recover amount of the bribe from contractor on the basis that contractor received a greater sum than what was the true price).

of claim is somewhat confusingly known as "fraud," and shares some,[24] though not all,[25] of the elements of the tort of deceit.[26]

**18–52** The measure of damages under this head is the loss actually suffered by the principal.[27] There is a strong, though not conclusive,[28] presumption that the amount of the bribe represents a loss to the principal, on the pragmatic basis that he would otherwise have benefited from it by way of discount or otherwise[29]: in addition the principal can claim any further losses he may have suffered.[30] As with deceit properly so called, contributory negligence is no defence.[31] In addition to being liable in damages, both the errant agent and, it seems, the briber himself are liable to pay over the amount of the bribe to the principal[32] on the basis that they are regarded as having been unjustly enriched by the amount of it.[33] But the claims for damages and for recoupment of the amount of the bribe are alternative: the principal must elect which to exercise.[34]

---

[24] For example, the exacting standard of proof (see *Fyffes Group Ltd v Templeman* [2000] 2 Lloyd's Rep. 643, at 656), and the inapplicability of contributory negligence (see below).

[25] For example, an employer can be vicariously liable under this head even for an act that was not within his employee's actual or ostensible authority, thus marking off this head of liability from deceit proper.

[26] "[T]he claim based on bribery is not a species of deceit but a special form of fraud where there is no representation made to the principal of the agent let alone reliance."—Steel J. in *Petrotrade Inc v Smith* [2000] 1 Lloyd's Rep. 486, at 490. On the other hand, a dishonest agent may also commit deceit by lying to his principal, in which case he is liable in the ordinary way: see, *e.g.* *Mahesan v Malaysia Government Officers Co-operative Housing Society Ltd* [1979] A.C. 374, and *Daraydan Holdings Ltd v Solland International Ltd* [2005] Ch. 119, [2004] EWHC 622 (Ch).

[27] See *Mahesan v Malaysia Government Officers Co-operative Housing Society Ltd* [1979] A.C. 374, at 381.

[28] *Mahesan v Malaysia Government Officers Co-operative Housing Society Ltd* [1979] A.C. 374, 383 (Lord Diplock).

[29] *Industries & General Mortgage Co Ltd v Lewis* [1949] 2 All E.R. 573 ; *Petrotrade Inc v Smith* [2000] 1 Lloyd's Rep. 486; *Fyffes Group Ltd v Templeman* [2000] 2 Lloyd's Rep. 643.

[30] For example, if he can show a specific way in which the agreement negotiated by the corrupt agent is less advantageous to him than a contract negotiated at arm's length. See, *e.g.* *Fyffes Group Ltd v Templeman* [2000] 2 Lloyd's Rep. 643.

[31] *Corporación National del Cobre de Chile v Sogemin Metals Ltd* [1997] 1 W.L.R. 1396.

[32] Agent: see, *e.g.* *Boston Deep Sea Fishing Co v Ansell* (1888) 39 Ch.D. 339 and, Briber: see *Fyffes Group Ltd v Templeman* [2000] 2 Lloyd's Rep. 643.

[33] The agent because he should not have taken the bribe in the first place: the [illegible] because he presumably gained at least to the extent of the bribe.

[34] *Mahesan v Malaysia Government Officers Co-operative Housing Society Ltd* [1979] A.C. 374; see Tettenborn, *Bribery, Corruption and Restitution—The Strange Case of Mr Mahesan* [illegible] 1979) L.Q.R. 68 and Needham, *Recovering the Profits of Bribery* (1979) 95 L.Q.R. 532.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VOYAGER SHIPHOLDING CORP.<br><br>Plaintiff,<br><br>- against -<br><br>HANJIN SHIPPING CO., LTD.,<br><br>Defendant. | 07 Civ. 11123 (GEL) |

**EXHIBIT 4 TO**
**DECLARATION OF DOUGLAS WILLIAM BATESON**
**IN SUPPORT OF PLAINTIFF'S**
**OPPOSITION TO MOTION FOR COUNTERSECURITY**
**DATED 11 JANUARY 2008**

THOMAS COOPER
11 Karneri Street Kolonaki
106 71 Athens Greece
T +30 210 361 4840 F +30 210 361 4842
E info@thomascooperlaw.com
www.thomascooperlaw.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

VOYAGER SHIPHOLDING CORP.,

Plaintiff,

- against -

HANJIN SHIPPING CO., LTD.,

Defendant.

---------------------------------------------------------------X

07 Civ. 11123 (GEL)

**DECLARATION OF**
**IN SUPPORT OF PLAINTIFF'S**
**OPPOSITION TO MOTION FOR COUNTERSECURITY**

I, Joel E. Varnal, Master of the vessel "KEN" declare under penalty of perjury of the laws of the United States of America as follows:

1. I am the Master of the Motor Vessel KEN, a single decker Bulk Carrier flying the Marshall Islands Flag with IMO Number 916 6871 and Official Number 1875.

2. I joined the vessel "KEN" in Zhanjiagang, China on July 26th 2005 as Master of the vessel. I remained the Master of said vessel continuously until 25/04/2006 when I disembarked in Houston, TX.

3. After a load of steel scrap cargo at the Port of Newark, New Jersey (sailed 17-Jan-2006), my vessel was ordered to proceed for discharge at Nemrut Bay, Turkey for the account of Mssrs Hanjin Shipping who were my Time Charterers at that time. I was also informed that this scrap cargo was going to be the last cargo under said time charter and that Hanjin Shipping would then redeliver the vessel to her Owners. The discharge at Nemrut Bay finished on February 17, 2006 at 1320h Local time (l/t) and the vessel sailed on February 18, 2006 at 2100h l/t.

4. Due to the fact that my vessel did not have immediate employment and were waiting for her next cargo ex Mylaki, Greece (fixed with Mssrs Eitzen, Denmark), at the request of my Owners, Mssrs Voyager Shipholding Corp, vessel's Class Society NKK carried out underwater survey (with certified divers) in lieu of drydocking. Said survey was effected on February 21, 2006. Specifically from 1030h to 1800h l/t. This completed the drydocking requirement of the vessel and no additional surveys were required.

5. As per the vessel's official logbook divers and class NKK came on board February 21, 2006 at 1010h l/t. Diving survey successfully completed on February 21, 2006 at 1800h l/t.

6. I hereby confirm that as said survey does not in anyway interfere with vessel's commercial operations (i.e. loading/discharging), it could just as easily been done in either Nemrut Bay or Mylaki, Greece (vessel loaded cement with loading arm, therefore divers would not interfere in any way).

Master MV KEN

Captain Joel E. Kamal

Executed on January 10, 2008 at DAMMAM, K.S.A.

WITNESS:

JOSE S. TINAPAY

CHIEF OFFICER