UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

VOYAGER SHIPHOLDING CORP.

                Plaintiff,

- against -

                                  07 Civ. 11123 (GEL)

HANJIN SHIPPING CO., LTD.

                Defendant,

---

### DECLARATION OF IAN RENFORD HAWKES

I, IAN RENFORD HAWKES, pursuant to Section 1746 of Title 28 of the United States Code, hereby declare and say the following under penalty of perjury:

1.    I am a solicitor of the Supreme Court of England and Wales and am a partner with the law firm of MFB Solicitors in London, England. I represent Defendant HANJIN SHIPPING CO., LTD. ("Hanjin") and I am fully familiar with the facts and circumstances of the disputes between the parties, the ongoing arbitration at London, England to resolve those disputes, and the proceedings before this Court to date. I make this Declaration in further support of Defendant's motion for counter-security and in reply to the opposition thereto filed by Plaintiff VOYAGER SHIPHOLDING CORP. ("Voyager").

2.    I have read and understood the contents of this Declaration and have assisted in its preparation.

2737922

2

3. Insofar as the contents of this Declaration are within my own knowledge they are true. Insofar as the contents of this Declaration are not within my own direct knowledge, they are true to the best of my information and belief.

4. The Voyager memorandum of law contains various assertions that the claims in respect of which Hanjin applies for counter-security are claims which were raised by Hanjin after Voyager commenced this New York action and *"solely as retaliation in response to plaintiffs' commencement of this action"*. That assertion is false. All of these claims were asserted in writing in detail by me to Mr Bateson in a fax sent on 20 November 2007. The two speed and performance claims had previously been described by me in a fax to Mr Bateson dated 19 October 2007. (Both faxes to Mr Bateson were without prejudice communications, so copies cannot be provided as attachments to this declaration). Voyager's action was not filed until December 10, 2007. Thus, it is inaccurate to suggest that Hanjin is using this action as a vehicle to *"retaliate"* against Voyager for having brought a Rule B attachment security proceeding against Hanjin.

5. Hanjin has recently discovered that the two speed and performance claims for which it currently seeks security were inadvertently omitted from the claims for which it obtained security via the arrest of Voyager's vessel M/V "KEN" in South Africa in June 2007. Further, as will be explained in detail below, Hanjin's claim for overpayment of hire in respect to the early redelivery of the vessel is also a legitimate claim only discovered subsequent to the arrest proceedings for which Hanjin is entitled to security.

6. Voyager's memorandum of law also places reliance on the fact that none of the three claims for which Hanjin seeks counter-security has been described in

273792

detail in the submissions in the ongoing London arbitration. That is correct but is not significant. The London arbitration proceedings between Hanjin and Voyager are at an extremely early stage. The submissions which have been made by Hanjin to Voyager relate to a single speed claim only. The majority of Hanjin's claims against Voyager have not been the subject of submissions in the London arbitration. I would further note that Voyager have their own claims in the arbitration (for which they filed the instant Rule B security application in New York) - but they have not put forth their claims in detail either.

7. At page 12 of the Voyager memorandum of law it is averred that Hanjin claim *"reimbursement of the full amount paid in settlement to the plaintiff in respect of the early re-delivery of the vessel"*. The nature of Hanjin's claim is described in more detail later in this declaration. The relevant dates are, however, that Hanjin re-delivered the vessel to Voyager on 18 February, earlier than the earliest permitted re-delivery date of 1 March. Hanjin has made a payment to Voyager in respect of Voyager's claim for damages for that early re-delivery. The payment covered the entire period from 18 February to 1 March. The sum which Hanjin claims to be entitled to recover is the sum paid in respect of the first part of this period, from 18 to 23 February. The payment made in respect of the period from 23 February to 1 March is not the subject of any recovery claim by Hanjin.

**The overpayment of hire claim**

8. The claim which was described in paragraphs 7 to 8 of Mr Unger's affidavit of 21 December as *"the overpayment of hire claim"* has been described by Mr Bateson in his declaration as a claim which must be brought by Hanjin as a claim in the tort of deceit. That is incorrect, for reasons which I will explain below.

9. Mr Bateson accurately states that the overpayment of hire claim arises because at around the time of redelivery of the vessel by Hanjin to Voyager on 18 February 2006, Voyager represented expressly or impliedly that following redelivery the vessel was unemployed for a period of slightly over 5 days because Voyager was unable to fix a charter for her during this time. The

273792

4

most convenient example of this representation is the telex from Voyager to Hanjin dated 27 February 2006, which is included in exhibit 1 to Mr Bateson's declaration.

10. I will not quote the wording of that 27 February telex here because I understand that Voyager do not dispute that this was intended by Voyager to be understood by Hanjin as a statement that the vessel was unemployed and idle from 1924 GMT 18 February to 2200 GMT on 22 February because Voyager had been unable to secure a charter for her during this time.

11. Documents received by Hanjin after the South African arrest in circumstances described in paragraph 6 of Mr Bateson's declaration mean, in my opinion, that there are reasonable grounds to doubt the accuracy of Voyager's representation that there was no available charter. I will comment below on exactly what those grounds are, in the section of this declaration headed *"The report to shareholders and the master's statement"*. Before doing so I should explain why I described Mr Bateson's characterisation of Hanjin's claim as *"incorrect"* in paragraph 8 above.

12. Hanjin's claim against Voyager arising in this situation can be formulated in various ways under English law. Those include the following:

    (1) That the early redelivery claim has not been fully and finally settled, as alleged by Mr Bateson. The payment made by Hanjin up to now is a provisional payment on account of its ultimate liability to Voyager under the charter accounting as a whole. Since the charter accounting as a whole has not been agreed, Hanjin remains able to challenge the accuracy of Voyager' individual claims which make up the charter accounting. It remains entitled to dispute its liability to Voyager to pay any damages or compensation for the period 18 to 23 February. For authority see for example paragraph 2-110 of *Chitty on Contracts*, a copy of which is attached in exhibit IRH1 and which states:-

        *"An agreement is also incomplete if it expressly provides that it is "subject to" the resolution of specified points; there is no contract in such a case until either those points are resolved or*

273792

> *the parties agree that their resolution is no longer necessary for the agreement to enter into contractual force".*

(2) Alternatively to (1), if the early redelivery claim has been fully and finally settled then that settlement agreement was made following a material factual misrepresentation by Voyager, the legal consequences of which are that Hanjin is entitled to damages and/or rescission of the settlement agreement. There is a general discussion of the broad principles applicable to misrepresentation at paragraph 6-001 of *Chitty on Contracts*, a copy of which is in IRH1.

(3) That the payment by Hanjin was caused by the inaccurate statement of Voyager that the vessel was idle and unemployed because Voyager was unable to secure charter business for her, entitling Hanjin to damages for the torts of deceit and/or negligent misstatement. See the very general discussion in paragraph 6-001 in *Chitty on Contracts*, as well as the extracts from the same text book which are exhibited to Mr Bateson's declaration.

13. At this time Hanjin has not reached a final decision on how its over payment of hire claim will be formulated if it cannot be settled, but it is likely that the three arguments listed above will be made as alternatives as is its right under English law.

**Legal issues arising out of Mr Bateson's declaration.**

14. Whilst the statements at paragraphs 11 and 12 of Mr Bateson's declaration about the law of a tort claim for fraud are correct as a matter of English law, he has not indicated how he relies on them to lead him to the conclusion that the claim is frivolous. There is a logical disconnect here, especially in light of the statements above as to Hanjin's ability to pursue the claim for overpayment of hire as a matter of English law.

15. The statement at paragraph 13 of Mr Bateson's declaration is generally accurate under English law. As he says, the general rule is that a positive act or representation is required. Hanjin relies on the positive acts and representations described in paragraphs 9-11 above.

**The report to shareholders and the master's statement**

16. I understand from Mr Bateson's declaration that in his opinion it is impossible to reasonably construe the 21 March 2006 circular to shareholders as indicating that (a) Voyager made the conscious decision following Hanjin's early redelivery to carry out the vessel's docking and intermediate surveys at a time when Hanjin would be paying hire for the vessel; and (b) Voyager chose not to look for alternative charter business during this time, instead seeking a charter into which the vessel could be delivered following completion of the docking and intermediate surveys. I believe that this is what Mr Bateson means when he describes Hanjin's claims as *"frivolous"* and having *"no prospect of success"*.

17. These are extremely serious allegations and are incorrect factually and legally. I have the following points in response.

18. My view is that the circular to shareholders is intended to describe an arrangement of exactly the type described above. The language and tone used in the memo is in my view intended to create the impression that advantage had been taken of the situation. Whilst Mr. Bateson tries to downplay this statement as mere *"puffery"* on the part of the managers, with respect, Mr Bateson has no first hand knowledge as to what was intended by the managers or their state of mind at the time the memo was written. Mr. Bateson's conclusory statement is nothing more than a guess—it is not evidence and should not be given any weight. Added to that, the paragraph of the report after that quoted by Mr Bateson says that the next charter was fixed after the renewal of the docking and intermediate surveys. This clearly suggests that Voyager intended all along to take advantage of the early re-delivery by Hanjin in order to carry out the surveys, for which the vessel otherwise would have been considered to be off-hire (ie. Owner would not be entitled to hire for the time spent performing the surveys which are owner's obligations). This conduct opens the door, as a matter of English law, to a challenge to the Voyager charter accounting and for overpayment of hire due to a material factual misrepresentation.

273792

19. The master's statement also does not provide conclusive evidence. He does not explain why the vessel went to Piraeus to perform the survey when, if he is correct, the vessel had no need to do so. Piraeus is not en route from Nemrut Bay to Myalaki and the call there would presumably have incurred port expenses. The master states that the surveyors could easily have carried out the inspection at Nemrut or at Myalaki: the question arises, why did Voyager not do exactly that? Further the master's description of the duration and complication of the survey is very different from its characterisation in the circular to shareholders. The master describes the operation as extremely straightforward and brief, the circular describes it as *"ordinarily very expensive"*. There is no certain explanation for this difference. Therefore, I disagree with Mr Bateson's apparent view that the only possible conclusion is that the master is correct and the circular is a *"puff"* in which Voyager has *"overplayed their hand"*.

20. Whilst Voyager contend that the master's statements are *"uncontroverted"*, this is only presently the case because the evidence which would conclusively prove the truth of the situation is in Voyager's hands and they have refused to provide it. Voyager knew from on or around 18 January 2006 that the vessel would be redelivered early. They had a substantial amount of time to make arrangements for the vessel's next employment. Their communications with charter brokers, with other potential charterers, and with Eitzen, the charterer to whom the vessel was delivered on 23 February will show whether or not charter business would have been available for the vessel prior to 23 February. Voyager could have provided this evidence now, but have elected not to do so.

21. Until the evidence described in paragraph 20 above – the evidence showing what owners did to fix the vessel for her next charter – is made available by Voyager, I cannot give any definitive opinion of the strength of the overpayment of hire claim. I am however able to conclusively say, even without having been able to review that evidence, that I absolutely disagree with Mr Bateson's allegation that the claim is frivolous and has no prospect of success. Neither assertion is in my view correct as a matter of English law.

**Further issues arising out of Mr Bateson's declaration**

22. Paragraph 17 of Mr Bateson's declaration contains an assertion that in Voyager's preliminary final hire statement Voyager *"simply claim for the time between the vessel's early re-delivery from the defendants up until the time they had secured new employment from her subsequent charterers, which delivery under the subsequent charter was prior to the minimum period of the charter with the defendant"*. This is incorrect. The sum claimed for early re-delivery in the final hire statement is US$ 174,708.80. The calculation of this figure is set out in Voyager's 27 February 2006 telex which is included in Exhibit 1 to Mr Bateson's declaration. The sum includes compensation from 18 February, the date of Hanjin's re-delivery to Voyager, right through to 1 March, the earliest date on which Hanjin could validly have re-delivered.

23. In paragraph 18 Mr Bateson suggests that Voyager made no express or implied statement about whether or not any diving or other survey had been conducted on the vessel in the period 18 to 23 February. That statement is correct and Hanjin does not suggest that Voyager did so. As explained above, however, Hanjin's claim is premised on the assertion that Voyager represented that they were unable to secure employment for the vessel in the period 18 to 23 February.

24. The final sentence of paragraph 21 of Mr Bateson's declaration asserts that Hanjin clearly did not and could not have relied on the circular to shareholders dated 21 March 2006 because it was only made available to them in the South African arrest proceedings in 2007. Again this is correct. Hanjin does not suggest that it relied on the 21 March 2006 circular to shareholders. It relied on the representations described in paragraphs 9 – 11 above. The importance of the 21 March 2006 circular is that it is evidence which suggests that those representations were inaccurate.

**Points arising out of Voyager's memorandum of law in opposition to Hanjin's motion for counter-security**

25. Voyager's memorandum of law asserts at page 5 that Voyager's claim against Hanjin arising out of the charter is US$ 85,750. Voyager have provided no final hire statement explaining how this figure is calculated.

273792

9

26. The hire statement which is attached to Mr Bateson's declaration as exhibit 1 is plainly inaccurate in at least the following respects:-

   (1) It fails to give credit to Hanjin for a substantial further hire payment. I am instructed by Hanjin that it paid a 37th hire instalment of US$ 400,891.94 on or around 8 March 2006.

   (2) The hire statement appended to Mr Bateson's declaration suggests that the total claimed by owners in respect of unrepaired stevedoring damage is US$ 35,000 plus US$ 40,750: US$ 75,750 altogether. In fact owners now acknowledge that the maximum claimed by them in respect of this item is US$ 65,000. The final statement provided by Mr Bateson therefore overstates owners' claim by US$ 10,750 in respect of this item.

   (3) Owners have agreed that charterers are entitled to a credit equal to 56 hours time arising out of the performance of the vessel on a passage from Liverpool to Penang in April 2005. At the charterparty hire rate, net of commission, the financial value of this deduction is 56/24 x US$ 25,500 = US$ 59,500, less 2.5% commission, US$ 1,487.50, a balance of US$ 58,012.50.

If these three items are taken into account then I calculate that Owners' maximum total claim against Hanjin is the figure set out in the hire statement attached to Mr Bateson's declaration, US$ 486,485.52, less the three adjustments described above, US$ 469,654.44 a balance of US$ 16,831.08.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated: London, England
   31 January 2008

_____

IAN RENFORD HAWKES

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

VOYAGER SHIPHOLDING CORP.

                Plaintiff,

- against -

                                  07 Civ. 11123 (GEL)

HANJIN SHIPPING CO., LTD.

                Defendant,

---

### EXHIBIT 1 TO DECLARATION OF
### IAN RENFORD HAWKES

2737922

THE COMMON LAW LIBRARY

# CHITTY ON CONTRACTS

TWENTY-NINTH EDITION

VOLUME I

**GENERAL PRINCIPLES**

LONDON
SWEET & MAXWELL
2004



been held that there was no contract precisely because there was no offer and acceptance[408]; and by those in which the terms of the contact have been held to depend on the analysis of the negotiations into offer, counter-offer and acceptance.[409]

### 6. INCOMPLETE AGREEMENT

**Agreement in principle only.**[410] Parties may reach agreement on essential matters of principle, but leave important points unsettled so that their agreement is incomplete. It has, for example, been held that there was no contract where an agreement for a lease failed to specify the date on which the term was to commence[411]; and that an agreement for sale of land by instalments was not a binding contract where it provided for conveyance of "a proportionate part" as each instalment of the price was paid, but failed to specify which part is to be conveyed on each payment.[412] An agreement is also incomplete if it expressly provides that it is "subject to" the resolution of specified points; there is no contract in such a case until either those points are resolved or the parties agree that their resolution is no longer necessary for the agreement to enter into contractual force.[413]

2-110

**Agreement complete despite lack of detail.** On the other hand, an agreement may be complete although it is not worked out in meticulous detail.[414] Thus an agreement for the sale of goods may be complete as soon as the parties have agreed to buy and sell, where the remaining details can be determined by the standard of reasonableness or by law. Even failure to agree the price is not

2-111

---

[408] *Hispanica de Petroleos SA v Vencedora Oceanica Navegacion SA (The Kapetan Markos N.L.)* [1987] 2 Lloyd's Rep. 323, 331 ("What was the mechanism of offer and acceptance?"); *The Aramis* [1989] 1 Lloyd's Rep. 213; Treitel [1989] L.M.C.L.Q. 162; *Taylor v Dickens* [1998] P.L.R. 806, 818 (doubted on another point in *Gillett v Holt* [2001] Ch. 210); *Schuldenfrei v Hilton* [1999] S.T.C. 821. The "offer and acceptance" analysis is also used in many of the arbitration cases discussed above, paras 2–005, 2–074 though it is viewed with scepticism in *The Multibank Holsatia*, above n.405, at 491 and in *Thai-Europe Tapioca Service Ltd v Seine Navigation Inc (The Maritime Winner)* [1989] 2 Lloyd's Rep. 506, 515.

[409] *e.g.* the "battle of forms" cases discussed above, para.2-032.

[410] Lücke (1967) 3 Adelaide L.Rev. 46.

[411] *Harvey v Pratt* [1965] 1 W.L.R. 1025; and see *Re Day's Will Trusts* [1962] 1 W.L.R. 1419.

[412] *Bushwall Properties Ltd v Vortex Properties* [1976] 1 W.L.R. 591; *cf. Hillreed Land v Beautridge* [1994] E.G.C.S. 55; *Avintar v Avill*, 1995 S.C.L.R. 1012; *Hadley v Kemp* [1999] E.M.L.R. 589 at 628; *London & Regional Development v TBI plc* [2002] EWCA Civ 355; *Spectra International plc v Tiscali Ltd* [2002] EWHC 2084 (Comm); [2002] All E.R. (D) 2009 (Oct); *Morgan Grenfell Development v Arrows Autosport Ltd* [2003] EWHC 333 (Ch); [2003] All E.R. (D) 417 (Feb); *Jordan Grand Prix Ltd v Vodafone Group plc* [2003] EWHC 1956 (Comm); [2003] 2 All E.R. (Comm) 864; *Compagnie Nogar D'Importation et D'Exportation SA v Abacha* [2003] EWCA Civ 1100; [2003] 2 All E.R. (Comm) 915.

[413] *Electrosteel Castings Ltd v Scan-Trans Shipping & Chartering Co* [2002] EWHC 1993 (Comm); [2002] 2 All E.R. (Comm) 1064 at [24].

[414] *First Energy (UK) Ltd v Hungarian International Bank Ltd* [1993] 2 Lloyd's Rep. 195, 205.

# CHAPTER 6

# MISREPRESENTATION[1]

|     |     | PARA. |
| --- | --- | --- |
| 1.  | In general | 6–001 |
| 2.  | What constitutes effective misrepresentation | 6–004 |
|     | (a) False statement of fact | 6–004 |
|     | (b) Statement by or known to other party | 6–020 |
|     | (c) Other requirements | 6–027 |
| 3.  | Damages for misrepresentation | 6–041 |
|     | (a) Fraudulent misrepresentation | 6–042 |
|     | (b) Negligent misrepresentation | 6–066 |
|     | (c) Innocent misrepresentation | 6–092 |
| 4.  | Rescission for misrepresentation | 6–100 |
|     | (a) General | 6–100 |
|     | (b) *Restitutio in integrum* | 6–112 |
|     | (c) Other bars to remedy of rescission | 6–120 |
| 5.  | Exclusion of liability for misrepresentation | 6–131 |
| 6.  | Contracts *uberrimae fidei* | 6–139 |

## 1. IN GENERAL

**Preliminary.** The modern law relating to misrepresentation is a somewhat   6–001
complex amalgam of rules of common law, equity and (since the coming into force of the Misrepresentation Act 1967)[2] statute law. It is also complicated by the fact that misrepresentation may constitute an actionable tort in certain circumstances, as well as providing grounds for relief in the law of contract. Prior to the enactment of the Misrepresentation Act 1967, the position broadly speaking was that a misrepresentation which induced a person to enter into a contract gave the representee the right to rescind the contract, subject to certain conditions, but generally gave him no right to damages unless the misrepresentation was fraudulent, or, in some cases, negligent, or unless the misrepresentation had contractual force. Since the coming into force of the Misrepresentation Act the representee will always be able to claim damages for negligent misrepresentation in circumstances in which he could have recovered damages had the misrepresentation been fraudulent. In addition the Act gives the court a discretion to refuse to permit a representee to rescind a contract, but to award him damages in lieu of rescission, if the misrepresentation is negligent or wholly innocent; but it

---

[1] See Allen, *Misrepresentation* (1988); Cartwright, *Unequal Bargaining* (1991), Ch.3; Cartwright, *Misrepresentation* (2002).
[2] The Act was based on the recommendations in the Law Reform Committee's Tenth Report, Cmnd. 1782, (1962) but with one important change, as to which see below, para.6–130. For a full appraisal of the Act, see Atiyah and Treitel, "Misrepresentation Act 1967" (1967) 30 M.L.R. 369.

[429]

6-001            CHAP. 6—MISREPRESENTATION

leaves the representee with an absolute right to rescind where the misrepresentation is fraudulent. The Act of 1967 does not, however, alter the rules as to what constitutes an effective misrepresentation. It has been said that the rules on misrepresentation have developed piecemeal, and that some of the rules which were developed when the remedies for misrepresentation were narrower than they now are, may not now operate well. Given the present state of the law, especially in the light of the decision in *Royscot Trust Ltd v Rogerson*[3] that the rules of fraud attach to liability for "negligent" misrepresentation under Misrepresentation Act 1967, s.2(1), the court should not be too ready to find that a misrepresentation has been made.[4]

6-002      **Misrepresentation and contractual terms.** Before the Misrepresentation Act was passed, the law relating to misrepresentation was generally concerned solely with misrepresentations made before the contract was entered into, and not to misrepresentations which actually constituted contractual terms. Although the word "misrepresentation" is literally applicable to a contractual term which consists of a false statement of fact (as opposed to a promise of future conduct), the term was commonly confined to misrepresentations which did not constitute contractual terms, simply because the law relating to contractual terms (whether promises as to future conduct or misrepresentations of fact) differed from the law relating to misrepresentations which were not contractual terms. Moreover, there was also some authority for the proposition that if a misrepresentation was made before a contract was entered into, and the misrepresentation was subsequently incorporated into the contract as a contractual term, the law relating to misrepresentation was not applicable, and the case had to be dealt with as one involving a contractual term and nothing else.[5] Since the passing of the Act of 1967 this is no longer the case, and it will often be necessary in any one situation to inquire carefully as to the effect of a misrepresentation both as a pre-contractual statement, *and* as a contractual term. Where these effects differ (as they often do) it is in some cases a matter of considerable difficulty to determine with any certainty the effect of the Misrepresentation Act on the law relating to contractual misstatement.[6]

6-003      **Terminology.** For many years it was usual to divide misrepresentations into two categories, fraudulent and innocent misrepresentation. The latter category included negligent misrepresentations, for, at least until the decision of the House of Lords in *Hedley Byrne & Co Ltd v Heller and Partners Ltd*,[7] it was thought that there was generally no difference between a negligent and a completely innocent misrepresentation. But since that decision, and the passing of the Misrepresentation Act, which also distinguishes in some respects between negligent and completely innocent misrepresentations, it has clearly become necessary to recognise that there are now three categories of misrepresentations. It

---

[3] [1991] 2 Q.B. 297; see below, para.6-069.
[4] *Avon Insurance v Swire* [2000] 1 All E.R. (Comm) 573, 633, Rix J.
[5] *Pennsylvania Shipping Co v Compagnie Nationale de Navigation* [1936] 2 All E.R. 1167, 1171; *Leaf v International Galleries* [1950] 2 K.B. 86.
[6] Below, paras 6-105 and 6-137.
[7] [1964] A.C. 465.